## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOHN DOE 1, a minor, by and through his parent and natural guardian JANE DOE 1; JOHN DOE 2, a minor, by and through his parent and natural guardian JANE DOE 2; JOHN DOE 3, a minor, by and through his parent and natural guardian JANE DOE 3; on behalf of themselves and all others similarly situated<br><br>    Plaintiffs,<br><br>       v.<br><br>NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; EDDIE M. BUFFALOE, JR., Secretary of the North Carolina Department of Public Safety, in his official capacity; WILLIAM L. LASSITER, Deputy Secretary of the Division of Juvenile Justice and Delinquency Prevention, in his official capacity; PETER BROWN, Facility Director of the Cabarrus Regional Juvenile Detention Center, in his official capacity,<br><br>    Defendants. | **COMPLAINT – CLASS ACTION**<br>_____-CV-_____ |

## CLASS ACTION COMPLAINT

Plaintiffs John Doe 1, John Doe 2, and John Doe 3 on behalf of themselves and all others similarly situated, by and through their undersigned counsel and parents and natural guardians, hereby file this Class Action Complaint against Defendants North

Carolina Department of Public Safety, Eddie M. Buffaloe, Jr., William L. Lassiter, and Peter Brown (collectively, the "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1. Over a decade ago, the Attorney General's National Task Force on Children Exposed to Violence addressed the harmful effects of solitary confinement of children, stating:

> Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement. A 2002 investigation by the U.S. Department of Justice showed that juveniles experience symptoms of paranoia, anxiety, and depression even after very short periods of isolation. Confined youth who spend extended periods isolated are among the most likely to attempt or actually commit suicide. One national study found that among the suicides in juvenile facilities, half of the victims were in isolation at the time they took their own lives, and 62 percent of victims had a history of solitary confinement.[1]

2. This practice was so prevalent and damaging that after an investigation by the United States Justice Department, President Obama banned the use of solitary confinement on juveniles in federal prisons in 2016. President Obama stated that

> [r]esearch suggests that solitary confinement has the potential to lead to devastating, lasting psychological consequences. It has been linked to depression, alienation, withdrawal, a reduced ability to interact with others and the potential for violent behavior. Some studies indicate that it can worsen existing mental illnesses and even trigger new ones. Prisoners

---

[1] Robert L. Listenbee, Jr. et al., *Report of the Attorney General's National Task Force on Children Exposed to Violence* at 178 (Dec. 12, 2012), https://www.justice.gov/sites/default/files/defendingchildhood/cev-rpt-full.pdf.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 2 of 57

in solitary are more likely to commit suicide, especially juveniles and people with mental illnesses.

The United States is a nation of second chances, but the experience of solitary confinement too often undercuts that second chance. Those who do make it out often have trouble holding down jobs, reuniting with family and becoming productive members of society.[2]

3. Recognizing the harmful effects solitary confinement have on juveniles, over seven years ago, in June 2016, Defendant North Carolina Department of Public Safety ("NCDPS") announced the end to solitary confinement for inmates in adult correctional facilities who were under 18 years of age.

4. In that announcement, Defendant Lassiter stated: "We also used to lock kids in their room for a long time, and put them in isolation. We don't do that anymore. We find that kids that are locked in their rooms, they're not growing. They're not getting the therapy. They're not trying to use the skills we're trying to teach them."[3]

5. Despite the overwhelming consensus that solitary confinement has devastating and long-term effects on juveniles, including depression, anxiety, suicide, psychosis, and post-traumatic stress disorder, and despite the abandonment of solitary confinement for juveniles throughout the country, NCDPS has embraced a policy, custom, and practice of solitary confinement of children as young as ten years old, who have not

---

[2] Barack Obama, *Why We Must Rethink Solitary Confinement*, Wash. Post (Jan. 25, 2016), attached as Exhibit 1.

[3] Zak Dahlheimer, *The Dark Past of the Stonewall Jackson Youth Development Center*, CBS17 (Nov. 24, 2019), www.cbs17.com/news/the-dark-past-of-the-stonewall-jackson-youth-development-center/.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 3 of 57

had their cases adjudicated yet, at juvenile detention centers across the state of North Carolina, including the Cabarrus Regional Juvenile Detention Center (the "Cabarrus Juvenile Jail"), for nearly 24 hours a day.

6. As a result of the persistent use of solitary confinement for children, NCDPS is also denying children in their custody educational services, further harming their development.

7. At one such juvenile detention center—the Cabarrus Juvenile Jail—children are regularly confined into small cells for 23 hours a day or more for weeks or even months without any valid reason. These children, many of whom already have mental health challenges, have little to nothing to do in their cells to advance their development and growth: no meaningful human interaction, no education or programming to address their developmental, physical, and clinical needs, and limited reading materials. The children are given 10 minutes a day to shower and, on some days, may be allowed out of their cell for 30 minutes of "recreation time," or a 10-minute phone call, or to fill their water bottle, or a half hour or hour of "school", or to clean up the jail.

8. At another juvenile detention Center—the Dillon Regional Juvenile Detention Center (the "Dillon Juvenile Jail")—children are let out of their cells for 20 minutes per day to shower and make a phone call. They are locked in their cell for the other 23 hours and 40 minutes of the day. The children's only education is crossword puzzles and word searches slipped under their cell door a few times a week.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 4 of 57

9. Defendants' policy, custom, and practice of solitary confinement has been going on so long many of the children detained do not even realize there is anything other than solitary confinement—that is, they think that being locked in their cell for over 23 hours a day is normal practice when being detained prior to adjudication of their case.

10. The children are so desperate to leave their cells for any amount of time that some have resorted to offering to mop floors or clean the jail just to get out of their cells.

11. Predictably, keeping the children locked in their cells for nearly 24 hours a day has also resulted in the children acting out because of their frustration and anger at the situation.

12. Instead of addressing the root cause of the problem, Defendants have responded by imposing further restrictions on the children when they act out, placing them in what they call "Temporary Confinement" or "TC" where Defendants take away the few remaining humane aspects of their confinement for days at a time, such as putting the flap down on the small window on their door so they cannot see out of their cell or turning off the water in their cell so they cannot flush the toilet or use the sink.

13. Solitary confinement has been proven dangerous for all ages, but is especially harmful for juveniles due to their developmental vulnerabilities. It is well established that isolating children and thereby preventing children from having meaningful contact with others increases their risk of suicide and self-harm. For those children that have a mental health challenge or disability, the risk of harm can be even greater. Despite the known dangers to the children in their care and their admission of the harm that solitary

confinement causes children, Defendants run the juvenile jails in North Carolina with inadequate staffing that predictably results in children being locked in their cells nearly 24 hours a day. Defendants have chosen this route in the face of public scrutiny and despite open discussions of the current conditions.

14. Plaintiffs, on behalf of themselves and all others similarly situated, bring this action to redress the violations of their civil, statutory, and constitutional rights by Defendants while acting under color of state law. Plaintiffs challenge Defendants' policies and practices of using solitary confinement at juvenile detention facilities across the state of North Carolina, including the Cabarrus Juvenile Jail and the Dillon Juvenile Jail. These children have suffered immense physical, social, and psychological harm from solitary confinement, and as such, Plaintiffs seek declaratory and injunctive relief demanding that Defendants cease the challenged unconstitutional policies and practices.

## JURISDICTION AND VENUE

15. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for Defendants' violation of their civil rights under the Eighth and Fourteenth Amendments to the United States Constitution.

16. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides federal district courts original jurisdiction in civil actions arising under the U.S. Constitution and the laws of the United States, and 28 U.S.C. § 1343(a)(3), which provides federal district courts original jurisdiction in civil actions to

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 6 of 57

redress the deprivation under color of any State law, of any right secured by the U.S. Constitution.

17.     This Court has personal jurisdiction over Defendants as residents of North Carolina.

18.     Venue is proper under 28 U.S.C. § 1391(b) because the Cabarrus Juvenile Jail is located in the Middle District of North Carolina and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Middle District of North Carolina.

19.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

**PARTIES**

**The Named Plaintiffs**

20.     Plaintiff John Doe 1 is a black 15-year-old male incarcerated at the Cabarrus Juvenile Jail. John Doe 1 has been at the Cabarrus Juvenile Jail since November 2023 and has not been allowed out of his cell other than to shower, go outside for recreation time (also called "rec time"), make a phone call, or get water. John Doe 1 appears in this action through his mother and guardian Jane Doe 1.

21.     Plaintiff John Doe 2 is a black 16-year-old male incarcerated at the Cabarrus Juvenile Jail. John Doe 2 has been at the Cabarrus Juvenile Jail since November 2023 and has not been allowed out of his cell more than an hour in a day since he arrived. John Doe 2 appears in this action through his mother and guardian Jane Doe 2.

22.     Plaintiff John Doe 3 is a black 17-year-old male incarcerated at the Cabarrus Juvenile Jail.  John Doe 3 has been at the Cabarrus Juvenile Jail since December 2023 and has not been allowed out of his cell more than an hour in a day since he arrived. John Doe 3 appears in this action through his mother and guardian Jane Doe 3.

**The Defendants**

23.     Defendant North Carolina Department of Public Safety is the state agency that acts in its administrative capacity to operate ten juvenile detention centers across North Carolina, including the Cabarrus Juvenile Jail.  NCDPS is responsible for, among other things, the administration of educational services and programs for children in its custody in juvenile detention centers awaiting adjudication of their case.

24.     Defendant Eddie M. Buffaloe, Jr. is Secretary of the North Carolina Department of Public Safety, the state agency designed to operate the juvenile detention facilities.  Defendant Buffaloe is named as a defendant in his official capacity.  As Secretary of NCDPS, Defendant Buffaloe is in charge of the administration and supervision of NCDPS and had at all material times overall supervisory authority of the ten juvenile detention centers in North Carolina operated by NCDPS, including the Cabarrus Juvenile Jail, and was and is acting under color of law.

25.     Defendant William L. Lassiter is the Deputy Secretary of the Division of Juvenile Justice and Delinquency Prevention ("DJJ"), a division of NCDPS.  Defendant Lassiter is named as a defendant in his official capacity.  As Deputy Secretary of DJJ, Defendant Lassiter is in charge of the administration and supervision of juvenile

corrections within NCDPS and had at all material times overall supervisory authority of the ten juvenile detention centers operated by NCDPS in North Carolina, including the Cabarrus Juvenile Jail, and was and is acting under color of state law.

26.     Defendant Peter Brown is the Facility Director of the Cabarrus Juvenile Jail. Defendant Brown is named as a defendant in his official capacity. Defendant Brown is responsible for the operation, staffing, and oversight at the Cabarrus Juvenile Jail.

<u>**FACTS**</u>

<u>**North Carolina Juvenile Detention Centers**</u>

27.     In North Carolina, NCDPS provides care and oversight for juveniles upon adjudication as delinquent for commission of offenses that would be criminal if committed by adults.

28.     NCDPS also administers and supervises facilities that house juveniles awaiting adjudication for commission of offenses that would be criminal if committed by adults (juvenile detention centers) and juveniles who have been adjudicated delinquent (youth development centers or "YDC").

29.     In North Carolina, Defendant NCDPS administers ten juvenile detention centers:  Alexander Regional Juvenile Detention Center; Cabarrus Juvenile Jail; Chatham Detention; Cumberland Regional Juvenile Detention Center; Dillon Juvenile Jail; Lenoir Detention; New Hanover Regional Juvenile Detention Center; Pitt Regional Juvenile Detention Center; Richmond Jenkins Juvenile Detention Center; and Wake Regional

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 9 of 57

Juvenile Detention Center. There are also four county-operated juvenile detention centers in North Carolina.[4]

30. NCDPS is responsible for the care and oversight of children at these juvenile detention centers.

31. Juvenile detention facilities in North Carolina house children between the ages of 10 and 17.

32. In 2021, 2,423 children were held at juvenile detention centers in North Carolina.[5]

33. The Cabarrus Juvenile Jail, located in Concord, North Carolina, is a 62-bed juvenile detention facility that houses children prior to adjudication of their cases, pending disposition after adjudication of their cases, or pending placement after disposition of their cases. It is overseen by Defendant Peter Brown, the Facility Director, who is responsible for the operation, staffing, and oversight.

34. Cabarrus County also has a YDC located right next to the Cabarrus Juvenile Jail that houses children upon adjudication as delinquent. To relieve the overcrowding at

---

[4] Juvenile Detention Centers, NCDPS (last visited Jan. 7, 2024), https://www.ncdps.gov/our-organization/juvenile-justice/juvenile-facility-operations/juvenile-detention-centers#Alexander-1398.

[5] Ryan Shaffer, *NC Juvenile Justice System Facing Critical Shortage and Unsafe Conditions for Youth and Staff at Detention Centers*, PRE News (May 18, 2023), https://www.publicradioeast.org/pre-news/2023-05-18/nc-juvenile-justice-system-facing-critical-shortage-and-unsafe-conditions-for-youth-and-staff-at-detention-centers.

the Cabarrus Juvenile Jail, certain children have been incarcerated pre-adjudication at the Cabarrus YDC (the "Cabarrus Juvenile Prison").

35.    A significant number of children housed in the Cabarrus Juvenile Jail come from Mecklenburg County.

36.    Mecklenburg County did not have a juvenile detention center from 2010 to 2019. Mecklenburg County closed the detention center to save money during the recession. But it reopened when North Carolina's Raise the Age law took effect in 2019. The State of North Carolina entered into a 3-year contract with the Charlotte Mecklenburg Sheriff's Office to operate a juvenile detention facility at Jail North.[6] It was the largest in the state, accommodating up to 72 children.

37.    Mecklenburg County Sheriff Garry McFadden decided to close the juvenile detention center at Jail North by December 1, 2022 to, in part, bulk up staffing at its adult jail uptown and save money.[7]

38.    The children at Jail North were transferred to various detention facilities within North Carolina, with the vast majority going to the Cabarrus Juvenile Jail.

39.    The Dillon Juvenile Jail, located in Butner, North Carolina, is a 35-bed juvenile detention facility that houses children prior to adjudication of their cases.

---

[6] Lisa Worf, *Mecklenburg Juvenile Detention Center's Closing Separates Families, Burdens Other Facilities*, WFAE (Dec. 1, 2022), https://www.wfae.org/charlotte-area/2022-12-01/meck-juvenile-detention-centers-closing-separates-families-burdens-other-facilities.

[7] *Id.*

40.     NCDPS administers a state subsidy program to pay a county that provides juvenile detention services and meets State standards a certain per diem per juvenile. In general, this per diem is 50% of the total cost of caring for a juvenile within the county and 100% of the total cost of caring for a juvenile from another county. N.C.G.S. § 143B-820.

41.     Therefore, there is an economic incentive for detention centers to allow children from other counties to be jailed at their detention center.

42.     North Carolina state statute requires that any county placing a juvenile in a detention facility in another county shall pay 50% of the total cost of caring for the juvenile to NCDPS. *Id.*

43.     North Carolina allows detention of children 10 years of age or older before they are adjudicated under certain circumstances. Children detained at juvenile detention centers in North Carolina, including the Cabarrus Juvenile Jail and Dillon Juvenile Jail, have, for the most part, not been adjudicated delinquent or convicted of the offense for which they were detained, but rather are locked in the facility pending hearing, disposition, or placement.

44.     Prior to adjudication, North Carolina state statute requires the court to review the need for continued secure custody and so children have frequent court appearances.

45.     Children transferred to Superior Court in North Carolina for trial as adults are housed in juvenile detention pending trial if they are not released on bond.

46.     Children in the juvenile justice system are different from adults in the criminal justice system; children who are adjudicated delinquent are not convicted of

crimes. Children are adjudicated delinquent in non-criminal proceedings and are not provided with the same procedural protections as adults.

47.     The primary goal of delinquency proceedings is to rehabilitate the child, not to punish.

48.     Juvenile detention centers are intended to be temporary facilities where a child will stay while waiting to go to court or until a placement can be arranged.

**NCDPS Obligations**

49.     Under North Carolina state statute, "[i]n order to provide any juvenile in a juvenile facility with appropriate treatment according to that juvenile's need, [NCDPS] shall be responsible for the administration of statewide educational, clinical, psychological, psychiatric, social, medication, vocational, and recreational services or programs." N.C.G.S. § 143B-815.

50.     NCDPS touts that "[j]uvenile detention centers provide quality services and programs for juveniles based on their individual needs, to give youths opportunities for positive behavioral change and development."[8]

51.     NCDPS also touts that "[j]uvenile detention centers provide a safe, secure, controlled and humane environment for juveniles and staff . . . and are staffed to provide appropriate oversight."[9]

---

[8] Juvenile Detention Centers, *supra* note 4.

[9] *Id.*

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 13 of 57

52.    NCDPS states that "youths are provided with basic educational services that mirror the course of study adopted by the N.C. Department of Public Instruction."[10]

53.    Far from the rosy public statements put out by NCDPS, the children locked in juvenile detention centers across North Carolina are not receiving "quality services," are not in a "humane environment," and are not receiving "basic educational services".

**Solitary Confinement at Juvenile Detention Centers in North Carolina**

54.    Children at juvenile detention centers across North Carolina are being locked in their cells 23 to 24 hours a day every day.

55.    Depending on the detention center, the children may be allowed out of their cells to: take a 10 minute shower; for 30 minutes of rec time twice a week; for 10 minutes to make a phone call; sometimes, if they ask, to go fill their water bottle or to clean an area of the juvenile detention center; or to go to "school", which typically lasts a half hour to an hour. Periodically the guards may allow a few children at a time to leave their cells for 30-60 minutes.

56.    Other than that, children are kept in their locked cell every other minute of the day.

57.    Upon information and belief, this solitary confinement has been going on statewide for at least approximately one year.

---

[10] *Id.*

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 14 of 57

**Cabarrus Juvenile Jail**

58.     The Cabarrus Juvenile Jail is one of ten juvenile detention centers in North Carolina. It has two buildings with 62 total beds. It consists of approximately 62 cells arranged on one floor and houses only juveniles. A typical cell is no larger than 8 by 10 feet and contains a toilet, sink, and small window to the outside. Each cell holds one child. The door to each cell is metal with only a panel slot to the outside through which food trays are passed and a small narrow window. The cells have no phones, radios, or televisions.

59.     The cells in the Cabarrus Juvenile Jail are arranged around a common area with tables, chairs, and a television.

60.     The population of children detained at the Cabarrus Juvenile Jail varies over time, though upon information and belief there are typically approximately 62 children at the Cabarrus Juvenile Jail on any given day.

61.     Children are often held at the Cabarrus Juvenile Jail for weeks at a time. It is common for children to be locked in the Cabarrus Juvenile Jail for multiple months.

62.     Children at the Cabarrus Juvenile Jail are locked in their cells for 23 or more hours a day. They are allowed out of their cells for one hour or less per day.

63.     NCDPS decides what the children are let out of their cell to do. On most days, the children get out of their cell for a 10-minute shower. Twice a week the children are let out of their cells for 30 minutes of rec time. Sometimes the children are let out of their cells to make a phone call to their family. Other times NCDPS employees allow the children out of their cells to fill their water bottles or clean areas of the Cabarrus Juvenile

Jail. Sometimes the children are let out of their cell to attend "school," which lasts a half hour to an hour.

64. At the Cabarrus Juvenile Jail, if the children take longer than 10 minutes in the shower, they have to shower using the sink in their room the next day.

65. For some children at the Cabarrus Juvenile Jail, the solitary confinement is made worse by the fact that there are not always mattresses available for the beds in cells for newly detained children. As a result, children sometimes are forced to sleep for multiple nights on a piece of plastic that serves as a bed frame in the cells.

66. Because they are not allowed out of their cells for more than a few minutes a day, those children without mattresses are also faced with a decision during the day of whether to lay on the plastic bed frame, sit on the plastic bed frame, lay or sit on the dirty jail floor, or be forced to stand in their cell all day.

67. Children locked in their cells have virtually no meaningful human interaction. Sometimes they can talk to other children through the walls, but risk punishment for doing so.

68. Defendants also run the Cabarrus Juvenile Prison, located right next door to the Cabarrus Juvenile Jail, for children who have been adjudicated delinquent.

69. Because of the lack of open cells at the Cabarrus Juvenile Jail, at certain points in 2023 children who have not yet had their cases adjudicated and would otherwise be held at the Cabarrus Juvenile Jail have been held at the Cabarrus Juvenile Prison. Children who have been held at the Cabarrus Juvenile Prison and then later held at the

Cabarrus Juvenile Jail have asked the guards to be transferred to the Cabarrus Juvenile Prison because there they were let out of their cells on a regular basis.

70.    Upon information and belief, the Cabarrus Juvenile Prison allows children out of their cells on a regular basis in part because various public interest organizations in North Carolina have oversight authority of the Cabarrus Juvenile Prison and regularly inspect the conditions of children detained in the Cabarrus Juvenile Prison.

71.    Upon information and belief, such inspections do not occur at the Cabarrus Juvenile Jail.

### **Dillon Juvenile Jail**

72.    The Dillon Juvenile Jail is one of ten juvenile detention centers in North Carolina.  It has 35 beds and only houses juveniles.  A typical cell is approximately 7 by 9 feet and contains a toilet, sink, and small window with bars to the outside of the jail.  The door to each cell is metal with only a narrow rectangle window to the inside of the jail. Black tape covers the small window to the inside of the jail so the children cannot see out.

73.    Children locked up at the Dillon Juvenile Jail report that there are sometimes black maggots in the toilet in their cell.  Instead of addressing the problem, Defendant NCDPS tells the children just not to use the toilet for a day or two.  The toilet in each child's cell is the only toilet the child has access to because the children are locked in their cells nearly 24 hours a day.

74.    The cells in the Dillon Juvenile Jail are arranged around a day room with tables, chairs, and a television.

75.    Children are often held in the Dillon Juvenile Jail for weeks at a time.  It is common for children to be locked in the Dillon Juvenile Jail for multiple months.

76.    Children at the Dillon Juvenile Jail are locked in their cells for more than 23 hours a day.  On most days, the children are allowed out of their cell to shower for 10 minutes.  Some days the children are not allowed to leave their cell to even shower.

77.    The children at the Dillon Juvenile Jail, up until approximately December 19, 2023, were allowed to use the phone for 10 minutes each day.  Beginning on December 19, 2023, Defendant NCDPS put a new policy in place at the Dillon Juvenile Jail limiting telephone use to once a week.

78.    The children at the Dillon Juvenile Jail are not given any rec time.  The children do not go outside unless they are transported to a court hearing.

79.    The children use the faucet in the sink in their cell for drinking water.  They are not allowed out of their cell to get water.

80.    The only time the children can interact with the other children is at night when they yell hoping that the other children can hear them.

81.    In at least one case, a child was held at the Dillon Juvenile Jail in these conditions for 50 days straight.

82.    Some children being held at the Dillon Juvenile Jail, who have not even been adjudicated of a crime, say being at the Dillon Juvenile Jail is worse than prison.

83.     The conditions at the Cabarrus Juvenile Jail and Dillon Juvenile Jail are very different than the conditions children experienced when held at Jail North before it closed at the end of 2022.

84.     Children describe the conditions at Jail North as much better than the Cabarrus Juvenile Jail.

85.     Upon information and belief, while at Jail North, the children were assigned one of three levels.  Bronze level meant that the child got 30 minutes outside his cell every day and a 5-minute call with his family.  Silver level meant that the child could stay outside his cell all day long and could have a 10-minute call with his family.  Gold level meant that the child could stay outside his cell all day long and could have a 15-minute call with his family.

86.     Upon information and belief, children on silver or gold level could shower whenever they wanted to, eat meals in the pod at small tables with other children, and go outside whenever they wanted during the day to engage in activities such as basketball.

87.     In addition, upon information and belief, Jail North provided Charlotte Mecklenburg School teachers to teach Charlotte Mecklenburg School classes in a classroom setting.

**The Conditions at the North Carolina Juvenile Detention Centers Are a Direct Result of Policies, Customs, and Practices Defendants Developed**

88.     The policy, custom, and practice of near 24-hour per day solitary confinement has developed as a consistent and deliberate policy, custom, and practice over an extended period of time under the leadership of Defendants Buffaloe and Lassiter, who

are responsible for overseeing the day-to-day operation of the juvenile jails, and under the oversight of NCDPS, which has policy making authority for the juvenile jails and exercises hiring authority and oversight. Defendants have subjected children to these conditions with no legitimate penological government purpose and in the face of condemnation of these practices.

89. Upon information and belief, the policy, custom, and practice of locking children in their cells nearly 24 hours a day experienced by children in juvenile jails is a direct result of a policy and practice of understaffing the juvenile detention centers that has been established by Defendant NCDPS and overseen and implemented by Defendants Buffaloe, Lassiter, and Brown.

90. The staffing shortages are a regular topic of discussion in the press, yet Defendants have denied that solitary confinement is being used on children regularly.

**Children Are More Vulnerable to the Harms of Solitary Confinement**

91. Solitary confinement, also known as segregation or isolation, came into frequent use in adult and juvenile detention facilities beginning in the 1980s as the number of incarcerated persons increased dramatically in the United States.

92. Over the last approximately ten years, however, the deleterious psychological impact of solitary confinement has become much clearer.

93. The National Commission on Correctional Health Care defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."[11]

94. Similarly, the Association for the Prevention of Torture defines solitary confinement as "keeping an inmate alone in a cell for over 22 hours a day."[12] That organization has concluded that "children, persons suffering from mental health disabilities, pregnant and nursing women, or women detained with their children should never be subjected to solitary confinement."[13]

95. Because juveniles are still developing psychologically, neurologically, and socially, they are especially susceptible to psychological harm when they are isolated from other people.

96. Juveniles in isolation face a significant risk of serious mental harm. Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. Research shows that almost all suicides within juvenile correctional facilities occur when the child is in some type of

---

[11] Position Statement: Solitary Confinement (Isolation), Nat'l Commission on Correctional Health Care (adopted April 10, 2016), https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf.

[12] Solitary Confinement, Ass'n for the Prevention of Torture (last visited Jan. 7, 2024), https://www.apt.ch/knowledge-hub/dfd/solitary-confinement.

[13] *Id.*

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 21 of 57

isolation and that the majority of juveniles who commit suicide had a history of being placed in isolation.

97. These mental health concerns can cause long-term harm. Solitary confinement can lead to chronic conditions like depression, which in teenagers can manifest as anger or as self-harm. In addition, children who experience depression and anxiety in their teenage years are at a higher risk for presenting with these diagnoses again. Damage associated with low self-esteem, vegetative features, and hopelessness associated with depression can similarly be long standing. Depression has a 10% or 15% mortality rate associated with it. Solitary confinement increases the risk of suicide substantially compared to the general population.

98. Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred. Unlikely to trust others, juveniles emerging from solitary have trouble forming therapeutic relationships necessary to address mental health concerns resulting from solitary confinement.

99. Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm. In the adolescent brain, the connections between the frontal lobe and the mid-brain have not fully developed. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric conditions like paranoia and anxiety. Trauma from solitary confinement has a high likelihood of causing these permanent changes.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 22 of 57

100.    The risk of harm is made worse by the disproportionately high incidence of preexisting trauma and mental health concerns among juveniles in the criminal justice system.  Research shows that more than 60% of the youth in correctional settings are experiencing major mental health challenges.[14]  Stress from isolation can compound past trauma and exacerbate mental health challenges and disabilities.

101.    For those juveniles experiencing mental health challenges and disabilities, the risk of harm is especially great.  People with mental health challenges and disabilities often experience cognitive deficits in their brain structure or biochemistry.  They often have weakened defensive mechanisms, are at a higher risk for further mental health complications, and are more susceptible to significant trauma from isolation.  Trauma from isolation will be more long-lasting for those with mental health challenges or disabilities than those without.

102.    Studies have shown that solitary confinement lasting more than 15 days may cause irreversible damage.[15]

---

[14] Minors in Custody – Mental Health Issues, Child Crime Prevention & Safety Center (last visited Jan. 7, 2024), https://childsafety.losangelescriminallawyer.pro/minors-in-custody-mental-health-issues.html#:~:text=Mental%20Health%20Concerns%20and%20Juvenile%20Justice&text=In%20fact%2C%20studies%20have%20shown,also%20have%20substance%20abuse%20issues.

[15] U.N. Secretary-General, Interim Report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment, U.N. Doc. A/66/268 at 9 (Aug. 5, 2011), https://immigrantjustice.org/sites/default/files/2011_08%2520United%2520Nations%2520Report%2520on%2520Solitary%2520Confinement.pdf.

103.    The American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care all have called on correctional facilities to halt the use of solitary confinement of juveniles.

104.    In 2012, the American Academy of Child and Adolescent Psychiatry issued a policy statement opposing the use of solitary confinement for juveniles in correctional facilities because of their developmental vulnerability, noting that "[t]he potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis.  Due to their developmental vulnerability, juvenile offenders are at particular risk of such adverse reactions.  Furthermore, the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement."[16]

105.    In 2014, the American Medical Association issued a policy statement declaring that it "oppose[d] the use of solitary confinement in juvenile correction facilities except for extraordinary circumstances when a juvenile is at acute risk of harm to self or others."[17]

_____

[16] Solitary Confinement of Juvenile Offenders, American Academy of Child & Adolescent Psychiatry (approved by Council April 2012), https://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_ offenders.aspx.

[17] Youth Solitary Confinement, the American Medical Association (last modified 2016), https://policysearch.ama-assn.org/policyfinder/detail/youth%20solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 24 of 57

106.    In 2016, the National Commission on Correctional Health Care issued a position statement concluding that "[j]uveniles . . . should be excluded from solitary confinement of any duration."[18]

107.    Acknowledging the high risk of mental health concerns as well as the higher rates of suicide and self-harm for youth in solitary confinement, in 2015 the United Nation's Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Juan E. Mendez, concluded that juveniles, given their physical and mental immaturity, should never be subjected to solitary confinement.  He called the imposition of solitary confinement of any duration on juveniles "cruel, inhuman or degrading treatment or punishment or even torture."[19]

108.    The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules) state that solitary confinement should be prohibited in cases involving children.[20]

109.    In a series of Eighth Amendment cases involving the death penalty and life without parole sentences, the United States Supreme Court has held that the Constitution

---

[18] Solitary Confinement (Isolation), *supra* note 11.

[19] Juan E. Mendez, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, U.N. Doc. A/HRC/28/68 at 9 (March 5, 2015), http://undocs.org/en/A/HRC/28/68.

[20] Commission on Crime Prevention and Criminal Justice, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules), U.N. Doc. E/CN.15/2015/L.6/Rev. 1 at 18-19 (May 21, 2015), https://www.unodc.org/documents/commissions/CCPCJ/CCPCJ_Sessions/CCPCJ_24/resolutions/L6_Rev1/ECN152015_L6Rev1_e_V1503585.pdf.

requires that children not be punished like adults without first accounting for the unique traits that make them children.

110. The Juvenile Detention Alternatives Initiative ("JDAI"), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to less than four hours.[21]

111. Having recognized in a 2012 report that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement,"[22] in 2016 the U.S. Department of Justice prohibited the use of solitary confinement for juveniles in federal prisons.

112. States have been banning the use of disciplinary isolation for children held in juvenile detention facilities as well.[23]

---

[21] Juvenile Detention Facility Assessment: Standards Instrument, JDAI at § III, 98 (2014 Update), https://www.cclp.org/wp-content/uploads/2016/06/JDAI-Detention-Facility-Assessment-Standards.pdf.

[22] *Report of the Attorney General's National Task Force on Children Exposed to Violence*, *supra* at note 1.

[23] *See, e.g.*, Amy Fettig, *2019 was a Watershed Year in the Movement to Stop Solitary Confinement*, ACLU National Prison Project (December 2019), https://www.aclu.org/news/prisoners-rights/2019-was-a-watershed-year-in-the-movement-to-stop-solitary-confinement (noting that five states passed laws in 2019 to limit the use of solitary confinement on children); *see also State Laws or Rules that Limit or Prohibit Solitary Confinement of Juveniles*, National Conference of State Legislatures (January 2021), https://www.documentcloud.org/documents/21203238-state-laws-that-limit-or-prohibit-solitary-confinement-2020 (cataloging states that have limited solitary confinement for children).

113.    Shortly after the federal ban was announced, in June 2016, NCDPS announced the end to solitary confinement for inmates in adult correctional facilities who were under 18 years of age.  The Commissioner of Adult Correction and Juvenile Justice at the time stated that

> [t]he mental health, medical, educational, social, spiritual and emotional needs of these youth are numerous and complex . . . it is of paramount importance that, while these youth are in our care, their unique needs are accurately identified and addressed in the most effective way possible. . . . In keeping with this commitment, we will eliminate the use of solitary confinement within our under-18 population and have developed a new program to address the aforementioned unique needs of this age group.[24]

At the time, North Carolina was one of only two states that tried 16- and 17-year-olds as adults.

114.    In 2015, with funding from the U.S. Department of Justice and the Bureau of Justice Assistance, NCDPS partnered with the Vera Institute of Justice ("Vera") "to help DPS reduce its use of segregation."  Vera's "assistance included conducting an assessment of DPS's use of segregation and providing ways to decrease its use."[25]

---

[24] Letter from W. David Guice, Commissioner Adult Correction and Juvenile Justice, to Colleagues at NCDPS (enclosing Youthful Offender Program) (June 15, 2016), https://files.nc.gov/ncdps/documents/files/YouthfulOffenderProgram.pdf; *see also State Prison System Announces End to Solitary Confinement for Inmates Under 18*, NCDPS (June 15, 2016), https://www.ncdps.gov/press-release/state-prison-system-announces-end-solitary-confinement-inmates-under-18;

[25] Jessa Wilcox, Léon Digard, Elena Vanko, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the North Carolina Department of Public Safety*, Vera Institute of Justice at 3 (Dec. 2016) [hereinafter the "Vera Report"],

115.    In December 2016, Vera issued a final report titled "The Safe Alternatives to Segregation Initiative:  Findings and Recommendations for the North Carolina Department of Public Safety" (the "Vera Report").

116.    The Vera Report noted as one of the "Key Reforms" that during its assessment "DPS began instituting several remarkable reforms, including: A prohibition on the use of segregation for youth under 18 years of age."[26]

117.    Vera "applaud[ed] this policy change, particularly in light of the research on the deleterious effects of restrictive housing on incarcerated youth."[27]  Vera noted that "the existing studies have found that placing youth in restrictive housing is correlated with significantly higher rates of suicide as well as with post-traumatic stress disorder (PTSD), depression, and future criminal activity.  The psychological harm caused by the solitary confinement of young people in juvenile and criminal justice settings can exacerbate preexisting mental illness and increase the likelihood of subsequent drug abuse."[28]

118.    The Vera Report notes that "DPS's new Youthful Offender Program goes beyond simply prohibiting putting youth in restrictive housing; it identifies that, '[s]upervision methods used with adults simply do not work with this population, and . . . supervision should be based on building positive relationships utilizing specific

---

https://files.nc.gov/ncdps/documents/files/Vera%20Safe%20Alternatives%20to%20Segregation%20Initiative%20Final%20Report.pdf.

[26] *Id.*

[27] *Id.* at 63.

[28] *Id.*

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 28 of 57

communication skills and using a positive discipline approach to teach new behaviors and self-control.'"[29]

**Defendants are Fully Aware of the Risks of Solitary Confinement and Have Deliberately Chosen to Ignore Those Risks**

119.    Defendants know or should be aware of the risks of solitary confinement for youth.

120.    For example, President Obama's actions to prohibit solitary confinement of juveniles in federal custody – and the research on which the prohibition was based – were widely reported in the media.

121.    NCDPS announced in June 2016 the end to solitary confinement for inmates in adult correctional facilities who were under 18 years of age noting that "[t]he mental health, medical, educational, social, spiritual and emotional needs of these youth are numerous and complex.  It is important that while these youth are in our care, their unique needs are accurately identified and addressed in the most effective way possible."[30]

122.    NCDPS also commissioned Vera to prepare an assessment of NCDPS's use of solitary confinement and the Vera Report provided to NCDPS discussed the "deleterious effects of restrictive housing on incarcerated youth."[31]

---

[29] *Id.* at 67.

[30] *State Prison System Announces End to Solitary Confinement for Inmates Under 18*, NCDPS, *supra* note 23.

[31] Vera Report at 63.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 29 of 57

123. Defendant Lassiter recognized the risks of solitary confinement in a public interview in November 2019:

> What we've learned was that just getting on them, getting in their face and being punitive towards them really wasn't changing their behavior. We also used to lock kids in their room for a long time, and put them in isolation. We don't do that anymore. We find that kids that are locked in their rooms, they're not growing. They're not getting the therapy. They're not trying to use the skills we're trying to teach them.[32]

124. In addition, the Council for Children's Rights ("CFCR") and other organizations and defense attorneys have consistently raised with NCDPS throughout 2023 the deplorable conditions that exist for children in the juvenile jails.

125. As early as January 31, 2023, CFCR raised concerns to Defendants regarding conditions at the Cabarrus Juvenile Jail that were "alarming." CFCR stated it was concerned about "lack of educational services, little to no therapeutic services, length of time between showers, limited to no time outside of their cells, [and] amount of time their flap is left down preventing any view outside of their cell." CFCR also noted that "the Deputies have reported the children are hungry when arriving to Court and during Court resulting in the Deputies obtaining food for the children." Despite the alarming allegations, Defendants have failed to address the problem.

126. On February 1, 2023, the Children's Alliance, an organization in Mecklenburg County made up of community members and organizations that works to collectively identify, advocate, and find solutions for the challenges and barriers faced by

---

[32] *The Dark Past of the Stonewall Jackson Youth Development Center*, *supra* note 3.

children in the community, held a meeting to discuss the state of the juvenile jails and overall impact of Raise the Age. Defendant Lassiter was asked to attend to provide a detailed overview of the current conditions and barriers. Defendant Lassiter attended the meeting and discussed the staffing shortages at the juvenile jails.

127. On June 5, 2023, the Children's Alliance held a meeting with, among others, Dena Diorio (the Mecklenburg County Manager) and representatives from the Children's Alliance and CFCR. The purpose of the meeting was to discuss whether Mecklenburg County would be willing to reopen the juvenile detention facility at Mecklenburg County Jail North that closed at the end of 2022. Upon information and belief, Defendant Lassiter attended the meeting and CFCR again raised to Defendant Lassiter that, among other things, the children at the Cabarrus Juvenile Jail were not being allowed out of their cells and were not receiving educational services.

128. On July 19, 2023, the Children's Alliance held a meeting with, among others, Defendant Lassiter, the Interim Chief Court Counselor for Mecklenburg County from NCDPS, the Mecklenburg County Sheriff Garry McFadden, certain Mecklenburg County district court judges, and representatives from the Children's Alliance and CFCR. The purpose of the meeting was to address how some children from Mecklenburg County in detention at the Cabarrus Juvenile Jail did not have beds and were sleeping on the floor. CFCR again raised at that meeting that, among other things, the children at the Cabarrus Juvenile Jail were not being allowed out of their cells, were not receiving educational services, and were not receiving therapeutic services. Sheriff McFadden advised that he

was not reopening the juvenile detention facility at Jail North. Defendant Lassiter reported that NCDPS was understaffed.

129. On October 25, 2023, the Children's Alliance held a meeting with, among others, Defendant Lassiter, Sheriff McFadden, Dena Diorio, representatives of the Mecklenburg County District Attorney's office and Mecklenburg County NCDPS, and representatives from the Children's Alliance and CFCR. The purpose of the meeting was to discuss concerns surrounding Mecklenburg County children who were being detained at the Cabarrus Juvenile Jail in light of the conditions at the Cabarrus Juvenile Jail.

130. Sheriff McFadden reiterated at the October 25, 2023 meeting that he was not reopening the juvenile detention center at Jail North. CFCR again raised its concern that, among other issues, the children at the Cabarrus Juvenile Jail were not being allowed out of their cells and were not receiving educational services. Defendant Lassiter acknowledged several investigations that had occurred into the conditions of the Cabarrus facilities which resulted in corrective action plans. Defendant Lassiter did not specify the location of the site investigations and reported to the group that conditions had improved. Upon information and belief, Defendant Lassiter was describing visits by Disability Rights North Carolina and other organizations to the Cabarrus Juvenile Prison, not the Cabarrus Juvenile Jail.

131. On December 18, 2023, The News & Observer in Raleigh published an article reporting that NCDPS was "locking minors up in rooms for days and weeks to cope

with a severe staffing shortage and other issue."[33]  The article described the story of a mother with a teen in a 35-bed detention center, upon information and belief the Dillon Juvenile Jail,[34] who had been locked in his 7 by 9 foot room for more than 30 days nearly 24 hours a day.  When confronted by the reporter, Defendant Lassiter admitted that Defendants are not letting the children in the state-run facilities out of their cells to cope with staffing shortages.

132.    In addition, defense attorneys for children detained and jailed in the Cabarrus Juvenile Jail have repeatedly put on the record in these children's court cases that the children are not being allowed out of their cells, are not receiving educational services, and are not receiving therapeutic services.  A court counselor employed by NCDPS is assigned to each child's case and is in the courtroom during every proceeding.  The NCDPS court counselors are present when the children's defense attorneys are describing these conditions at the Cabarrus Juvenile Jail.

133.    The conditions at the Cabarrus Juvenile Jail are so concerning that attorneys for the children detained there have requested in many cases, and the District Court judges have ordered, that the children be allowed to shower, be allowed nurse visits, be allowed

---

[33] Virginia Bridges, *NC Isolates Incarcerated Youth in Locked Rooms.  Is it Solitary Confinement?*, The Charlotte Observer (Dec. 18, 2023), https://www.msn.com/en-us/news/us/nc-isolates-incarcerated-youth-in-locked-rooms-is-it-solitary-confinement/ar-AA1lFOvW.

[34] Defendant NCDPS maintains a website describing the ten juvenile detention centers in North Carolina.  The only detention center listed with 35 beds is the Dillon Juvenile Jail.  *See* Juvenile Detention Centers, NCDPS, *supra* note 4.

to attend doctors' appointments, be allowed to have telephone calls with family, and even be transferred to county-run juvenile detention centers that do not impose solitary confinement.

134.    By virtue of complaints and meetings with advocates, Defendants have been repeatedly put on notice of the substantial right of serious harm posed by its use of solitary confinement.  Notwithstanding this notice, Defendants continue their regular use of solitary confinement and ignore the complaints of the children and their counsel.

**Denying Juveniles in Solitary Confinement Appropriate Education Under North Carolina State Law Without Due Process**

135.    In addition to being placed at risk of serious harm, the children in solitary confinement are also denied North Carolina state-mandated educational services without due process.

136.    NCDPS is statutorily mandated to provide educational services to children in juvenile detention centers, including Cabarrus Juvenile Jail.  N.C.G.S. § 143B-815.

137.    The NCPDS DJJ Education Policy and Requirements and Procedures ("NCDPS Education Policy") states that each child must receive 1,000 hours of instruction per year or 500 hours per semester for high schools on semester schedules while in its care.

138.    Defendants' actions prevent children from attending school at the detention centers and from regularly receiving tutoring or other individualized instruction or classroom services.  These children are left without any regular educational instruction for as long as they are in solitary confinement.  Children can go weeks at a time without receiving any schoolwork or instruction.

139.    Upon information and belief, Defendants make no meaningful effort to provide children held in solitary confinement with educational instruction and therefore the children receive no education during their time in solitary confinement, which is often the entire time they are held at the jail.

**Cabarrus Juvenile Jail**

140.    Although the Cabarrus Juvenile Jail can hold 62 children and has been overcrowded for most, if not all of 2023, only a handful of children have received educational services.

141.    NCDPS employees at the Cabarrus Juvenile Jail maintain a calendar showing how many children received educational services each day.

142.    When the second semester started on January 3, 2023, NCDPS allowed children out of their cell at the Cabarrus Juvenile Jail to attend school 12 days that month. On those 12 days, anywhere from 2 to 12 children attended school. Many days only 3 or 4 children attended school. On the other days, no children attended school.

143.    School attendance at the Cabarrus Juvenile Jail only got worse from there.

144.    In February 2023, NCDPS allowed children to attend school 11 days that month. On those 11 days, anywhere from 3 to 8 children attended school on any given day, with the exception of one day where 11 children attended school. On most days, only 3 or 4 children attended school. On the other days, no children attended school.

145.    By April and May 2023, NCDPS was hardly allowing any children out of their cells at the Cabarrus Juvenile Jail to attend school. In April 2023, NCDPS allowed

children to attend school on 7 days. Among those 7 days, on two days only 1 child attended school and on two other days only 2 children attended school. On the other days, no children attended school. In May 2023, NCDPS allowed children to attend school at the Cabarrus Juvenile Jail on 4 days. On those days, 2, 4, 5, and 9 kids attended. On the other days, no children attended school.

146.    In June 2023, summer school started at the Cabarrus Juvenile Jail. NCDPS allowed children to attend school on 5 of the 15 school days. On those days, 5 to 8 children went to school each day.

147.    In July 2023, NCDPS allowed children to attend school on 3 days that month. On the other days, no children attended school.

148.    Upon information and belief, the same children did not attend school on each of the days NCDPS allowed children out of their cell to receive educational services.

149.    In light of the fact that the Cabarrus Juvenile Jail has 62 beds and is consistently full, holding "school" a few times a month for a few children means that most children are going to school a handful of times per month at most.

150.    Even when the children are allowed to go to school, school generally lasts a half hour to an hour at the Cabarrus Juvenile Jail. At that rate, each child would have to go to school 1000 – 2000 days a year to reach 1,000 hours of instruction as mandated by the NCDPS Education Policy.

151.    The instruction that is provided during that one half hour to an hour of school is usually a lesson via video on a laptop that is provided to the children.

**Dillon Juvenile Jail**

152.    The children in the Dillon Juvenile Jail are not receiving educational services at all.

153.    The closest thing to activities even resembling educational services is Defendant NCDPS sliding crosswords and word search handouts under the doors of the children's cell a few times a week.

154.    The children in the Dillon Juvenile Jail are not going to classes or receiving any other type of instruction.

155.    Outside of any formal educational services, the Dillon Juvenile Jail does not even have enough books to allow the children to exchange books when they have finished reading them.

156.    It is well-established that education in correctional facilities reduces recidivism rates.[35]

157.    Defendants have failed to provide the children at juvenile detention centers in North Carolina access to meaningful and comprehensive educational resources.

158.    NCDPS employs the teachers at the juvenile detention centers, but upon information and belief, none of the children in detention are receiving full-time educational services.

---

[35] *See* Lois M. Davis, Robert Bozick, Jennifer L. Steele, Jessica Saunders, and Jeremy N.V. Miles, *Evaluating the Effectiveness of Correctional Education:  A Meta-Analysis of Programs That Provide Education to Incarcerated Adults*, RAND Corporation (2013), https://www.rand.org/pubs/research_reports/RR266.html.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 37 of 57

159.     Children incarcerated in juvenile detention centers in North Carolina are at crucial points in their educational development.  Outside incarceration, cancellation of a single day of school causes school districts to mobilize and plan to make up every lost hour at the end of the year.  Yet when juveniles enter juvenile detention centers prior to their cases even being adjudicated, their educational needs are simply ignored for the weeks or months they are detained there.  They are thus deprived of education and denied the education provided to other children their age in North Carolina.

160.     As a proximate result of Defendants' repeated failures to provide an adequate education to children in their custody, the children incarcerated in the juvenile detention centers suffer compounding physical and psychological harm from their confinement and are falling behind in their academic development.

## <u>NAMED PLAINTIFFS' INDIVIDUAL ALLEGATIONS</u>

**Plaintiff John Doe 1**

161.     John Doe 1 is fifteen-years old and has been detained at the Cabarrus Juvenile Jail since November 2023.  The charges against him have not been adjudicated.

162.     John Doe 1's cell at the Cabarrus Juvenile Jail is small.  It is just large enough for him to be able to do pushups on the floor.  It has one bed, a sink, and a toilet.  It has a small window above the bed to the outside.  It has a metal door with a skinny window to the interior of the Cabarrus Juvenile Jail.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 38 of 57

163.    John Doe 1 has been locked in his cell in isolation every day since he arrived at the Cabarrus Juvenile Jail in November 2023.  On most days, he is in his cell for 23 hours and 50 minutes of the 24-hour day.

164.    The only times the guards unlock John Doe 1's cell and let him out temporarily are:

   a.  A 10-minute shower.  John Doe 1 is allowed 10 minutes to take a shower.  If he takes longer than 10 minutes, the next day is a "bird bath" day.  A "bird bath" is where John Doe 1 is not let out of his cell at all to shower and has to clean himself using the sink in his cell.  Some days John Doe 1 is not allowed to shower at all.  For example, on or about December 26, 2023, John Doe 1 was not allowed to shower and was told it was because the jail was short on staff.

   b.  Rec time.  Once a week John Doe 1 is supposed to get "rec time" where the guards let the children out of their cells a few children at a time and bring them outside for 30 minutes.

   c.  To get water.  John Doe 1 sometimes asks the guards to leave his cell to fill up his cup with water just to get out of his cell.  Up until recently some of the guards have allowed him out of his cell to get water, but he must immediately return to his cell after he gets water.  Now the children are not allowed to have cups in their room and so there are no opportunities to leave the cell to get water.

d. To clean. John Doe 1 sometimes asks the guards if he can mop the floor or clean up so that he can get out of his cell. The guards sometimes allow him to do this.

e. Phone calls. On Tuesdays and Fridays John Doe 1 is allowed to come out of his cell onto the pod to make a phone call. He is generally limited to 10 minutes for his phone time.

f. Discretionary releases. On a few days, one guard has allowed John Doe 1 and others out of their cells, three children at a time, into the pod where they can play games or watch tv for 30 minutes.

165. Other than a 10-minute shower, John Doe 1 was not allowed out of his cell on Christmas day.

166. John Doe 1 and the children in the Cabarrus Juvenile Jail eat their meals in their cell alone. The jail staff cannot watch the children eat because each child is in his own cell and there is only a small window into the cell.

167. The Cabarrus Juvenile Jail guards bring breakfast to the children in their cells at 8 AM, lunch at 11 AM, and dinner at 4 PM. John Doe 1 is often hungry because they bring dinner so early.

168. John Doe 1 has been allowed to have one visit so far with family.

169. The guards have punished children for actions as minor as attempting to talk to other children while in their cells. In response, the guards often institute "Temporary Confinement" for 3 days in which the guards flip the flap down on their door and window

so that the children cannot see out their door or window. This is in addition to the solitary confinement the children at the Cabarrus Juvenile Jail are already experiencing.

170. John Doe 1 is in 9th grade. John Doe 1 has not received any educational services or attended school since he arrived at the Cabarrus Juvenile Jail in November. John Doe 1 understands that children have to be at the Cabarrus Juvenile Jail for two to three weeks before they can start receiving educational services. Even when the children have been at the Cabarrus Juvenile Jail for this length of time, only a few children a day are allowed to receive educational services. When the children are allowed out of their cell to go to school, the children are given a Chromebook and headphones and listen to a lesson on the computer.

171. John Doe 1 has little to do in his cell. He reads books, but if he finishes his book, he cannot get a new one until the guards let him out of his cell, which can sometimes be a full day or more. He also does pushups, although there is little room in his cell to do that. He sometimes talks to the other children but risks getting in trouble and being placed in Temporary Confinement as a consequence.

172. John Doe 1 is frustrated and angry that he has to be in his cell all day. Sometimes his frustration boils over and he just screams. It is difficult to be in his cell the entire day because the other children are often screaming and yelling and banging on their cells.

173. John Doe 1's interaction with jail staff is limited. At times, he has to bang on this cell door and walls to try to get the staff's attention.

174. When John Doe 1 does get the jail staff's attention, the staff at the Cabarrus Juvenile Jail tell John Doe 1 that they cannot let him out of his cell because they are short on staff.

175. John Doe 1 has been in the Cabarrus Juvenile Jail previously in 2023. Each time he has been in the Cabarrus Juvenile Jail in 2023 he has experienced the same solitary confinement conditions.

**Plaintiff John Doe 2**

176. John Doe 2 is sixteen-years old and has been detained at the Cabarrus Juvenile Jail since November 2023. The charges against him have not been adjudicated.

177. John Doe 2's cell at the Cabarrus Juvenile Jail is small. It is approximately the size of a medium sized closet in a house. It has a bed on the wall and a sink and toilet. It has a small window on the door to the interior of the Cabarrus Juvenile Jail.

178. There are often bugs in John Doe 2's cell. He regularly kills ants and spiders in his cell and has been bit on the face by insects.

179. John Doe 2 has been locked in his cell in isolation every day since he arrived at the Cabarrus Juvenile Jail in November 2023. On most days, he is in his cell for 23 hours and 50 minutes of the 24-hour day.

180. The only times the guards unlock John Doe 2's cell and let him out temporarily are:

      a. A 10-minute shower. John Doe 2 is allowed 10 minutes to take a shower. If he takes longer than 10 minutes, he will get in trouble.

b. Rec time. John Doe 2 last was allowed out of his cell for rec time weeks ago. John Doe 2 has asked the jail staff to go outside, but the staff has told him they are short staffed.

c. Phone calls. On Mondays and Wednesdays John Doe 2 is allowed to come out of his cell onto the pod to make a phone call. He is limited to ten minutes for his phone time.

d. Discretionary releases. Once in a while the guards will allow John Doe 2 out of his cell for 45 minutes to an hour into the pod. John Doe 2 was allowed out of his cell for about an hour on or about December 23 or December 24, and he played board games.

181. Other than a 10-minute shower and a 10-minute telephone conversation with his mother, John Doe 2 was not allowed out of his cell on Christmas day.

182. John Doe 2 eats all of his meals in his locked cell. He is not supervised during that time.

183. When the children get in trouble with the guards, the guards often institute "Temporary Confinement." For example, if the children take longer than 10 minutes in the shower or have too many books in their cells, the guards can institute Temporary Confinement. Temporary Confinement can include putting the flap down over the window of a child's door to his cell, turning off the water in his cell, and taking away a child's blankets on his bed.

184. John Doe 2 was put in Temporary Confinement once where the guards put the flap on his window down so he could not see out his door to the interior of the jail and turned his water off so he could not flush his toilet.

185. Temporary Confinement is in addition to the solitary confinement the children at the Cabarrus Juvenile Jail are already experiencing.

186. John Doe 2 is in 10th grade. John Doe 2 has not received any education services or attended school since he arrived at the Cabarrus Juvenile Jail in November 2023. John Doe 2 was told that he might be able to receive educational services after January 1, 2024.

187. John Doe 2 has not received any mental health treatment or counseling since he arrived at the Cabarrus Juvenile Jail in November despite being declared to not have capacity in previous juvenile proceedings in District Court.

188. John Doe 2 has little to do in his cell. He reads books. He also works out in the little room he has in his cell by doing pushups, dips, and planks. He sometimes writes songs. He spends a lot of time just lying in his bed.

189. John Doe 2 is depressed, mad, and sad that he has to be in his cell all day. He spends a lot of time thinking about what he can do differently when he gets out of jail and goes home.

190. The guards at the Cabarrus Juvenile Jail tell John Doe 2 that they cannot let him out of his cell because they are short on staff.

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 44 of 57

191.    John Doe 2 has been in the Cabarrus Juvenile Jail prior to 2023 and does not understand why he cannot come out of his cell like he was able to back then.

**Plaintiff John Doe 3**

192.     John Doe 3 is 17-years old and has been detained at the Cabarrus Juvenile Jail since December 2023.  The charges against him have not been adjudicated.

193.    John Doe 3's cell at the Cabarrus juvenile jail is very small.  It has a bed, sink and toilet, small window to the outside, and a door with a small narrow rectangle window to the inside of the jail.

194.    There is a flap that can be put up or down covering his window on his cell door.  About half the time the flap is down so that John Doe 3 cannot see out through the window on his door.

195.    John Doe 3 has difficulty sleeping because some of the other children are yelling and beating on their doors at night.

196.    John Doe 3 has been locked in his cell in isolation every day since he arrived at the Cabarrus Juvenile Jail in December 2023.  On most days he is in his cell for 23 hours and 50 minutes of the 24-hour day.

197.    The only times the guards have unlocked John Doe 3's cell and let him out temporarily are:

    a.  A 10 or 15-minute shower.

    b.  The guards let 4 children out of their cells one day, including John Doe 3, for 10 to 15 minutes to watch tv in the pod.

c.  To make a phone to his family.  John Doe 3 understands the policy to be that the children get to make a 5 or 10-minute phone call to their family on Tuesdays and Fridays, although he is not always allowed to make a call on those days.

198.    John Doe 3 has not been allowed to have any recreational time outside since he has been held at the Cabarrus Juvenile Jail.  When John Doe 3 has asked the guards if the children will be able to have rec time, they say no.

199.    John Doe 3 receives three meals a day that are brought to and left in his cell. John Doe 3 is nearly always hungry because the food does not taste good and he can barely eat it.

200.    John Doe 3's interaction with jail staff is very limited since he is in his cell all day long.  If he needed to get a guard's attention, he would try to bang on his cell door and hope the guard came to his cell.

201.    John Doe 3 is in 11th grade.  John Doe 3 has not received any educational services or attended school since he arrived at the Cabarrus Juvenile Jail.

202.    John Doe 3 was held in the Cabarrus Juvenile Jail previously in 2023.  John Doe 3 stated the conditions were largely the same back then, except he and the other children were usually not even allowed out of their cells to shower and were held in their cells 24 hours a day.

203. Now, John Doe 3 has very little do in his cell all day at the Cabarrus Juvenile Jail. He mainly sleeps and reads. He spends most of his time thinking about what he can do to make sure he is never put in a situation like this again.

204. John Doe 3 is often sad because of the conditions that he is being held in and because he is away from his family.

## CLASS ACTION ALLEGATIONS

205. Plaintiffs John Doe 1, John Doe 2, and John Doe 3 bring this action on their own behalf and on behalf of others similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All juveniles who are currently, or in the future will be, detained in a North Carolina juvenile detention facility operated by NCDPS (the "Statewide Class").

In the alternative, Plaintiffs seek to represent a Class consisting of:

> All juveniles who are currently, or in the future will be, detained in the Cabarrus Juvenile Jail (the "Cabarrus Class").

206. The above classes are collectively referred to as the "Class." If discovery or further investigation reveals that the Classes should be expanded or otherwise modified, the named Plaintiffs reserve their right to amend the Class definitions or propose subclasses as necessary.

207. The Class satisfies the requirements of Rule 23(a) in that:

    a. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The juvenile detention centers in North Carolina house thousands of

juveniles annually. In 2021, 2,423 children were held at juvenile detention centers in North Carolina. The Cabarrus Juvenile Jail detains hundreds of juveniles annually. All juveniles incarcerated at the juvenile detention centers are at significant risk of unconstitutional solitary confinement and unlawful denial of educational services. Every month, Class members enter and exit the juvenile detention centers. The names, case numbers, dates of confinement, and all other relevant records are in possession of Defendants and are easily ascertainable. Many of these children are unable to file individual lawsuits because of their youth, disabilities, or lack of financial resources.

b. *Commonality*: Common questions of law and fact arise from Defendants' conduct described herein. Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include, but are not limited to the following:

i.    Whether Defendants permit and practice solitary confinement;

ii.    Whether Defendants' policies and practices of placing incarcerated children in solitary confinement have violated and will continue to violate Class members' Eighth and Fourteenth Amendment rights;

iii.    Whether Defendants have unlawfully denied educational services to incarcerated children in violation of the Class members' Fourteenth Amendment rights;

iv.    Whether, and to what extent, injunctive relief should be imposed on Defendants to prevent such conduct in the future; and

v.     Whether Defendants should be enjoined from continuing their unlawful practices.

c. *Typicality*: Plaintiffs' claims are typical of the claims of the Class members. All Plaintiffs are incarcerated at juvenile detention centers in North Carolina, including the Cabarrus Juvenile Jail, and have been subject to Defendants' challenged policies, practices, and procedures (or lack thereof). Therefore, Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

d. *Adequacy of Representation*: Plaintiffs, their representatives, and class counsel will fairly and adequately protect the interests of the Class and will diligently serve as Class representatives. Plaintiffs do not have any antagonistic interests to the Class members and seek injunctive relief on a class-wide basis to remedy class injuries and enjoin Defendants' unlawful conduct. Furthermore, Plaintiffs and the Class members are represented by competent counsel who are experienced in civil rights and class action litigation.

e. This action is maintainable as a class action pursuant to Rule 23(b)(1)(A) because the prosecution of separate actions by individual children would create a risk of inconsistent and varying adjudications, which in turn, would establish incompatible standards of conduct for the juvenile detention centers.

f. This action is also maintainable as a class action pursuant to Rule 23(b)(2) because Defendants have acted, or failed to act, on grounds generally applicable to the

Class as a whole, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Class.

g. This action is also maintainable pursuant to Rule 23(b)(3) because the common questions of law and fact overwhelmingly predominate in this case. The common questions of law and fact listed above are dispositive questions in the case of every member of the Class. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of Defendants' policies and practices than individual suits by hundreds or thousands of North Carolina residents.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT: VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)
### (brought on behalf of the Statewide Class, or,
### in the alternative, on behalf of the Cabarrus Class)

208. The allegations of paragraphs 1 to 207 above are incorporated herein.

209. When Defendants take a child into custody, they assume a duty under the Fourteenth Amendment of the U.S. Constitution to protect the child from harm and substantial risk of serious harms.

210. Plaintiffs and members of the Class have substantive Due Process rights that include, but are not limited to: the right to be free from and protected from physical, psychological, and emotional harm; the right to necessary treatment, care, and services; the

Case 1:24-cv-00017-LCB-JLW   Document 1   Filed 01/08/24   Page 50 of 57

right not to deteriorate physically, psychologically, or emotionally while in custody; and the right to be free from substantial risks of the above-mentioned harms.

211. Defendants maintain a policy, custom, and practice of using solitary confinement as the default confinement method in juvenile detention centers in a manner that lacks any penological or justifiable government purpose and is grossly inconsistent with established clinical and legal consensus that youth solitary confinement is profoundly harmful.

212. Defendants further compound the harm to children detained at juvenile detention centers by denying them any meaningful education at critical points in their academic development.

213. These practices are imposed on juveniles with no legitimate government purpose or penological purpose and violate public policy and law in other regards.

214. Defendants are aware of the harm and risks of harm these practices cause to children at the juvenile detention centers, yet have consistently applied the same harmful policies and practices and failed to make any changes to improve the conditions. Defendants' response to this harm and risk of harm, or lack of a response, is objectively unreasonable and shows a deliberate, knowing, or reckless disregard for the consequences.

215. Defendants' actions were taken under color of state law and within the scope of their employment. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

216. The conditions described in this Complaint violate the Due Process rights of the children detained at juvenile detention centers in North Carolina operated by NCDPS.

217. Defendants have continuously violated the law, as detailed in this Complaint. As a proximate result of Defendants' actions, Plaintiffs, as well as the Class they represent, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries.

218. Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to subject Plaintiffs and the Class to a substantial risk of serious harm, in violation of their Fourteenth Amendment rights.

## SECOND CAUSE OF ACTION

### DECLARATORY JUDGMENT:  VIOLATION OF THE EIGHTH AMENDMENT
### (42 U.S.C. § 1983)
### (brought on behalf of the Statewide Class, or,
### in the alternative, on behalf of the Cabarrus Class)

219. The allegations of paragraphs 1 to 218 above are incorporated herein.

220. Furthermore, the Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment on convicted and incarcerated juveniles, including by exercising deliberate indifference to substantial risks of serious harm, inhumane conditions, and inadequate care.

221. The above-described conditions of solitary confinement at juvenile detention centers across the state of North Carolina and Defendants' policies, practices, acts, and omissions have inflicted, and continue to inflict, grave and inhumane deprivations, injuries,

and risks to the Plaintiffs as well as the Class, all of which violate contemporary standards of decency and are intolerable in today's society.

222. The risks of harm to Plaintiffs and the Class as a result of the above-described conditions at the juvenile detention centers and Defendants' policies, practices, acts, and omissions are obvious and known to Defendants.

223. Moreover, Defendants were notified of these risks by others and, thus, actually knew of the risks of harm to Plaintiffs and the Class as a result of the above-described conditions of confinement at the juvenile detention centers and Defendants' policies, practices, acts, and omissions.

224. Despite actual knowledge of the obvious risks of harm to Plaintiffs and the Class at the juvenile detention centers, Defendants have disregarded these excessive risks to the health and safety of Plaintiffs and the Class and have failed to rectify the conditions of confinement at the juvenile detention centers or to make preventative changes to their policies and procedures.

225. As a result, Defendants have acted with deliberate indifference to the excessive risk of harm to Plaintiffs and the Class as a result of the conditions of confinement at the juvenile detention centers operated by NCDPS and Defendants' policies, practices, acts, and omissions complained of herein.

226. By imposing solitary confinement, Defendants have subjected Plaintiffs and the Class to cruel and unusual punishment, in violation of the Eighth Amendment.

227.    Defendants have acted or failed to act and are continuing to act or fail to act under color of state law.

228.    Plaintiffs have no adequate remedy at law to address the harms described herein.  The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to subject Plaintiffs and the Class to a substantial risk of serious harm, in violation of their Eighth Amendment rights.

### **THIRD CAUSE OF ACTION**

**TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**
**(42 U.S.C. § 1983)**
**(brought on behalf of the Statewide Class, or,**
**in the alternative, on behalf of the Cabarrus Class)**

229.    The allegations of paragraphs 1 to 228 above are incorporated herein.

230.    Based on the allegations contained in the previous paragraphs, Plaintiffs claim they are entitled to a Preliminary and Permanent Injunction.

231.    Plaintiffs' Eighth and Fourteenth Amendment rights have been violated under color of state law.

232.    To end an ongoing violation of Plaintiffs' rights, Defendants must be immediately restrained from placing Plaintiffs and the Class in solitary confinement as punishment, discipline, or because there is inadequate staffing, and from placing Plaintiffs in solitary confinement for any reason other than a rare and temporary response to prevent imminent and serious physical harm to persons due to a juvenile's behavior.

233. To make Plaintiffs whole and restore their rights, Defendants must also be enjoined from taking further action to deprive Plaintiffs of their right to humane treatment while awaiting adjudication in the form of placing them in solitary confinement.

234. Plaintiffs and the Class have no adequate remedy at law and only injunctive relief can restore their constitutionally protected rights and ensure the protection of their rights in the future.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a. Issue an Order that this action be maintained as a class action, appointing Plaintiffs as representatives of the Statewide Class or, in the alternative, the Cabarrus Class;

b. Issue an order appointing the undersigned attorneys as Class Counsel in this action;

c. Issue an order declaring that Defendants' acts and omissions violate Plaintiffs' and the Class's rights under the Eighth and Fourteenth Amendments to the United States Constitution;

d. Grant preliminary and permanent injunctive relief eliminating the use of solitary confinement for juveniles for any purpose other than a rare and temporary response to prevent imminent and serious physical harm to persons due to a juvenile's behavior;

e. Issue such further injunctive relief as necessary to rectify the unconstitutional use of solitary confinement;

f. Issue an Order retaining jurisdiction of this matter to enforce the terms of the Court's orders and appoint a neutral monitor to ensure compliance with the injunctive relief;

g. Issue an order enjoining Defendants and their officers, agents, affiliates, subsidiaries, servants, employees and all other persons or entities in active concert or privity or participation with them, from taking retaliatory action against Plaintiffs for bringing this lawsuit, or against any juveniles in Defendants' custody for their past or future expression of support of Plaintiffs or opposition to Defendants' use of solitary confinement on juveniles;

h. Award payment of Plaintiffs' reasonable attorneys' fees and costs associated with this action pursuant to 28 U.S.C. § 1988, *et seq.* or under any other relevant authority; and

i. Grant such other relief as this Court may deem just and proper.

Dated this 8th day of January, 2024.

[*signatures on next page*]

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/  Robert L. Lindholm
Robert L. Lindholm (N.C. Bar No. 52800)
One Wells Fargo Center, 23rd Floor
301 South College Street
Charlotte, NC 28202
(704) 417-3000
robert.lindholm@nelsonmullins.com

Donna O. Tillis*
Yasmeen Ebbini*
Michelle Campbell*
1320 Main Street, 17th Floor
Columbia, SC 29201
(803) 799-2000
donna.tillis@nelsonmullins.com
yasmeen.ebbini@nelsonmullins.com
michelle.campbell@nelsonmullins.com

Matthew G. Lindenbaum*
One Financial Center, Suite 3500
Boston, MA 02111
(617) 217-4700
matthew.lindenbaum@nelsonmullins.com

**COUNCIL FOR CHILDREN'S RIGHTS**

Michelle Duprey (N.C. Bar No. 53205)
601 E. Fifth Street, Suite 510
Charlotte, NC 28202
(704) 943-9642
MDuprey@cfcrights.org

*Pro hac vice forthcoming*

*Attorneys for Plaintiffs*