IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No.: 1:24-cv-17-LCB-JLW

| | |
|---|---|
| JOHN DOE 1, et al., | |
| *Plaintiffs*, | |
| v. | **DEFENDANTS' ANSWER** |
| NORTH CAROLINA DEPARTMENT, et al., | |
| *Defendants*. | |

NOW COME Defendants to hereby answer and otherwise respond to the allegations contained in Plaintiff's complaint.

## PRELIMINARY STATEMENT

1.      Over a decade ago, the Attorney General's National Task Force on Children Exposed to Violence addressed the harmful effects of solitary confinement of children, stating:

> Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement. A 2002 investigation by the U.S. Department of Justice showed that juveniles experience symptoms of paranoia, anxiety, and depression even after very short periods of isolation. Confined youth who spend extended periods isolated are among the most likely to attempt or actually commit suicide. One national study found that among the suicides in juvenile facilities, half of the victims were in isolation at the time they took their own lives, and 62 percent of victims had a history of solitary confinement.[1]

**RESPONSE:** Defendants admit that this paragraph references a report of the United States Attorney General which speaks for itself and is the best evidence of its contents.

2.      This practice was so prevalent and damaging that after an investigation by the

---

[1] Robert L. Listenbee, Jr. et al., *Report of the Attorney General's National Task Force on Children Exposed to Violence* at 178 (Dec. 12, 2012), https://www.justice.gov/sites/default/files/defendingchildhood/cev-rpt-full.pdf.

United States Justice Department, President Obama banned the use of solitary confinement on juveniles in federal prisons in 2016. President Obama stated that

> [r]esearch suggests that solitary confinement has the potential to lead to devastating, lasting psychological consequences. It has been linked to depression, alienation, withdrawal, a reduced ability to interact with others and the potential for violent behavior. Some studies indicate that it can worsen existing mental illnesses and even trigger new ones. Prisoners in solitary are more likely to commit suicide, especially juveniles and people with mental illnesses.
>
> The United States is a nation of second chances, but the experience of solitary confinement too often undercuts that second chance. Those who do make it out often have trouble holding down jobs, reuniting with family and becoming productive members of society.[2]

**RESPONSE:** Defendants admit, upon information and belief, that after an investigation by the United States Justice Department, President Obama took action with respect to housing juveniles in federal prisons in 2016. Defendants further admit that this paragraph refers to a written statement attributed to President Obama, which speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants lack sufficient knowledge and information to respond any remaining allegations in this paragraph concerning the nature, prevalence or impact of the practices referred to in this paragraph.

3.      Recognizing the harmful effects solitary confinement have on juveniles, over seven years ago, in June 2016, Defendant North Carolina Department of Public Safety ("NCDPS") announced the end to solitary confinement for inmates in adult correctional facilities who were under 18 years of age.

**RESPONSE:** Defendants admit that on June 15, 2016, NCDPS announced that effective September 1, 2016, it would eliminate the use of solitary confinement within its under-18

---

[2] Barack Obama, *Why We Must Rethink Solitary Confinement*, Wash. Post (Jan. 25, 2016), attached as Exhibit 1.

population. Except as specifically admitted, Defendants deny any remaining allegations contained in this paragraph.

4.       In that announcement, Defendant Lassiter stated: "We also used to lock kids in their room for a long time, and put them in isolation. We don't do that anymore. We find that kids that are locked in their rooms, they're not growing. They're not getting the therapy. They're not trying to use the skills we're trying to teach them."[3]

**RESPONSE:** Denied. Defendants further state that this quote comes from a 2019 article and not the 2016 announcement referenced in paragraph 3.

5.       Despite the overwhelming consensus that solitary confinement has devastating and long-term effects on juveniles, including depression, anxiety, suicide, psychosis, and post-traumatic stress disorder, and despite the abandonment of solitary confinement for juveniles throughout the country, NCDPS has embraced a policy, custom, and practice of solitary confinement of children as young as ten years old, who have not had their cases adjudicated yet, at juvenile detention centers across the state of North Carolina, including the Cabarrus Regional Juvenile Detention Center (the "Cabarrus Juvenile Jail"), for nearly 24 hours a day.

**RESPONSE**: Defendants specifically deny "embracing" a policy, custom, or practice of isolating juveniles for nearly 24 hours a day at the Cabarrus Regional Juvenile Detention Center (which Plaintiffs incorrectly refer to as a jail and which Defendants will hereafter refer to as "Cabarrus Juvenile DC"). Defendants deny any remaining allegations.

6.       As a result of the persistent use of solitary confinement for children, NCDPS is also denying children in their custody educational services, further harming their development.

**RESPONSE**: Defendants specifically deny the "persistent use of solitary confinement."

---

[3] Zak Dahlheimer, *The Dark Past of the Stonewall Jackson Youth Development Center*, CBS17 (Nov. 24, 2019), www.cbs17.com/news/the-dark-past-of-the-stonewalljacksonyouth-development-center/.

Defendants deny any remaining allegations.

7.      At one such juvenile detention center—the Cabarrus Juvenile Jail—children are regularly confined into small cells for 23 hours a day or more for weeks or even months without any valid reason. These children, many of whom already have mental health challenges, have little to nothing to do in their cells to advance their development and growth: no meaningful human interaction, no education or programming to address their developmental, physical, and clinical needs, and limited reading materials. The children are given 10 minutes a day to shower and, on some days, may be allowed out of their cell for 30 minutes of "recreation time," or a 10-minute phone call, or to fill their water bottle, or a half hour or hour of "school", or to clean up the jail.

**RESPONSE**: Defendants specifically deny that children at the Cabarrus Juvenile DC are regularly confined into small cells for 23 hours a day or more for weeks or even months without any valid reason. Defendants deny the remaining allegations contained in this paragraph.

8.      At another juvenile detention Center—the Dillon Regional Juvenile Detention Center (the "Dillon Juvenile Jail")—children are let out of their cells for 20 minutes per day to shower and make a phone call. They are locked in their cell for the other 23 hours and 40 minutes of the day. The children's only education is crossword puzzles and word searches slipped under their cell door a few times a week.

**RESPONSE**: Defendants specifically deny that children at Dillon Regional Juvenile Detention Center (which Plaintiffs incorrectly refer to as a jail and which Defendants will hereafter refer to as "Dillon Juvenile DC") are locked in their rooms for more than 23 hours of the day. Defendants deny the remaining allegations contained in this paragraph.

9.      Defendants' policy, custom, and practice of solitary confinement has been going on so long many of the children detained do not even realize there is anything other than solitary

confinement—that is, they think that being locked in their cell for over 23 hours a day is normal practice when being detained prior to adjudication of their case.

**RESPONSE**: Defendants specifically deny a policy, custom, or practice of solitary confinement. Defendants further deny that confining juveniles to their rooms for over 23 hours a day is a normal or accepted practice. Except as specifically admitted herein, Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the beliefs of unidentified persons.

10.    The children are so desperate to leave their cells for any amount of time that some have resorted to offering to mop floors or clean the jail just to get out of their cells.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the internal thought processes of unidentified persons.

11.    Predictably, keeping the children locked in their cells for nearly 24 hours a day has also resulted in the children acting out because of their frustration and anger at the situation.

**RESPONSE**: Defendants specifically deny that children are kept locked in their rooms for nearly 24 hours a day. Defendants lack sufficient information and knowledge to admit or deny the remaining allegations in this paragraph concerning the behavior of unidentified persons.

12.    Instead of addressing the root cause of the problem, Defendants have responded by imposing further restrictions on the children when they act out, placing them in what they call "Temporary Confinement" or "TC" where Defendants take away the few remaining humane aspects of their confinement for days at a time, such as putting the flap down on the small window on their door so they cannot see out of their cell or turning off the water in their cell so they cannot flush the toilet or use the sink.

**RESPONSE**: Defendants admit that Temporary Confinement refers to the temporary

isolation of a child from others, until the child can safely return to the general population. Defendants further admit that Temporary Confinement is used when a child poses a threat to themselves, other children, or staff, or when they present some other safety or security risk. Defendants specifically deny that they "take away the few remaining humane aspects of their confinement." Defendants deny any remaining allegations contained in this paragraph.

13. Solitary confinement has been proven dangerous for all ages, but is especially harmful for juveniles due to their developmental vulnerabilities. It is well established that isolating children and thereby preventing children from having meaningful contact with others increases their risk of suicide and self-harm. For those children that have a mental health challenge or disability, the risk of harm can be even greater. Despite the known dangers to the children in their care and their admission of the harm that solitary confinement causes children, Defendants run the juvenile jails in North Carolina with inadequate staffing that predictably results in children being locked in their cells nearly 24 hours a day. Defendants have chosen this route in the face of public scrutiny and despite open discussions of the current conditions.

**RESPONSE**: Defendants admit, upon information and belief, that being isolated for prolonged periods of time without meaningful interaction and stimulation may have negative physical and mental health impacts. Defendants further admit that the mental health, medical, educational, social, spiritual and emotional needs of juveniles are numerous, complex, and unique and this can affect how juveniles are impacted by prolonged periods of isolation without meaningful interaction and stimulation. Defendants further admit that staffing levels can impact operations, and therefore, they have taken (and continue to take) numerous steps to improve staffing levels. However, Defendants specifically deny that they are "choosing" to operate facilities with inadequate staff. Defendants further deny that they are knowingly exposing juveniles

to a risk of harm. Defendants also deny that children are being locked in their rooms for nearly 24 hours a day. Defendants deny any remaining allegations contained in this paragraph.

14.     Plaintiffs, on behalf of themselves and all others similarly situated, bring this action to redress the violations of their civil, statutory, and constitutional rights by Defendants while acting under color of state law. Plaintiffs challenge Defendants' policies and practices of using solitary confinement at juvenile detention facilities across the state of North Carolina, including the Cabarrus Juvenile Jail and the Dillon Juvenile Jail. These children have suffered immense physical, social, and psychological harm from solitary confinement, and as such, Plaintiffs seek declaratory and injunctive relief demanding that Defendants cease the challenged unconstitutional policies and practices.

RESPONSE: Defendants admit that Plaintiffs purport to assert the legal claims on the basis set forth in this paragraph. But Defendants deny that they have violated any of Plaintiffs' rights under any law. Defendants further deny that Plaintiffs are entitled to any of the relief they seek.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for Defendants' violation of their civil rights under the Eighth and Fourteenth Amendments to the United States Constitution.

RESPONSE: Defendants admit that Plaintiffs assert legal claims pursuant to the authority cited in this paragraph. Defendants deny that Plaintiffs are entitled to any of the relief they seek.

16.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides federal district courts original jurisdiction in civil actions arising under the U.S. Constitution and the laws of the United States, and 28 U.S.C. § 1343(a)(3), which provides federal district courts original jurisdiction in civil actions to redress the deprivation under color of

any State law, of any right secured by the U.S. Constitution.

RESPONSE: Defendants admit that this Court generally has subject-matter jurisdiction over claims asserted pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). Except as specifically admitted, the remaining allegations assert legal conclusions to which responses are not required. To the extent, a response is required, Defendants deny that Plaintiffs are entitled to any of the relief they seek.

17.     This Court has personal jurisdiction over Defendants as residents of North Carolina.

RESPONSE: Admitted.

18.     Venue is proper under 28 U.S.C. § 1391(b) because the Cabarrus Juvenile Jail is located in the Middle District of North Carolina and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Middle District of North Carolina.

RESPONSE: Admitted.

19.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

RESPONSE: Defendants admit that this Court is authorized to grant declaratory and injunctive relief under the authority cited in this paragraph. But Defendants deny that Plaintiffs are entitled to any of the relief they seek.

## PARTIES

### The Named Plaintiffs

20.     Plaintiff John Doe 1 is a black 15-year-old male incarcerated at the Cabarrus Juvenile Jail. John Doe 1 has been at the Cabarrus Juvenile Jail since November 2023 and has not been allowed out of his cell other than to shower, go outside for recreation time (also called "rec time"), make a phone call, or get water. John Doe 1 appears in this action through his mother and guardian Jane Doe 1.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified Jonh Doe 1.

21.     Plaintiff John Doe 2 is a black 16-year-old male incarcerated at the Cabarrus Juvenile Jail. John Doe 2 has been at the Cabarrus Juvenile Jail since November 2023 and has not been allowed out of his cell more than an hour in a day since he arrived. John Doe 2 appears in this action through his mother and guardian Jane Doe 2.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified Jonh Doe 2.

22.     Plaintiff John Doe 3 is a black 17-year-old male incarcerated at the Cabarrus Juvenile Jail. John Doe 3 has been at the Cabarrus Juvenile Jail since December 2023 and has not been allowed out of his cell more than an hour in a day since he arrived. John Doe 3 appears in this action through his mother and guardian Jane Doe 3.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified Jonh Doe 3.

**The Defendants**

23.     Defendant North Carolina Department of Public Safety is the state agency that acts in its administrative capacity to operate ten juvenile detention centers across North Carolina, including the Cabarrus Juvenile Jail. NCDPS is responsible for, among other things, the administration of educational services and programs for children in its custody in juvenile detention centers awaiting adjudication of their case.

**RESPONSE**: Defendants admit that NCDPS operates eight juvenile detention centers across North Carolina, including the Cabarrus Juvenile DC and that each facility provides educational services and programs for children awaiting adjudication of their cases. Except as

specifically admitted, Defendants deny any of the remaining allegations based on the specific language used therein.

24.     Defendant Eddie M. Buffaloe, Jr. is Secretary of the North Carolina Department of Public Safety, the state agency designed to operate the juvenile detention facilities. Defendant Buffaloe is named as a defendant in his official capacity. As Secretary of NCDPS, Defendant Buffaloe is in charge of the administration and supervision of NCDPS and had at all material times overall supervisory authority of the ten juvenile detention centers in North Carolina operated by NCDPS, including the Cabarrus Juvenile Jail, and was and is acting under color of law.

**RESPONSE**: Admitted, except that NCDPS operates eight juvenile detention centers in North Carolina.

25.     Defendant William L. Lassiter is the Deputy Secretary of the Division of Juvenile Justice and Delinquency Prevention ("DJJ"), a division of NCDPS. Defendant Lassiter is named as a defendant in his official capacity. As Deputy Secretary of DJJ, Defendant Lassiter is in charge of the administration and supervision of juvenile corrections within NCDPS and had at all material times overall supervisory authority of the ten juvenile detention centers operated by NCDPS in North Carolina, including the Cabarrus Juvenile Jail, and was and is acting under color of state law.

**RESPONSE**:  Admitted, except that NCDPS operates eight juvenile detention centers in North Carolina.

26.     Defendant Peter Brown is the Facility Director of the Cabarrus Juvenile Jail. Defendant Brown is named as a defendant in his official capacity. Defendant Brown is responsible for the operation, staffing, and oversight at the Cabarrus Juvenile Jail.

**RESPONSE**: Admitted.

# FACTS

## North Carolina Juvenile Detention Centers

27.     In North Carolina, NCDPS provides care and oversight for juveniles upon adjudication as delinquent for commission of offenses that would be criminal if committed by adults.

**RESPONSE**: Defendants admit that juveniles who are adjudicated for offenses that occurred prior to their 18th birthday may be assigned to one of four youth development centers. At these centers, DPS provides developmentally appropriate health, education, and other services. Defendants deny any remaining allegations in this paragraph based on the specific language used therein.

28.     NCDPS also administers and supervises facilities that house juveniles awaiting adjudication for commission of offenses that would be criminal if committed by adults (juvenile detention centers) and juveniles who have been adjudicated delinquent (youth development centers or "YDC").

**RESPONSE**: Defendants admit that DPS operates eight juvenile detention centers, which are secure, temporary facilities that house juveniles sent there by court order pending hearing, disposition, or placement. Defendants deny any remaining allegations in this paragraph based on the specific language used therein.

29.     In North Carolina, Defendant NCDPS administers ten juvenile detention centers: Alexander Regional Juvenile Detention Center; Cabarrus Juvenile Jail; Chatham Detention; Cumberland Regional Juvenile Detention Center; Dillon Juvenile Jail; Lenoir Detention; New Hanover Regional Juvenile Detention Center; Pitt Regional Juvenile Detention Center; Richmond Jenkins Juvenile Detention Center; and Wake Regional Juvenile Detention Center. There are also

four county-operated juvenile detention centers in North Carolina.[4]

**RESPONSE**: Admitted, except that Chatham Detention and Lenoir Detention are both YDCs and not juvenile detention centers.

30.    NCDPS is responsible for the care and oversight of children at these juvenile detention centers.

**RESPONSE**: Defendants admit that NCDPS provides developmentally appropriate health, education, and other services to the children housed within its facilities. Defendants deny any remaining allegations in this paragraph based on the specific language used therein.

31.    Juvenile detention facilities in North Carolina house children between the ages of 10 and 17.

**RESPONSE**: Admitted.

32.    In 2021, 2,423 children were held at juvenile detention centers in North Carolina.[5]

**RESPONSE**: Admitted.

33.    The Cabarrus Juvenile Jail, located in Concord, North Carolina, is a 62-bed juvenile detention facility that houses children prior to adjudication of their cases, pending disposition after adjudication of their cases, or pending placement after disposition of their cases. It is overseen by Defendant Peter Brown, the Facility Director, who is responsible for the operation, staffing, and oversight.

**RESPONSE**: Admitted, except that Cabarrus Juvenile DC currently has 78 beds.

34.    Cabarrus County also has a YDC located right next to the Cabarrus Juvenile Jail

---

[4] Juvenile Detention Centers, NCDPS (last visited Jan. 7, 2024), https://www.ncdps.gov/our-organization/juvenile-justice/juvenile-facilityoperations/juvenile-detention-centers#Alexander-1398.
[5] Ryan Shaffer, *NC Juvenile Justice System Facing Critical Shortage and Unsafe Conditions for Youth and Staff at Detention Centers*, PRE News (May 18, 2023), https://www.publicradioeast.org/pre-news/2023-05-18/nc-juvenile-justice-system-facingcritical-shortage-and-unsafe-conditions-for-youth-and-staff-at-detention-centers.

that houses children upon adjudication as delinquent. To relieve the overcrowding at the Cabarrus Juvenile Jail, certain children have been incarcerated pre-adjudication at the Cabarrus YDC (the "Cabarrus Juvenile Prison").

**RESPONSE**:  Defendants admit that there is a YDC facility located next to the Cabarrus Juvenile DC and that the YDC houses juveniles that have already been adjudicated delinquent. Except as specifically admitted, Defendants deny the remaining allegations contained in this paragraph.

35.     A significant number of children housed in the Cabarrus Juvenile Jail come from Mecklenburg County.

**RESPONSE**: Based on the wording of this allegation, which is nonspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

36.     Mecklenburg County did not have a juvenile detention center from 2010 to 2019. Mecklenburg County closed the detention center to save money during the recession. But it reopened when North Carolina's Raise the Age law took effect in 2019. The State of North Carolina entered into a 3-year contract with the Charlotte Mecklenburg Sheriff's Office to operate a juvenile detention facility at Jail North.[6] It was the largest in the state, accommodating up to 72 children.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

---

[6] Lisa Worf, *Mecklenburg Juvenile Detention Center's Closing Separates Families, Burdens Other Facilities*, WFAE (Dec. 1, 2022), https://www.wfae.org/charlottearea/2022-12-01/meck-juvenile-detention-centers-closing-separates-families-burdensother-facilities.

37.     Mecklenburg County Sheriff Garry McFadden decided to close the juvenile detention center at Jail North by December 1, 2022 to, in part, bulk up staffing at its adult jail uptown and save money.[7]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. To the extent a response is required, Defendants lack sufficient knowledge and information to respond to the assertions made in this paragraph or the written document it references all of which pertain to actors and entities which are not controlled by Defendants.

38.     The children at Jail North were transferred to various detention facilities within North Carolina, with the vast majority going to the Cabarrus Juvenile Jail.

**RESPONSE**: Based on the wording of this allegation, which is nonspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

39.     The Dillon Juvenile Jail, located in Butner, North Carolina, is a 35-bed juvenile detention facility that houses children prior to adjudication of their cases.

**RESPONSE**: Admitted, except that Dillon Juvenile DC currently has 55 beds.

40.     NCDPS administers a state subsidy program to pay a county that provides juvenile detention services and meets State standards a certain per diem per juvenile. In general, this per diem is 50% of the total cost of caring for a juvenile within the county and 100% of the total cost of caring for a juvenile from another county. N.C.G.S. § 143B-820.

**RESPONSE**:  Defendants admit that this paragraph refers to a statute that speaks for itself and offers the best evidence of its contents. Defendants deny any allegations contained in this

---

[7] *Id.*

paragraph to the extent they are inconsistent with said statute.

41.     Therefore, there is an economic incentive for detention centers to allow children from other counties to be jailed at their detention center.

**RESPONSE**: Denied.

42.     North Carolina state statute requires that any county placing a juvenile in a detention facility in another county shall pay 50% of the total cost of caring for the juvenile to NCDPS. *Id.*

**RESPONSE**: Defendants admit that this paragraph refers to a statute that speaks for itself and offers the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said statute.

43.     North Carolina allows detention of children 10 years of age or older before they are adjudicated under certain circumstances. Children detained at juvenile detention centers in North Carolina, including the Cabarrus Juvenile Jail and Dillon Juvenile Jail, have, for the most part, not been adjudicated delinquent or convicted of the offense for which they were detained, but rather are locked in the facility pending hearing, disposition, or placement.

**RESPONSE**: Defendants admit that North Carolina allows detention of children 10 years of age or older before they are adjudicated under certain circumstances, and that most of the children detained at juvenile detention centers in North Carolina, including the Cabarrus Juvenile DC and Dillon Juvenile DC, have not been adjudicated delinquent or convicted of the offense for which they were charged and thus are housed in the facility pending hearing, disposition, or placement. Except as specifically admitted, any remaining allegations are denied.

44.     Prior to adjudication, North Carolina state statute requires the court to review the need for continued secure custody and so children have frequent court appearances.

**RESPONSE**: Defendants admit that this paragraph refers to a statute that speaks for itself and offers the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said statute.

45.    Children transferred to Superior Court in North Carolina for trial as adults are housed in juvenile detention pending trial if they are not released on bond.

**RESPONSE**: Defendants admit that children who are transferred to Superior Court in North Carolina for trial as adults are housed in juvenile detention centers pending trial until they turn 18, at which time they are transferred to a county jail.

46.    Children in the juvenile justice system are different from adults in the criminal justice system; children who are adjudicated delinquent are not convicted of crimes. Children are adjudicated delinquent in non-criminal proceedings and are not provided with the same procedural protections as adults.

**RESPONSE**: The allegations contained in this paragraph are legal conclusions to which no response is required. To the extent a response is deemed required, it is admitted that children generally are adjudicated delinquent through the juvenile justice system and not convicted of crimes.  Defendants also admit that juveniles are afforded enhanced protections in juvenile proceedings. Defendants deny any remaining allegations based on the specific language used therein.

47.    The primary goal of delinquency proceedings is to rehabilitate the child, not to punish.

**RESPONSE**: Defendants admit that rehabilitation is one of the statutory purposes of delinquency proceedings. Defendants deny any remaining allegations based on the specific language used therein.

48.     Juvenile detention centers are intended to be temporary facilities where a child will stay while waiting to go to court or until a placement can be arranged.

**RESPONSE**: Admitted.

**NCDPS Obligations**

49.     Under North Carolina state statute, "[i]n order to provide any juvenile in a juvenile facility with appropriate treatment according to that juvenile's need, [NCDPS] shall be responsible for the administration of statewide educational, clinical, psychological, psychiatric, social, medication, vocational, and recreational services or programs." N.C.G.S. § 143B-815.

**RESPONSE**: Defendants admit that this paragraph refers to a statute that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said statute.

50.     NCDPS touts that "[j]uvenile detention centers provide quality services and programs for juveniles based on their individual needs, to give youths opportunities for positive behavioral change and development."[8]

**RESPONSE**: Defendants admit that this paragraph references a document that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said document.

51.     NCDPS also touts that "[j]uvenile detention centers provide a safe, secure, controlled and humane environment for juveniles and staff . . . and are staffed to provide appropriate oversight."[9]

**RESPONSE**: Defendants admit that this paragraph references a document that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this

---

[8] Juvenile Detention Centers, *supra* note 4.
[9] *Id.*

paragraph to the extent they are inconsistent with said document.

52.     NCDPS states that "youths are provided with basic educational services that mirror the course of study adopted by the N.C. Department of Public Instruction."[10]

**RESPONSE**: Defendants admit that this paragraph references a document that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said document.

53.     Far from the rosy public statements put out by NCDPS, the children locked in juvenile detention centers across North Carolina are not receiving "quality services," are not in a "humane environment," and are not receiving "basic educational services".

**RESPONSE**: Denied.

**<u>Solitary Confinement at Juvenile Detention Centers in North Carolina</u>**

54.     Children at juvenile detention centers across North Carolina are being locked in their cells 23 to 24 hours a day every day.

**RESPONSE**: Denied.

55.     Depending on the detention center, the children may be allowed out of their cells to: take a 10 minute shower; for 30 minutes of rec time twice a week; for 10 minutes to make a phone call; sometimes, if they ask, to go fill their water bottle or to clean an area of the juvenile detention center; or to go to "school", which typically lasts a half hour to an hour. Periodically the guards may allow a few children at a time to leave their cells for 30- 60 minutes.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, and the nature of those activities, varies. Except as specifically admitted, Defendants deny the remaining allegations in this

---

[10] *Id.*

paragraph based on the specific language used therein.

56.     Other than that, children are kept in their locked cell every other minute of the day.

**RESPONSE**: Denied.

57.     Upon information and belief, this solitary confinement has been going on statewide for at least approximately one year.

**RESPONSE**: Defendants specifically deny that children are held in "solitary confinement." Defendants deny any remaining allegations in this paragraph.

**Cabarrus Juvenile Jail**

58.     The Cabarrus Juvenile Jail is one of ten juvenile detention centers in North Carolina. It has two buildings with 62 total beds. It consists of approximately 62 cells arranged on one floor and houses only juveniles. A typical cell is no larger than 8 by 10 feet and contains a toilet, sink, and small window to the outside. Each cell holds one child. The door to each cell is metal with only a panel slot to the outside through which food trays are passed and a small narrow window. The cells have no phones, radios, or televisions.

**RESPONSE**: Defendants admit that Cabarrus Juvenile DC is one of eight state operated detention centers and that it currently has 78 beds. Defendants further admit the rooms are approximately 8 by 10 and each has a toilet and sink. Defendants also admit that there are no phones, radios, or televisions inside the rooms. Except as specifically admitted herein, Defendants deny the remaining allegations contained in this paragraph.

59.     The cells in the Cabarrus Juvenile Jail are arranged around a common area with tables, chairs, and a television.

**RESPONSE**: Admitted.

60.     The population of children detained at the Cabarrus Juvenile Jail varies over time,

though upon information and belief there are typically approximately 62 children at the Cabarrus Juvenile Jail on any given day.

**RESPONSE**: Defendants admit that the population fluctuates based on multiple factors, and that the capacity is currently 78. Except as specifically admitted herein, Defendants deny the remaining allegations contained in this paragraph.

61. Children are often held at the Cabarrus Juvenile Jail for weeks at a time. It is common for children to be locked in the Cabarrus Juvenile Jail for multiple months.

**RESPONSE**: Defendants admit that the length of time that a juvenile spends housed at Cabarrus Juvenile DC varies and depends on multiple factors. Defendants deny the remaining allegations in this paragraph based on the wording thereof.

62. Children at the Cabarrus Juvenile Jail are locked in their cells for 23 or more hours a day. They are allowed out of their cells for one hour or less per day.

**RESPONSE**: Denied.

63. NCDPS decides what the children are let out of their cell to do. On most days, the children get out of their cell for a 10-minute shower. Twice a week the children are let out of their cells for 30 minutes of rec time. Sometimes the children are let out of their cells to make a phone call to their family. Other times NCDPS employees allow the children out of their cells to fill their water bottles or clean areas of the Cabarrus Juvenile Jail. Sometimes the children are let out of their cell to attend "school," which lasts a half hour to an hour.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, and the nature of those activities, varies. Except as specifically admitted, Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

64.     At the Cabarrus Juvenile Jail, if the children take longer than 10 minutes in the shower, they have to shower using the sink in their room the next day.

**RESPONSE**: Denied.

65.     For some children at the Cabarrus Juvenile Jail, the solitary confinement is made worse by the fact that there are not always mattresses available for the beds in cells for newly detained children. As a result, children sometimes are forced to sleep for multiple nights on a piece of plastic that serves as a bed frame in the cells.

**RESPONSE**: Denied.

66.     Because they are not allowed out of their cells for more than a few minutes a day, those children without mattresses are also faced with a decision during the day of whether to lay on the plastic bed frame, sit on the plastic bed frame, lay or sit on the dirty jail floor, or be forced to stand in their cell all day.

**RESPONSE**: Defendants specifically deny that the juveniles in their custody are only permitted out of their rooms for a few minutes a day. Defendants deny the remaining allegations in this paragraph.

67.     Children locked in their cells have virtually no meaningful human interaction. Sometimes they can talk to other children through the walls, but risk punishment for doing so.

**RESPONSE**: Defendants deny that that the juveniles in their custody have virtually no meaningful interaction. Defendants deny the remaining allegations in this paragraph.

68.     Defendants also run the Cabarrus Juvenile Prison, located right next door to the Cabarrus Juvenile Jail, for children who have been adjudicated delinquent.

**RESPONSE**: Admitted, except that Plaintiffs incorrectly refer to the Cabarrus YDC as a prison.

69.     Because of the lack of open cells at the Cabarrus Juvenile Jail, at certain points in 2023 children who have not yet had their cases adjudicated and would otherwise be held at the Cabarrus Juvenile Jail have been held at the Cabarrus Juvenile Prison. Children who have been held at the Cabarrus Juvenile Prison and then later held at the Cabarrus Juvenile Jail have asked the guards to be transferred to the Cabarrus Juvenile Prison because there they were let out of their cells on a regular basis.

**RESPONSE**:  Defendants admit that a number of vacant beds at the Cabarrus YDC were converted for use by the Cabarrus Juvenile DC. Except as specifically admitted herein, Defendants deny the remaining allegations contained in this paragraph.

70.     Upon information and belief, the Cabarrus Juvenile Prison allows children out of their cells on a regular basis in part because various public interest organizations in North Carolina have oversight authority of the Cabarrus Juvenile Prison and regularly inspect the conditions of children detained in the Cabarrus Juvenile Prison.

**RESPONSE**: Defendants admit that children housed at the Cabarrus YDC are regularly permitted to engage in activities outside of their rooms. Defendants deny that this is because of any involvement by outside organizations. Defendants further admit that outside organizations can and do inspect the conditions within the Cabarrus YDC.

71.     Upon information and belief, such inspections do not occur at the Cabarrus Juvenile Jail.

**RESPONSE**: Denied.

**Dillon Juvenile Jail**

72.     The Dillon Juvenile Jail is one of ten juvenile detention centers in North Carolina. It has 35 beds and only houses juveniles. A typical cell is approximately 7 by 9 feet and contains

a toilet, sink, and small window with bars to the outside of the jail. The door to each cell is metal with only a narrow rectangle window to the inside of the jail. Black tape covers the small window to the inside of the jail so the children cannot see out.

**RESPONSE**: Defendants admit that Dillon Juvenile DC is one of eight state operated detention centers and that it currently has 55 beds. Defendants further admit that Dillon Juvenile DC only houses juveniles and that the room size varies but on average is 8 by 10 feet. Defendants further admit that each room has a toilet and sink and that the doors all have a black privacy flap which is a requirement of the Prison Rape Elimination Act and which can be raised or lowered at the juveniles' request. Except as admitted, Defendants deny the remaining allegations based on the specific language used therein.

73.     Children locked up at the Dillon Juvenile Jail report that there are sometimes black maggots in the toilet in their cell. Instead of addressing the problem, Defendant NCDPS tells the children just not to use the toilet for a day or two. The toilet in each child's cell is the only toilet the child has access to because the children are locked in their cells nearly 24 hours a day.

**RESPONSE**: Defendants specifically deny that juveniles at Dillon Juvenile DC are kept in their rooms for nearly 24 hours a day. Defendants deny the remaining allegations in this paragraph.

74.     The cells in the Dillon Juvenile Jail are arranged around a day room with tables, chairs, and a television.

**RESPONSE**: Admitted, as to the one of the three housing units at Dillon Juvenile DC. Defendants further admit that in the other two housing units, the dayroom is a separate room with hallways/wings that lead to the resident rooms.

75.     Children are often held in the Dillon Juvenile Jail for weeks at a time. It is common

for children to be locked in the Dillon Juvenile Jail for multiple months.

**RESPONSE**: Defendants admit that the length of time that a juvenile spends housed at Dillon Juvenile DC varies and depends on multiple factors. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

76.     Children at the Dillon Juvenile Jail are locked in their cells for more than 23 hours a day. On most days, the children are allowed out of their cell to shower for 10 minutes. Some days the children are not allowed to leave their cell to even shower.

**RESPONSE**: Denied.

77.     The children at the Dillon Juvenile Jail, up until approximately December 19, 2023, were allowed to use the phone for 10 minutes each day. Beginning on December 19, 2023, Defendant NCDPS put a new policy in place at the Dillon Juvenile Jail limiting telephone use to once a week.

**RESPONSE**: Denied.

78.     The children at the Dillon Juvenile Jail are not given any rec time. The children do not go outside unless they are transported to a court hearing.

**RESPONSE**: Denied.

79.     The children use the faucet in the sink in their cell for drinking water. They are not allowed out of their cell to get water.

**RESPONSE**: Denied.

80.     The only time the children can interact with the other children is at night when they yell hoping that the other children can hear them.

**RESPONSE**: Denied.

81.     In at least one case, a child was held at the Dillon Juvenile Jail in these conditions

for 50 days straight.

**RESPONSE**: Defendants deny that any juvenile at any facility has been kept in their room for 50 days straight.

82.    Some children being held at the Dillon Juvenile Jail, who have not even been adjudicated of a crime, say being at the Dillon Juvenile Jail is worse than prison.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to allegations concerning comments by unknown persons comparing their experiences at Dillon Juvenile DC to an unspecified prison, and therefore deny them.

83.    The conditions at the Cabarrus Juvenile Jail and Dillon Juvenile Jail are very different than the conditions children experienced when held at Jail North before it closed at the end of 2022.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to allegations concerning the conditions experienced by unknown persons at unspecified times at a facility which Defendants do not operate, and therefore deny them.

84.    Children describe the conditions at Jail North as much better than the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to allegations concerning comments by unknown persons about their experiences at a facility which Defendants do not operate, and therefore deny them.

85.    Upon information and belief, while at Jail North, the children were assigned one of three levels. Bronze level meant that the child got 30 minutes outside his cell every day and a 5-minute call with his family. Silver level meant that the child could stay outside his cell all day long and could have a 10-minute call with his family. Gold level meant that the child could stay outside

his cell all day long and could have a 15-minute call with his family.

RESPONSE: Defendants lack sufficient knowledge and information to respond to allegations concerning the operations at a facility which Defendants do not operate, and therefore deny them.

86. Upon information and belief, children on silver or gold level could shower whenever they wanted to, eat meals in the pod at small tables with other children, and go outside whenever they wanted during the day to engage in activities such as basketball.

RESPONSE: Defendants lack sufficient knowledge and information to respond to allegations concerning the operations at a facility which Defendants do not operate, and therefore deny them.

87. In addition, upon information and belief, Jail North provided Charlotte Mecklenburg School teachers to teach Charlotte Mecklenburg School classes in a classroom setting.

RESPONSE: Defendants lack sufficient knowledge and information to respond to allegations concerning the operations at a facility which Defendants do not operate, and therefore deny them.

**The Conditions at the North Carolina Juvenile Detention Centers Are a Direct Result of Policies, Customs, and Practices Defendants Developed**

88. The policy, custom, and practice of near 24-hour per day solitary confinement has developed as a consistent and deliberate policy, custom, and practice over an extended period of time under the leadership of Defendants Buffaloe and Lassiter, who are responsible for overseeing the day-to-day operation of the juvenile jails, and under the oversight of NCDPS, which has policy making authority for the juvenile jails and exercises hiring authority and oversight. Defendants have subjected children to these conditions with no legitimate penological government purpose

and in the face of condemnation of these practices.

**RESPONSE**: Defendants specifically deny that they have a policy, custom, or practice of near 24-hour per day solitary confinement. Defendants further specifically deny that they have subjected juveniles in their custody to unlawful conditions with no legitimate penological government purpose. Defendants admit that they have oversight over juvenile detention facilities, including hiring, and policy making authority. However, Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

89.    Upon information and belief, the policy, custom, and practice of locking children in their cells nearly 24 hours a day experienced by children in juvenile jails is a direct result of a policy and practice of understaffing the juvenile detention centers that has been established by Defendant NCDPS and overseen and implemented by Defendants Buffaloe, Lassiter, and Brown.

**RESPONSE**: Defendants specifically deny that that they have a policy, custom, or practice of locking juveniles in their rooms for nearly 24 hours a day. Because staffing levels are the result of multiple factors, many of which are outside of the control of Defendants, they specifically deny that they have a policy and practice of understaffing the juvenile detention centers. To the contrary, Defendants admit that they have taken many measures to improve staffing levels across all of their facilities, including Cabarrus and Dillon Juvenile DCs.

90.    The staffing shortages are a regular topic of discussion in the press, yet Defendants have denied that solitary confinement is being used on children regularly.

**RESPONSE**: Defendants admit that staffing levels have been and continue to be a top priority for Defendants. Defendants specifically deny the use of "solitary confinement" in their facilities. Defendants lack sufficient knowledge and information to respond to the allegations concerning regularity of topics published by the press, and therefore deny them.

**Children Are More Vulnerable to the Harms of Solitary Confinement**

91.     Solitary confinement, also known as segregation or isolation, came into frequent use in adult and juvenile detention facilities beginning in the 1980s as the number of incarcerated persons increased dramatically in the United States.

**RESPONSE**: Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

92.     Over the last approximately ten years, however, the deleterious psychological impact of solitary confinement has become much clearer.

**RESPONSE**: Defendants admit that prolonged periods of isolation without meaningful interaction and stimulation may have negative physical and mental health impacts. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

93.     The National Commission on Correctional Health Care defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."[11]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

94.     Similarly, the Association for the Prevention of Torture defines solitary confinement as "keeping an inmate alone in a cell for over 22 hours a day."[12] That organization

---

[11] Position Statement: Solitary Confinement (Isolation), Nat'l Commission on Correctional Health Care (adopted April 10, 2016), https://www.ncchc.org/wpcontent/uploads/Solitary-Confinement-Isolation.pdf.
[12] Solitary Confinement, Ass'n for the Prevention of Torture (last visited Jan. 7, 2024), https://www.apt.ch/knowledge-hub/dfd/solitary-confinement.

has concluded that "children, persons suffering from mental health disabilities, pregnant and nursing women, or women detained with their children should never be subjected to solitary confinement."[13]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

95. Because juveniles are still developing psychologically, neurologically, and socially, they are especially susceptible to psychological harm when they are isolated from other people.

**RESPONSE**: Defendants admit that prolonged periods of isolation without meaningful interaction and stimulation may have negative physical and mental health impacts. Defendants further admit that juveniles are still developing psychologically, neurologically, and socially, and thus the psychological impact of certain conditions may affect them differently than adults. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

96. Juveniles in isolation face a significant risk of serious mental harm. Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. Research shows that almost all suicides within juvenile correctional facilities occur when the child is in some type of isolation and that the majority of juveniles who commit suicide had a history of being placed in isolation.

---

[13] *Id.*

**RESPONSE**: Defendants admit that prolonged periods of isolation without meaningful interaction and stimulation may have negative physical and mental health impacts. Defendants further admit that because juveniles are still developing psychologically, neurologically, and socially, and they may face unique risks. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

97.     These mental health concerns can cause long-term harm. Solitary confinement can lead to chronic conditions like depression, which in teenagers can manifest as anger or as self-harm. In addition, children who experience depression and anxiety in their teenage years are at a higher risk for presenting with these diagnoses again. Damage associated with low self-esteem, vegetative features, and hopelessness associated with depression can similarly be long standing. Depression has a 10% or 15% mortality rate associated with it. Solitary confinement increases the risk of suicide substantially compared to the general population.

**RESPONSE**: Defendants admit that prolonged periods of isolation without meaningful interaction and stimulation may have negative physical and mental health impacts. Defendants further admit that because juveniles are still developing psychologically, neurologically, and socially, they may face unique risks. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

98.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred. Unlikely to trust others, juveniles emerging from solitary have trouble forming therapeutic relationships necessary to address mental health concerns resulting from solitary confinement.

**RESPONSE**: Defendants admit that prolonged periods of isolation without meaningful interaction and stimulation may have negative physical and mental health impacts. Defendants further admit that because juveniles are still developing psychologically, neurologically, and socially, they may face unique risks. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

99.    Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm. In the adolescent brain, the connections between the frontal lobe and the mid-brain have not fully developed. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric conditions like paranoia and anxiety. Trauma from solitary confinement has a high likelihood of causing these permanent changes.

**RESPONSE**: Defendants admit that prolonged periods of isolation without meaningful interaction and stimulation may have negative physical and mental health impacts. Defendants further admit that because juveniles are still developing psychologically, neurologically, and socially, they may face unique risks. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

100.    The risk of harm is made worse by the disproportionately high incidence of preexisting trauma and mental health concerns among juveniles in the criminal justice system. Research shows that more than 60% of the youth in correctional settings are experiencing major mental health challenges.[14] Stress from isolation can compound past trauma and exacerbate mental

---

[14] Minors in Custody – Mental Health Issues, Child Crime Prevention & Safety Center (last visited Jan. 7, 2024), https://childsafety.losangelescriminallawyer.pro/minors-in-custodymental-

health challenges and disabilities.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

101. For those juveniles experiencing mental health challenges and disabilities, the risk of harm is especially great. People with mental health challenges and disabilities often experience cognitive deficits in their brain structure or biochemistry. They often have weakened defensive mechanisms, are at a higher risk for further mental health complications, and are more susceptible to significant trauma from isolation. Trauma from isolation will be more long-lasting for those with mental health challenges or disabilities than those without.

**RESPONSE**: Defendants admit that for people experiencing mental health challenges and disabilities, the risk of harm to them in general may be different than for people without mental health challenges and disabilities. Based on the wording of this paragraph, which is unspecific and ambiguous, Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

102. Studies have shown that solitary confinement lasting more than 15 days may cause irreversible damage.[15]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

---

healthissues.html#:~:text=Mental%20Health%20Concerns%20and%20Juvenile%20Justice&te
xt=In%20fact%2C%20studies%20have%20shown,also%20have%20substance%20abuse%20issues.

[15] U.N. Secretary-General, Interim Report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment, U.N. Doc. A/66/268 at 9 (Aug. 5, 2011), https://immigrantjustice.org/sites/default/files/2011_08%2520United%2520Nations%252
0Report%2520on%2520Solitary%2520Confinement.pdf

103.    The American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care all have called on correctional facilities to halt the use of solitary confinement of juveniles.

**RESPONSE**: Defendants admit that this paragraph refers to statements issued by the associations referenced herein, which speak for themselves, offer their own assertions, and are the best evidence of their contents. Except as specifically admitted, Defendants deny any remaining allegations.

104.    In 2012, the American Academy of Child and Adolescent Psychiatry issued a policy statement opposing the use of solitary confinement for juveniles in correctional facilities because of their developmental vulnerability, noting that "[t]he potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis. Due to their developmental vulnerability, juvenile offenders are at particular risk of such adverse reactions. Furthermore, the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement."[16]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

105.    In 2014, the American Medical Association issued a policy statement declaring that it "oppose[d] the use of solitary confinement in juvenile correction facilities except for extraordinary circumstances when a juvenile is at acute risk of harm to self or others."[17]

---

[16] Solitary Confinement of Juvenile Offenders, American Academy of Child & Adolescent Psychiatry (approved by Council April 2012), https://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_offenders.aspx.

[17] Youth Solitary Confinement, the American Medical Association (last modified 2016), https://policysearch.amaassn.org/policyfinder/detail/youth%20solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

106.     In 2016, the National Commission on Correctional Health Care issued a position statement concluding that "[j]uveniles . . . should be excluded from solitary confinement of any duration."[18]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said document.

107.     Acknowledging the high risk of mental health concerns as well as the higher rates of suicide and self-harm for youth in solitary confinement, in 2015 the United Nation's Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Juan E. Mendez, concluded that juveniles, given their physical and mental immaturity, should never be subjected to solitary confinement. He called the imposition of solitary confinement of any duration on juveniles "cruel, inhuman or degrading treatment or punishment or even torture."[19]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

108.     The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules) state that solitary confinement should be prohibited in cases involving children.[20]

---

[18] Solitary Confinement (Isolation), *supra* note 11.

[19] Juan E. Mendez, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, U.N. Doc. A/HRC/28/68 at 9 (March 5, 2015), http://undocs.org/en/A/HRC/28/68.

[20] Commission on Crime Prevention and Criminal Justice, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules), U.N. Doc. E/CN.15/2015/L.6/Rev. 1 at 18-19 (May 21, 2015), https://www.unodc.org/documents/commissions/CCPCJ/CCPCJ_Sessions/CCPCJ_24/res olutions/L6_Rev1/ECN152015_L6Rev1_e_V1503585.pdf.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

109.     In a series of Eighth Amendment cases involving the death penalty and life without parole sentences, the United States Supreme Court has held that the Constitution requires that children not be punished like adults without first accounting for the unique traits that make them children.

**RESPONSE**: Defendants admit that to the extent that this paragraph refers to specific court opinions, those opinions speak for themselves and are the best evidence of their contents. Except as specifically admitted, Defendants deny any remaining allegations.

110.     The Juvenile Detention Alternatives Initiative ("JDAI"), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to less than four hours.[21]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

111.     Having recognized in a 2012 report that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement,"[22] in 2016 the U.S. Department of Justice prohibited the use of solitary confinement for juveniles in federal prisons.

---

[21] Juvenile Detention Facility Assessment: Standards Instrument, JDAI at § III, 98 (2014 Update), https://www.cclp.org/wp-content/uploads/2016/06/JDAI-Detention-FacilityAssessment-Standards.pdf
[22] *Report of the Attorney General's National Task Force on Children Exposed to Violence*, *supra* at note 1.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

112.    States have been banning the use of disciplinary isolation for children held in juvenile detention facilities as well.[23]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

113.    Shortly after the federal ban was announced, in June 2016, NCDPS announced the end to solitary confinement for inmates in adult correctional facilities who were under 18 years of age. The Commissioner of Adult Correction and Juvenile Justice at the time stated that

> [t]he mental health, medical, educational, social, spiritual and emotional needs of these youth are numerous and complex . . . it is of paramount importance that, while these youth are in our care, their unique needs are accurately identified and addressed in the most effective way possible. . . . In keeping with this commitment, we will eliminate the use of solitary confinement within our under-18 population and have developed a new program to address the aforementioned unique needs of this age group.[24]

At the time, North Carolina was one of only two states that tried 16- and 17-year-olds as adults.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for

---

[23] *See, e.g.*, Amy Fettig, *2019 was a Watershed Year in the Movement to Stop Solitary Confinement*, ACLU National Prison Project (December 2019), https://www.aclu.org/news/prisoners-rights/2019-was-a-watershed-year-in-themovement-to-stop-solitary-confinement (noting that five states passed laws in 2019 to limit the use of solitary confinement on children); *see also State Laws or Rules that Limit or Prohibit Solitary Confinement of Juveniles*, National Conference of State Legislatures (January 2021), https://www.documentcloud.org/documents/21203238-state-laws-thatlimit-or-prohibit-solitary-confinement-2020 (cataloging states that have limited solitary confinement for children)

[24] Letter from W. David Guice, Commissioner Adult Correction and Juvenile Justice, to Colleagues at NCDPS (enclosing Youthful Offender Program) (June 15, 2016), https://files.nc.gov/ncdps/documents/files/YouthfulOffenderProgram.pdf; *see also State Prison System Announces End to Solitary Confinement for Inmates Under 18*, NCDPS (June 15, 2016), https://www.ncdps.gov/press-release/state-prison-system-announces-endsolitary-confinement-inmates-under-18.

itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said document. Defendants further admit that this document was released after the Federal government announced changes to its practices in 2016. Except as specifically admitted, Defendants deny any remaining allegations.

114.     In 2015, with funding from the U.S. Department of Justice and the Bureau of Justice Assistance, NCDPS partnered with the Vera Institute of Justice ("Vera") "to help DPS reduce its use of segregation." Vera's "assistance included conducting an assessment of DPS's use of segregation and providing ways to decrease its use."[25]

**RESPONSE**: Defendants admit that NCDPS partnered with Vera to conduct a study, which was published in December 2016, and appears on NCDPS's website. Defendants further admit that this paragraph refers to the Vera report which speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

115.     In December 2016, Vera issued a final report titled "The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the North Carolina Department of Public Safety" (the "Vera Report").

**RESPONSE**: Admitted.

116.     The Vera Report noted as one of the "Key Reforms" that during its assessment "DPS began instituting several remarkable reforms, including: A prohibition on the use of segregation for youth under 18 years of age."[26]

**RESPONSE**: Defendants admit that this paragraph refers to the Vera report which speaks

---

[25] Jessa Wilcox, Léon Digard, Elena Vanko, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the North Carolina Department of Public Safety*, Vera Institute of Justice at 3 (Dec. 2016) [hereinafter the "Vera Report"]
https://files.nc.gov/ncdps/documents/files/Vera%20Safe%20Alternatives%20to%20Segregation%20Initiative%20Final%20Report.pdf.
[26] *Id*.

for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

117.    Vera "applaud[ed] this policy change, particularly in light of the research on the deleterious effects of restrictive housing on incarcerated youth."[27] Vera noted that "the existing studies have found that placing youth in restrictive housing is correlated with significantly higher rates of suicide as well as with post-traumatic stress disorder (PTSD), depression, and future criminal activity. The psychological harm caused by the solitary confinement of young people in juvenile and criminal justice settings can exacerbate preexisting mental illness and increase the likelihood of subsequent drug abuse."[28]

**RESPONSE**: Defendants admit that this paragraph refers to the Vera report which speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

118.    The Vera Report notes that "DPS's new Youthful Offender Program goes beyond simply prohibiting putting youth in restrictive housing; it identifies that, '[s]upervision methods used with adults simply do not work with this population, and . . . supervision should be based on building positive relationships utilizing specific communication skills and using a positive discipline approach to teach new behaviors and self-control.'"[29]

**RESPONSE**: Defendants admit that this paragraph refers to the Vera report which speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

---

[27] *Id*. at 63.
[28] *Id*.
[29] *Id*. at 67.

**Defendants are Fully Aware of the Risks of Solitary Confinement and Have Deliberately Chosen to Ignore Those Risks**

119.    Defendants know or should be aware of the risks of solitary confinement for youth.

**RESPONSE**: Defendants specifically deny actual or constructive knowledge that any of their policies, customs, practices, or the conditions of any of their facilities, cause, exacerbate, or expose the juveniles in their custody to a risk of harm.

120.    For example, President Obama's actions to prohibit solitary confinement of juveniles in federal custody – and the research on which the prohibition was based – were widely reported in the media.

**RESPONSE**: Defendants admit knowledge of the actions taken by the Federal government, which are referenced in this paragraph. Defendants lack sufficient knowledge and information to respond to the allegation concerning unspecified research, and therefore deny them.

121.    NCDPS announced in June 2016 the end to solitary confinement for inmates in adult correctional facilities who were under 18 years of age noting that "[t]he mental health, medical, educational, social, spiritual and emotional needs of these youth are numerous and complex. It is important that while these youth are in our care, their unique needs are accurately identified and addressed in the most effective way possible."[30]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said document. Except as specifically admitted, Defendants deny any remaining allegations.

122.    NCDPS also commissioned Vera to prepare an assessment of NCDPS's use of

---

[30] *State Prison System Announces End to Solitary Confinement for Inmates Under 18*, NCDPS, *supra* note 23.

solitary confinement and the Vera Report provided to NCDPS discussed the "deleterious effects of restrictive housing on incarcerated youth."[31]

RESPONSE: Defendants admit that NCDPS partnered Vera to conduct a study, which was published and speaks for itself and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations.

123.    Defendant Lassiter recognized the risks of solitary confinement in a public interview in November 2019:

> What we've learned was that just getting on them, getting in their face and being punitive towards them really wasn't changing their behavior. We also used to lock kids in their room for a long time, and put them in isolation. We don't do that anymore. We find that kids that are locked in their rooms, they're not growing. They're not getting the therapy. They're not trying to use the skills we're trying to teach them.[32]

RESPONSE: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. To the extent a response is required, Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with specific statements of Defendant Lassiter as contained in said document. Except as specifically admitted, Defendants deny any remaining allegations.

124.    In addition, the Council for Children's Rights ("CFCR") and other organizations and defense attorneys have consistently raised with NCDPS throughout 2023 the deplorable conditions that exist for children in the juvenile jails.

RESPONSE: Defendants admit that through 2023, various external stakeholders have contacted them to voice various concerns. Defendants specifically deny that the conditions at any of their facilities are "deplorable." Defendants lack sufficient knowledge and information to

---

[31] Vera Report at 63.
[32] *The Dark Past of the Stonewall Jackson Youth Development Center*, *supra* note 3.

respond to the allegations concerning the frequency or content of communications sent by unspecified persons or groups, and therefore deny them.

125.    As early as January 31, 2023, CFCR raised concerns to Defendants regarding conditions at the Cabarrus Juvenile Jail that were "alarming." CFCR stated it was concerned about "lack of educational services, little to no therapeutic services, length of time between showers, limited to no time outside of their cells, [and] amount of time their flap is left down preventing any view outside of their cell." CFCR also noted that "the Deputies have reported the children are hungry when arriving to Court and during Court resulting in the Deputies obtaining food for the children." Despite the alarming allegations, Defendants have failed to address the problem.

**RESPONSE**: Defendants admit that this paragraph appears to refer to a document that speaks for itself and is the best evidence of its contents. Defendants lack sufficient knowledge and information to respond to the allegations concerning the contents of this unspecified communication, and therefore deny them. Defendants deny any remaining allegations in this paragraph.

126.    On February 1, 2023, the Children's Alliance, an organization in Mecklenburg County made up of community members and organizations that works to collectively identify, advocate, and find solutions for the challenges and barriers faced by children in the community, held a meeting to discuss the state of the juvenile jails and overall impact of Raise the Age. Defendant Lassiter was asked to attend to provide a detailed overview of the current conditions and barriers. Defendant Lassiter attended the meeting and discussed the staffing shortages at the juvenile jails.

**RESPONSE**: Defendants admit that Defendant Lassiter has knowledge of the Children's Alliance and attended past meetings. Defendants deny that Defendant Lassiter attended a meeting

on February 1, 2023, and discussed staffing shortages. Except as specifically admitted, Defendants deny any remaining allegations.

127.    On June 5, 2023, the Children's Alliance held a meeting with, among others, Dena Diorio (the Mecklenburg County Manager) and representatives from the Children's Alliance and CFCR. The purpose of the meeting was to discuss whether Mecklenburg County would be willing to reopen the juvenile detention facility at Mecklenburg County Jail North that closed at the end of 2022. Upon information and belief, Defendant Lassiter attended the meeting and CFCR again raised to Defendant Lassiter that, among other things, the children at the Cabarrus Juvenile Jail were not being allowed out of their cells and were not receiving educational services.

**RESPONSE**: Defendants admit that Defendant Lassiter attended a meeting of the Children's Alliance on June 5, 2023. Defendants specifically deny the allegation that Defendant Lassiter reported that children at the Cabarrus Juvenile DC were not being allowed out of their rooms and were not receiving educational services.  Except as specifically admitted, Defendants deny any remaining allegations.

128.    On July 19, 2023, the Children's Alliance held a meeting with, among others, Defendant Lassiter, the Interim Chief Court Counselor for Mecklenburg County from NCDPS, the Mecklenburg County Sheriff Garry McFadden, certain Mecklenburg County district court judges, and representatives from the Children's Alliance and CFCR. The purpose of the meeting was to address how some children from Mecklenburg County in detention at the Cabarrus Juvenile Jail did not have beds and were sleeping on the floor. CFCR again raised at that meeting that, among other things, the children at the Cabarrus Juvenile Jail were not being allowed out of their cells, were not receiving educational services, and were not receiving therapeutic services. Sheriff McFadden advised that he was not reopening the juvenile detention facility at Jail North.

Defendant Lassiter reported that NCDPS was understaffed.

**RESPONSE**: Defendants admit that Defendant Lassiter attended a meeting of the Children's Alliance on July 19, 2023, and reported that NCDPS was understaffed. Based on the wording of the Defendants lack sufficient knowledge and information to respond to the allegations concerning statements made by other persons.

129. On October 25, 2023, the Children's Alliance held a meeting with, among others, Defendant Lassiter, Sheriff McFadden, Dena Diorio, representatives of the Mecklenburg County District Attorney's office and Mecklenburg County NCDPS, and representatives from the Children's Alliance and CFCR. The purpose of the meeting was to discuss concerns surrounding Mecklenburg County children who were being detained at the Cabarrus Juvenile Jail in light of the conditions at the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants admit that on October 25, 2023, the Children's Alliance held a meeting with, among others, Defendant Lassiter to discuss the children who were being detained at the Cabarrus Juvenile DC. Except as specifically admitted, Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

130. Sheriff McFadden reiterated at the October 25, 2023 meeting that he was not reopening the juvenile detention center at Jail North. CFCR again raised its concern that, among other issues, the children at the Cabarrus Juvenile Jail were not being allowed out of their cells and were not receiving educational services. Defendant Lassiter acknowledged several investigations that had occurred into the conditions of the Cabarrus facilities which resulted in corrective action plans. Defendant Lassiter did not specify the location of the site investigations and reported to the group that conditions had improved. Upon information and belief, Defendant Lassiter was describing visits by Disability Rights North Carolina and other organizations to the Cabarrus

Juvenile Prison, not the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants admit that Defendant Lassiter attended a meeting of the Children's Alliance on October 25, 2023, and discussed that various groups conducted site investigations at both the Cabarrus Juvenile DC and Cabarrus YDC. Based on the wording of this paragraph, Defendants lack sufficient knowledge and information to respond to the allegations concerning statements made by other persons.

131.   On December 18, 2023, The News & Observer in Raleigh published an article reporting that NCDPS was "locking minors up in rooms for days and weeks to cope with a severe staffing shortage and other issue."[33] The article described the story of a mother with a teen in a 35-bed detention center, upon information and belief the Dillon Juvenile Jail,[34] who had been locked in his 7 by 9 foot room for more than 30 days nearly 24 hours a day. When confronted by the reporter, Defendant Lassiter admitted that Defendants are not letting the children in the state-run facilities out of their cells to cope with staffing shortages.

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. Except as specifically admitted, Defendants deny any remaining allegations based on the specific wording thereof.

132.   In addition, defense attorneys for children detained and jailed in the Cabarrus Juvenile Jail have repeatedly put on the record in these children's court cases that the children are not being allowed out of their cells, are not receiving educational services, and are not receiving therapeutic services. A court counselor employed by NCDPS is assigned to each child's case and

---

[33] Virginia Bridges, *NC Isolates Incarcerated Youth in Locked Rooms. Is it Solitary Confinement?*, The Charlotte Observer (Dec. 18, 2023), https://www.msn.com/enus/news/us/nc-isolates-incarcerated-youth-in-locked-rooms-is-it-solitary-confinement/arAA1lFOvW.

[34] Defendant NCDPS maintains a website describing the ten juvenile detention centers in North Carolina. The only detention center listed with 35 beds is the Dillon Juvenile Jail. *See* Juvenile Detention Centers, NCDPS, *supra* note 4.

is in the courtroom during every proceeding. The NCDPS court counselors are present when the children's defense attorneys are describing these conditions at the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants admit that a court counselor employed by NCDPS is assigned to cases and is present at various proceedings. Defendants lack sufficient knowledge and information to respond to the allegations concerning the frequency or content of communications overheard by unspecified persons during unspecified court proceedings, and therefore deny them.

133.    The conditions at the Cabarrus Juvenile Jail are so concerning that attorneys for the children detained there have requested in many cases, and the District Court judges have ordered, that the children be allowed to shower, be allowed nurse visits, be allowed to attend doctors' appointments, be allowed to have telephone calls with family, and even be transferred to county-run juvenile detention centers that do not impose solitary confinement.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations concerning the requests of unspecified defense attorneys or the orders of unspecified judges in unspecified cases, and therefore deny them.

134.    By virtue of complaints and meetings with advocates, Defendants have been repeatedly put on notice of the substantial right of serious harm posed by its use of solitary confinement. Notwithstanding this notice, Defendants continue their regular use of solitary confinement and ignore the complaints of the children and their counsel.

**RESPONSE**: Denied.

### Denying Juveniles in Solitary Confinement Appropriate Education Under North Carolina State Law Without Due Process

135.    In addition to being placed at risk of serious harm, the children in solitary confinement are also denied North Carolina state-mandated educational services without due process.

**RESPONSE**: Defendants specifically deny exposing juveniles to a known risk of harm. Defendants further specifically deny the use of "solitary confinement." Defendants also deny that they are not providing the required level of educational services in their facilities.

136.    NCDPS is statutorily mandated to provide educational services to children in juvenile detention centers, including Cabarrus Juvenile Jail. N.C.G.S. § 143B-815.

**RESPONSE**: Defendants admit that this paragraph refers to a statute that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said statute.

137.    The NCPDS DJJ Education Policy and Requirements and Procedures ("NCDPS Education Policy") states that each child must receive 1,000 hours of instruction per year or 500 hours per semester for high schools on semester schedules while in its care.

**RESPONSE**: Defendants admit that this paragraph refers to a policy that speaks for itself and is the best evidence of its contents. Defendants deny any allegations contained in this paragraph to the extent they are inconsistent with said policy.

138.    Defendants' actions prevent children from attending school at the detention centers and from regularly receiving tutoring or other individualized instruction or classroom services. These children are left without any regular educational instruction for as long as they are in solitary confinement. Children can go weeks at a time without receiving any schoolwork or instruction.

**RESPONSE**: Defendants specifically deny the use of "solitary confinement." Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used herein.

139.    Upon information and belief, Defendants make no meaningful effort to provide

children held in solitary confinement with educational instruction and therefore the children receive no education during their time in solitary confinement, which is often the entire time they are held at the jail.

**RESPONSE**: Defendants specifically deny the use of "solitary confinement." Defendants deny the remaining allegations in this paragraph.

### Cabarrus Juvenile Jail

140.    Although the Cabarrus Juvenile Jail can hold 62 children and has been overcrowded for most, if not all of 2023, only a handful of children have received educational services.

**RESPONSE**: Denied.

141.    NCDPS employees at the Cabarrus Juvenile Jail maintain a calendar showing how many children received educational services each day.

**RESPONSE**: Defendants admit that at some point in late 2023, NCDPS staff at the Cabarrus Juvenile DC began maintaining daily reports regarding educational services provided to youth housed at the facility.

142.    When the second semester started on January 3, 2023, NCDPS allowed children out of their cell at the Cabarrus Juvenile Jail to attend school 12 days that month. On those 12 days, anywhere from 2 to 12 children attended school. Many days only 3 or 4 children attended school. On the other days, no children attended school.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

143.    School attendance at the Cabarrus Juvenile Jail only got worse from there.

**RESPONSE**: Denied.

144.    In February 2023, NCDPS allowed children to attend school 11 days that month. On those 11 days, anywhere from 3 to 8 children attended school on any given day, with the exception of one day where 11 children attended school. On most days, only 3 or 4 children attended school. On the other days, no children attended school.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

145.    By April and May 2023, NCDPS was hardly allowing any children out of their cells at the Cabarrus Juvenile Jail to attend school. In April 2023, NCDPS allowed children to attend school on 7 days. Among those 7 days, on two days only 1 child attended school and on two other days only 2 children attended school. On the other days, no children attended school. In May 2023, NCDPS allowed children to attend school at the Cabarrus Juvenile Jail on 4 days. On those days, 2, 4, 5, and 9 kids attended. On the other days, no children attended school.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

146.    In June 2023, summer school started at the Cabarrus Juvenile Jail. NCDPS allowed children to attend school on 5 of the 15 school days. On those days, 5 to 8 children went to school each day.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the

children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

147.     In July 2023, NCDPS allowed children to attend school on 3 days that month. On the other days, no children attended school.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

148.     Upon information and belief, the same children did not attend school on each of the days NCDPS allowed children out of their cell to receive educational services.

**RESPONSE**: Defendants admit that depending on multiple factors the amount of time the children are able to access activities outside of their rooms, including educational programming, varies. Defendants deny the remaining allegations in this paragraph based on the specific language used therein.

149.     In light of the fact that the Cabarrus Juvenile Jail has 62 beds and is consistently full, holding "school" a few times a month for a few children means that most children are going to school a handful of times per month at most.

**RESPONSE**: Denied.

150.     Even when the children are allowed to go to school, school generally lasts a half hour to an hour at the Cabarrus Juvenile Jail. At that rate, each child would have to go to school 1000 – 2000 days a year to reach 1,000 hours of instruction as mandated by the NCDPS Education Policy.

**RESPONSE**: Denied.

151.    The instruction that is provided during that one half hour to an hour of school is usually a lesson via video on a laptop that is provided to the children.

**RESPONSE**: Denied.

**Dillon Juvenile Jail**

152.    The children in the Dillon Juvenile Jail are not receiving educational services at all.

**RESPONSE**: Denied.

153.    The closest thing to activities even resembling educational services is Defendant NCDPS sliding crosswords and word search handouts under the doors of the children's cell a few times a week.

**RESPONSE**: Denied.

154.    The children in the Dillon Juvenile Jail are not going to classes or receiving any other type of instruction.

**RESPONSE**: Denied.

155.    Outside of any formal educational services, the Dillon Juvenile Jail does not even have enough books to allow the children to exchange books when they have finished reading them.

**RESPONSE**: Denied.

156.    It is well-established that education in correctional facilities reduces recidivism rates.[35]

**RESPONSE**: Defendants admit that this paragraph refers to a document that speaks for itself, offers its own assertions, and is the best evidence of its contents. To the extent a response is

---

[35] *See* Lois M. Davis, Robert Bozick, Jennifer L. Steele, Jessica Saunders, and Jeremy N.V. Miles, *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs That Provide Education to Incarcerated Adults*, RAND Corporation (2013), https://www.rand.org/pubs/research_reports/RR266.html.

required, Defendants admit, upon information and belief, that education in correctional facilities reduces recidivism.

157.    Defendants have failed to provide the children at juvenile detention centers in North Carolina access to meaningful and comprehensive educational resources.

**RESPONSE**: Denied.

158.    NCDPS employs the teachers at the juvenile detention centers, but upon information and belief, none of the children in detention are receiving full-time educational services.

**RESPONSE**: Defendants admit that teachers are employed at NCDPS juvenile detention centers. Except as specifically admitted herein, Defendants deny the remaining allegations.

159.    Children incarcerated in juvenile detention centers in North Carolina are at crucial points in their educational development. Outside incarceration, cancellation of a single day of school causes school districts to mobilize and plan to make up every lost hour at the end of the year. Yet when juveniles enter juvenile detention centers prior to their cases even being adjudicated, their educational needs are simply ignored for the weeks or months they are detained there. They are thus deprived of education and denied the education provided to other children their age in North Carolina.

**RESPONSE**: Defendants admit that juveniles are incarcerated in juvenile detention centers at a time in their lives when providing for their education is important. Defendants specifically deny that they are ignoring the education needs of juveniles. The remaining allegations in this paragraph are denied based on the specific language used therein.

160.    As a proximate result of Defendants' repeated failures to provide an adequate education to children in their custody, the children incarcerated in the juvenile detention centers

suffer compounding physical and psychological harm from their confinement and are falling behind in their academic development.

**RESPONSE**: Denied.

<u>**NAMED PLAINTIFFS' INDIVIDUAL ALLEGATIONS**</u>

**Plaintiff John Doe 1**

161.    John Doe 1 is fifteen-years old and has been detained at the Cabarrus Juvenile Jail since November 2023. The charges against him have not been adjudicated.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

162.    John Doe 1's cell at the Cabarrus Juvenile Jail is small. It is just large enough for him to be able to do pushups on the floor. It has one bed, a sink, and a toilet. It has a small window above the bed to the outside. It has a metal door with a skinny window to the interior of the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants admit that all rooms have a bed, a sink, and a toilet. Except as specifically admitted, Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

163.    John Doe 1 has been locked in his cell in isolation every day since he arrived at the Cabarrus Juvenile Jail in November 2023. On most days, he is in his cell for 23 hours and 50 minutes of the 24-hour day.

**RESPONSE**: Defendants deny that any juveniles are locked in their rooms for 23 hours and 50 minutes a day on most days. Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph concerning the unidentified John Doe 1.

164.    The only times the guards unlock John Doe 1's cell and let him out temporarily are:

a.  A 10-minute shower. John Doe 1 is allowed 10 minutes to take a shower. If he takes longer than 10 minutes, the next day is a "bird bath" day. A "bird bath" is where John Doe 1 is not let out of his cell at all to shower and has to clean himself using the sink in his cell. Some days John Doe 1 is not allowed to shower at all. For example, on or about December 26, 2023, John Doe 1 was not allowed to shower and was told it was because the jail was short on staff.

b.  Rec time. Once a week John Doe 1 is supposed to get "rec time" where the guards let the children out of their cells a few children at a time and bring them outside for 30 minutes.

c.  To get water. John Doe 1 sometimes asks the guards to leave his cell to fill up his cup with water just to get out of his cell. Up until recently some of the guards have allowed him out of his cell to get water, but he must immediately return to his cell after he gets water. Now the children are not allowed to have cups in their room and so there are no opportunities to leave the cell to get water.

d.  To clean. John Doe 1 sometimes asks the guards if he can mop the floor or clean up so that he can get out of his cell. The guards sometimes allow him to do this.

e.  Phone calls. On Tuesdays and Fridays John Doe 1 is allowed to come out of his cell onto the pod to make a phone call. He is generally limited to 10 minutes for his phone time.

f.  Discretionary releases. On a few days, one guard has allowed John Doe 1

and others out of their cells, three children at a time, into the pod where they can play games or watch tv for 30 minutes.

**RESPONSE**: Defendants deny that any juvenile is locked in their rooms for 23 hours and 50 minutes a day on most days. Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph concerning the unidentified John Doe 1, including the allegations in subparagraphs a. through f.

165.    Other than a 10-minute shower, John Doe 1 was not allowed out of his cell on Christmas day.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

166.    John Doe 1 and the children in the Cabarrus Juvenile Jail eat their meals in their cell alone. The jail staff cannot watch the children eat because each child is in his own cell and there is only a small window into the cell.

**RESPONSE**: Defendants deny that most children at Cabarrus Juvenile DC eat their meals in their rooms alone. Defendants admit that most often, children at the Cabarrus Juvenile DC eat their meals outside of their rooms at tables in the dayroom area. Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph concerning the unidentified John Doe 1.

167.    The Cabarrus Juvenile Jail guards bring breakfast to the children in their cells at 8 AM, lunch at 11 AM, and dinner at 4 PM. John Doe 1 is often hungry because they bring dinner so early.

**RESPONSE**: Defendants admit that at the Cabarrus Juvenile DC, breakfast is served at approximately 8AM, lunch is served at approximately 11AM, and dinner is served at

approximately 5PM, and children receive additional snacks after each meal. Except as specifically admitted, any remaining allegations contained in this paragraph are denied.

168. John Doe 1 has been allowed to have one visit so far with family.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

169. The guards have punished children for actions as minor as attempting to talk to other children while in their cells. In response, the guards often institute "Temporary Confinement" for 3 days in which the guards flip the flap down on their door and window so that the children cannot see out their door or window. This is in addition to the solitary confinement the children at the Cabarrus Juvenile Jail are already experiencing.

**RESPONSE**: Defendants admit that staff sometimes have to take actions in response to specific behavioral, safety, or security concerns. Defendants specifically deny the remaining allegations in this paragraph.

170. John Doe 1 is in 9th grade. John Doe 1 has not received any educational services or attended school since he arrived at the Cabarrus Juvenile Jail in November. John Doe 1 understands that children have to be at the Cabarrus Juvenile Jail for two to three weeks before they can start receiving educational services. Even when the children have been at the Cabarrus Juvenile Jail for this length of time, only a few children a day are allowed to receive educational services. When the children are allowed out of their cell to go to school, the children are given a Chromebook and headphones and listen to a lesson on the computer.

**RESPONSE**: Defendants specifically deny that children must be at the Cabarrus Juvenile DC for two to three weeks before they receive educational services. Defendants admit that children occasionally use laptop computers for educational instruction. Defendants lack sufficient

knowledge and information to respond to the remaining allegations in this paragraph concerning the unidentified John Doe 1. Defendants deny any remaining allegations in this paragraph.

171.     John Doe 1 has little to do in his cell. He reads books, but if he finishes his book, he cannot get a new one until the guards let him out of his cell, which can sometimes be a full day or more. He also does pushups, although there is little room in his cell to do that. He sometimes talks to the other children but risks getting in trouble and being placed in Temporary Confinement as a consequence.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

172.     John Doe 1 is frustrated and angry that he has to be in his cell all day. Sometimes his frustration boils over and he just screams. It is difficult to be in his cell the entire day because the other children are often screaming and yelling and banging on their cells.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

173.     John Doe 1's interaction with jail staff is limited. At times, he has to bang on this cell door and walls to try to get the staff's attention.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

174.     When John Doe 1 does get the jail staff's attention, the staff at the Cabarrus Juvenile Jail tell John Doe 1 that they cannot let him out of his cell because they are short on staff.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

175.     John Doe 1 has been in the Cabarrus Juvenile Jail previously in 2023. Each time he

has been in the Cabarrus Juvenile Jail in 2023 he has experienced the same solitary confinement conditions.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 1.

**Plaintiff John Doe 2**

176.    John Doe 2 is sixteen-years old and has been detained at the Cabarrus Juvenile Jail since November 2023. The charges against him have not been adjudicated.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2.

177.    John Doe 2's cell at the Cabarrus Juvenile Jail is small. It is approximately the size of a medium sized closet in a house. It has a bed on the wall and a sink and toilet. It has a small window on the door to the interior of the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants admit that all rooms have a bed, a sink, and a toilet. Otherwise, Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2.

178.    There are often bugs in John Doe 2's cell. He regularly kills ants and spiders in his cell and has been bit on the face by insects.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2.

179.    John Doe 2 has been locked in his cell in isolation every day since he arrived at the Cabarrus Juvenile Jail in November 2023. On most days, he is in his cell for 23 hours and 50 minutes of the 24-hour day.

**RESPONSE**: Defendants deny that any juvenile is locked in their room for 23 hours and

50 minutes per day for most days. Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2.

180.     The only times the guards unlock John Doe 2's cell and let him out temporarily are:

    a.    A 10-minute shower. John Doe 2 is allowed 10 minutes to take a shower. If he takes longer than 10 minutes, he will get in trouble.

    b.    Rec time. John Doe 2 last was allowed out of his cell for rec time weeks ago. John Doe 2 has asked the jail staff to go outside, but the staff has told him they are short staffed.

    c.    Phone calls. On Mondays and Wednesdays John Doe 2 is allowed to come out of his cell onto the pod to make a phone call. He is limited to ten minutes for his phone time.

    d.    Discretionary releases. Once in a while the guards will allow John Doe 2 out of his cell for 45 minutes to an hour into the pod. John Doe 2 was allowed out of his cell for about an hour on or about December 23 or December 24, and he played board games.

**RESPONSE**: Defendants deny that any juvenile is locked in their room for 23 hours and 50 minutes per day for most days. Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2, including the allegations in subparagraphs a. through d.

181.     Other than a 10-minute shower and a 10-minute telephone conversation with his mother, John Doe 2 was not allowed out of his cell on Christmas day.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2.

182.     John Doe 2 eats all of his meals in his locked cell. He is not supervised during that time.

**RESPONSE**: Defendants specifically deny that children at the Cabarrus Juvenile DC eat all of their meals in their rooms. Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 2.

183.     When the children get in trouble with the guards, the guards often institute "Temporary Confinement." For example, if the children take longer than 10 minutes in the shower or have too many books in their cells, the guards can institute Temporary Confinement. Temporary Confinement can include putting the flap down over the window of a child's door to his cell, turning off the water in his cell, and taking away a child's blankets on his bed.

**RESPONSE**: Defendants admit that staff sometimes have to take actions in response to specific behavioral, safety, or security concerns. Defendants specifically deny the remaining allegations in this paragraph.

184.     John Doe 2 was put in Temporary Confinement once where the guards put the flap on his window down so he could not see out his door to the interior of the jail and turned his water off so he could not flush his toilet.

**RESPONSE**: Defendants admit that the doors have flaps that can cover the window on the door to provide privacy while a juvenile is using the toilet, changing clothes, or for other reasons, consistent with the requirements of the Prison Rape Elimination Act. Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph.

185.     Temporary Confinement is in addition to the solitary confinement the children at the Cabarrus Juvenile Jail are already experiencing.

**RESPONSE**: Defendants deny the use of "solitary confinement." Defendants admit that

at times juveniles must be temporarily isolated for safety and security reasons and that this is referred to as Temporary Confinement.

186.     John Doe 2 is in 10th grade. John Doe 2 has not received any education services or attended school since he arrived at the Cabarrus Juvenile Jail in November 2023. John Doe 2 was told that he might be able to receive educational services after January 1, 2024.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

187.     John Doe 2 has not received any mental health treatment or counseling since he arrived at the Cabarrus Juvenile Jail in November despite being declared to not have capacity in previous juvenile proceedings in District Court.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

188.     John Doe 2 has little to do in his cell. He reads books. He also works out in the little room he has in his cell by doing pushups, dips, and planks. He sometimes writes songs. He spends a lot of time just lying in his bed.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

189.     John Doe 2 is depressed, mad, and sad that he has to be in his cell all day. He spends a lot of time thinking about what he can do differently when he gets out of jail and goes home.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

190.     The guards at the Cabarrus Juvenile Jail tell John Doe 2 that they cannot let him out of his cell because they are short on staff.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

191.    John Doe 2 has been in the Cabarrus Juvenile Jail prior to 2023 and does not understand why he cannot come out of his cell like he was able to back then.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph.

**Plaintiff John Doe 3**

192.    John Doe 3 is 17-years old and has been detained at the Cabarrus Juvenile Jail since December 2023. The charges against him have not been adjudicated.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

193.    John Doe 3's cell at the Cabarrus juvenile jail is very small. It has a bed, sink and toilet, small window to the outside, and a door with a small narrow rectangle window to the inside of the jail.

**RESPONSE**: Defendants admit that all rooms have a bed, a sink, and a toilet. Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

194.    There is a flap that can be put up or down covering his window on his cell door. About half the time the flap is down so that John Doe 3 cannot see out through the window on his door.

**RESPONSE**: Defendants admit that the doors to the rooms at Cabarrus Juvenile DC have flaps that can cover the window on the door to provide privacy consistent with the requirements of the Prison Rape Elimination Act. Defendants lack sufficient knowledge and information to

respond to the remaining allegations in this paragraph concerning the unidentified John Doe 3.

195.     John Doe 3 has difficulty sleeping because some of the other children are yelling and beating on their doors at night.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

196.     John Doe 3 has been locked in his cell in isolation every day since he arrived at the Cabarrus Juvenile Jail in December 2023. On most days he is in his cell for 23 hours and 50 minutes of the 24-hour day.

**RESPONSE**: Defendants deny that any juvenile is locked in their room for 23 hours and 50 minutes per day for most days. Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

197.     The only times the guards have unlocked John Doe 3's cell and let him out temporarily are:

    a.     A 10 or 15-minute shower.

    b.     The guards let 4 children out of their cells one day, including John Doe 3, for 10 to 15 minutes to watch tv in the pod.

    c.     To make a phone to his family. John Doe 3 understands the policy to be that the children get to make a 5 or 10-minute phone call to their family on Tuesdays and Fridays, although he is not always allowed to make a call on those days.

**RESPONSE**: Defendants deny that any juvenile, including John Doe 2, is locked in their room for 23 hours and 50 minutes per day for most days. Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John

Doe 3, including the allegations in subparagraphs a. through c.

198. John Doe 3 has not been allowed to have any recreational time outside since he has been held at the Cabarrus Juvenile Jail. When John Doe 3 has asked the guards if the children will be able to have rec time, they say no.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

199. John Doe 3 receives three meals a day that are brought to and left in his cell. John Doe 3 is nearly always hungry because the food does not taste good and he can barely eat it.

**RESPONSE**: Defendants deny that children at the Cabarrus Juvenile DC eat all meals in their rooms. Defendants lack sufficient knowledge and information to respond to the remaining allegations in this paragraph concerning the unidentified John Doe 3.

200. John Doe 3's interaction with jail staff is very limited since he is in his cell all day long. If he needed to get a guard's attention, he would try to bang on his cell door and hope the guard came to his cell.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

201. John Doe 3 is in 11th grade. John Doe 3 has not received any educational services or attended school since he arrived at the Cabarrus Juvenile Jail.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

202. John Doe 3 was held in the Cabarrus Juvenile Jail previously in 2023. John Doe 3 stated the conditions were largely the same back then, except he and the other children were usually not even allowed out of their cells to shower and were held in their cells 24 hours a day.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3 or other unidentified persons.

203.    Now, John Doe 3 has very little do in his cell all day at the Cabarrus Juvenile Jail. He mainly sleeps and reads. He spends most of his time thinking about what he can do to make sure he is never put in a situation like this again.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

204.    John Doe 3 is often sad because of the conditions that he is being held in and because he is away from his family.

**RESPONSE**: Defendants lack sufficient knowledge and information to respond to the allegations in this paragraph concerning the unidentified John Doe 3.

## CLASS ACTION ALLEGATIONS

205.    Plaintiffs John Doe 1, John Doe 2, and John Doe 3 bring this action on their own behalf and on behalf of others similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All juveniles who are currently, or in the future will be, detained in a North Carolina juvenile detention facility operated by NCDPS (the "Statewide Class").

In the alternative, Plaintiffs seek to represent a Class consisting of:

> All juveniles who are currently, or in the future will be, detained in the Cabarrus Juvenile Jail (the "Cabarrus Class").

**RESPONSE**: Defendants admit that Plaintiffs seek to represent the putative class alleged in this paragraph. However, Defendants specifically deny that the putative class meets the requirements for class certification. Defendants also specifically deny that Plaintiffs qualify to represent any such putative class.

206.    The above classes are collectively referred to as the "Class." If discovery or further investigation reveals that the Classes should be expanded or otherwise modified, the named Plaintiffs reserve their right to amend the Class definitions or propose subclasses as necessary.

**RESPONSE**: Defendants specifically deny that the putative class meets the requirements for class certification, and therefore denies that further expansion or modification would be proper.

207.    The Class satisfies the requirements of Rule 23(a) in that:

a.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable.        The juvenile detention centers in North Carolina house thousands of juveniles annually. In 2021, 2,423 children were held at juvenile detention centers in North Carolina. The Cabarrus Juvenile Jail detains hundreds of juveniles annually. All juveniles incarcerated at the juvenile detention centers are at significant risk of unconstitutional solitary confinement and unlawful denial of educational services. Every month, Class members enter and exit the juvenile detention centers. The names, case numbers, dates of confinement, and all other relevant records are in possession of Defendants and are easily ascertainable. Many of these children are unable to file individual lawsuits because of their youth, disabilities, or lack of financial resources.

b.    *Commonality*: Common questions of law and fact arise from Defendants' conduct described herein. Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include, but are not limited to the following:

i.    Whether Defendants permit and practice solitary confinement;

ii.    Whether Defendants' policies and practices of placing incarcerated children in solitary confinement have violated and will continue to violate Class members' Eighth and Fourteenth Amendment rights;

iii. Whether Defendants have unlawfully denied educational services to incarcerated children in violation of the Class members' Fourteenth Amendment rights;

iv. Whether, and to what extent, injunctive relief should be imposed on Defendants to prevent such conduct in the future; and

v. Whether Defendants should be enjoined from continuing their unlawful practices.

c. *Typicality*: Plaintiffs' claims are typical of the claims of the Class members. All Plaintiffs are incarcerated at juvenile detention centers in North Carolina, including the Cabarrus Juvenile Jail, and have been subject to Defendants' challenged policies, practices, and procedures (or lack thereof). Therefore, Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

d. *Adequacy of Representation*: Plaintiffs, their representatives, and class counsel will fairly and adequately protect the interests of the Class and will diligently serve as Class representatives. Plaintiffs do not have any antagonistic interests to the Class members and seek injunctive relief on a class-wide basis to remedy class injuries and enjoin Defendants' unlawful conduct. Furthermore, Plaintiffs and the Class members are represented by competent counsel who are experienced in civil rights and class action litigation.

e. This action is maintainable as a class action pursuant to Rule 23(b)(1)(A) because the prosecution of separate actions by individual children would create a risk of inconsistent and varying adjudications, which in turn, would establish incompatible standards of conduct for the juvenile detention centers.

f. This action is also maintainable as a class action pursuant to Rule 23(b)(2)

because Defendants have acted, or failed to act, on grounds generally applicable to the Class as a whole, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Class.

g.      This action is also maintainable pursuant to Rule 23(b)(3) because the common questions of law and fact overwhelmingly predominate in this case. The common questions of law and fact listed above are dispositive questions in the case of every member of the Class. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of Defendants' policies and practices than individual suits by hundreds or thousands of North Carolina residents.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**DECLARATORY JUDGMENT: VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983) (brought on behalf of the Statewide Class, or, in the alternative, on behalf of the Cabarrus Class)**

208.    The allegations of paragraphs 1 to 207 above are incorporated herein.

**RESPONSE**: Defendants incorporate their responses to paragraphs 1 to 207 herein.

209.    When Defendants take a child into custody, they assume a duty under the Fourteenth Amendment of the U.S. Constitution to protect the child from harm and substantial risk of serious harms.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

210.    Plaintiffs and members of the Class have substantive Due Process rights that

include, but are not limited to: the right to be free from and protected from physical, psychological, and emotional harm; the right to necessary treatment, care, and services; the right not to deteriorate physically, psychologically, or emotionally while in custody; and the right to be free from substantial risks of the above-mentioned harms.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

211.    Defendants maintain a policy, custom, and practice of using solitary confinement as the default confinement method in juvenile detention centers in a manner that lacks any penological or justifiable government purpose and is grossly inconsistent with established clinical and legal consensus that youth solitary confinement is profoundly harmful.

**RESPONSE**: Denied.

212.    Defendants further compound the harm to children detained at juvenile detention centers by denying them any meaningful education at critical points in their academic development.

**RESPONSE**: Denied.

213.    These practices are imposed on juveniles with no legitimate government purpose or penological purpose and violate public policy and law in other regards.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

214.    Defendants are aware of the harm and risks of harm these practices cause to children at the juvenile detention centers, yet have consistently applied the same harmful policies and practices and failed to make any changes to improve the conditions. Defendants' response to this harm and risk of harm, or lack of a response, is objectively unreasonable and shows a deliberate,

knowing, or reckless disregard for the consequences.

**RESPONSE**: Denied.

215.    Defendants' actions were taken under color of state law and within the scope of their employment. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

216.    The conditions described in this Complaint violate the Due Process rights of the children detained at juvenile detention centers in North Carolina operated by NCDPS.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

217.    Defendants have continuously violated the law, as detailed in this Complaint. As a proximate result of Defendants' actions, Plaintiffs, as well as the Class they represent, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries.

**RESPONSE**: Denied.

218.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to subject Plaintiffs and the Class to a substantial risk of serious harm, in violation of their Fourteenth Amendment rights.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT: VIOLATION OF THE EIGHTH AMENDMENT (42 U.S.C. § 1983) (brought on behalf of the Statewide Class, or, in the alternative, on behalf of the Cabarrus Class)

219.    The allegations of paragraphs 1 to 218 above are incorporated herein.

**RESPONSE**: Defendants incorporate their responses to paragraphs 1 to 218 herein.

220.    Furthermore, the Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment on convicted and incarcerated juveniles, including by exercising deliberate indifference to substantial risks of serious harm, inhumane conditions, and inadequate care.

**RESPONSE**: Admitted.

221.    The above-described conditions of solitary confinement at juvenile detention centers across the state of North Carolina and Defendants' policies, practices, acts, and omissions have inflicted, and continue to inflict, grave and inhumane deprivations, injuries, and risks to the Plaintiffs as well as the Class, all of which violate contemporary standards of decency and are intolerable in today's society.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

222.    The risks of harm to Plaintiffs and the Class as a result of the above-described conditions at the juvenile detention centers and Defendants' policies, practices, acts, and omissions are obvious and known to Defendants.

**RESPONSE**: Denied.

223.    Moreover, Defendants were notified of these risks by others and, thus, actually knew of the risks of harm to Plaintiffs and the Class as a result of the above- described conditions of confinement at the juvenile detention centers and Defendants' policies, practices, acts, and

omissions.

**RESPONSE**: Denied.

224.     Despite actual knowledge of the obvious risks of harm to Plaintiffs and the Class at the juvenile detention centers, Defendants have disregarded these excessive risks to the health and safety of Plaintiffs and the Class and have failed to rectify the conditions of confinement at the juvenile detention centers or to make preventative changes to their policies and procedures.

**RESPONSE**: Denied.

225.     As a result, Defendants have acted with deliberate indifference to the excessive risk of harm to Plaintiffs and the Class as a result of the conditions of confinement at the juvenile detention centers operated by NCDPS and Defendants' policies, practices, acts, and omissions complained of herein.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

226.     By imposing solitary confinement, Defendants have subjected Plaintiffs and the Class to cruel and unusual punishment, in violation of the Eighth Amendment.

**RESPONSE**: Defendants specifically deny that the impose "solitary confinement." The remaining allegations in this paragraph are denied.

227.     Defendants have acted or failed to act and are continuing to act or fail to act under color of state law.

**RESPONSE**: Denied.

228.     Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to subject Plaintiffs and the Class to a substantial risk of

serious harm, in violation of their Eighth Amendment rights.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

**THIRD CAUSE OF ACTION**

**TEMPORARY AND PERMANENT INJUNCTIVE RELIEF (42 U.S.C. § 1983) (brought on behalf of the Statewide Class, or, in the alternative, on behalf of the Cabarrus Class)**

229. The allegations of paragraphs 1 to 228 above are incorporated herein.

**RESPONSE**: Defendants incorporate their responses to paragraphs 1 to 218 herein.

230. Based on the allegations contained in the previous paragraphs, Plaintiffs claim they are entitled to a Preliminary and Permanent Injunction.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

231. Plaintiffs' Eighth and Fourteenth Amendment rights have been violated under color of state law.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

232. To end an ongoing violation of Plaintiffs' rights, Defendants must be immediately restrained from placing Plaintiffs and the Class in solitary confinement as punishment, discipline, or because there is inadequate staffing, and from placing Plaintiffs in solitary confinement for any reason other than a rare and temporary response to prevent imminent and serious physical harm to persons due to a juvenile's behavior.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

233. To make Plaintiffs whole and restore their rights, Defendants must also be enjoined

from taking further action to deprive Plaintiffs of their right to humane treatment while awaiting adjudication in the form of placing them in solitary confinement.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

234.    Plaintiffs and the Class have no adequate remedy at law and only injunctive relief can restore their constitutionally protected rights and ensure the protection of their rights in the future.

**RESPONSE**: The allegations in this paragraph are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

**ALL OTHER ALLEGATIONS MADE IN PLAINTIFFS' COMPLAINT, INCLUDING THE DOCUMENTS REFERENCED THEREIN AND THE RELIEF REQUESTED, EXCEPT AS SPECIFICALLY ADMITTED ABOVE, ARE HEREBY DENIED.**

**FURTHER ANSWERING THE COMPLAINT AND AS FURTHER DEFENSES THERETO, DEFENDANTS ASSERT THE FOLLOWING:**

**FIRST FURTHER DEFENSE**

Plaintiffs fail to state a claim upon which this Court can grant relief pursuant to the Eighth, or Fourteenth Amendments to the United States Constitution.

**SECOND FURTHER DEFENSE**

Defendants deny that their policies, practices, actions, or omissions, violate Plaintiffs' constitutional or other rights. More specifically, Defendants deny that any of their policies, practices, actions, or omissions, subject Plaintiffs to cruel and unusual punishment, are deliberately indifferent to any known substantial risk of harm, or otherwise violate Plaintiffs' rights.

**THIRD FURTHER DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because if Plaintiffs have suffered any injury, which is expressly denied, such injury would not be a proximate result of any of

Defendants' policies, practices, or actions.

## FOURTH FURTHER DEFENSE

Defendants are not liable to Plaintiffs pursuant to 42 U.S.C. § 1983 because of the absence of an express policy adopted by Defendants that caused any alleged constitutional deprivation or violation of any law.

## FIFTH FURTHER DEFENSE

Defendants are not liable to Plaintiffs pursuant to 42 U.S.C. § 1983 because of the absence of a clear and persistent pattern of constitutional violations similar to that alleged by Plaintiffs of which Defendants were aware or should have been aware.

## SIXTH FURTHER DEFENSE

Defendants are not liable to Plaintiffs pursuant to 42 U.S.C. § 1983 because Defendants did not tacitly approve of any unconstitutional conduct, policy, custom, or other law that was the cause of the alleged constitutional violation.

## SEVENTH FURTHER DEFENSE

Defendants are not liable to Plaintiffs pursuant to 42 U.S.C. § 1983 because Defendants did not fail to institute a policy despite an obvious need to do so such that Defendants were deliberately indifferent in failing to adopt such policy.

## EIGHTH FURTHER DEFENSE

Defendants' actions, at all times, were performed in good faith as part of their official duties and were reasonably related to legitimate government objectives. Thus, Defendants are entitled to deference, as their good faith actions were particularly within the discretion and province of the legislative and executive branches of government.

## NINTH FURTHER DEFENSE

Because Plaintiffs have not exhausted alternative administrative remedies available to them and have not sufficiently alleged that such available remedies are inadequate, their claims are barred pursuant to 42 U.S.C. § 1997e(a).

## TENTH FURTHER DEFENSE

Defendants specifically plead that Plaintiffs seek prospective relief that may exceed this Court's authority under 18 U.S.C. § 3626.

## ELEVENTH FURTHER DEFENSE

The individual defendants are shielded from liability by the Eleventh Amendment and sovereign immunity, which Defendants assert in this action including but not limited to all official capacity claims against them.

## TWELFTH FURTHER DEFENSE

Defendants plead all other applicable immunities to which they are entitled by law as a complete bar to all applicable claims in this action.

## THIRTEENTH FURTHER DEFENSE

Ordering Defendants to formulate and implement new policies and practices may constitute an inappropriate incursion by the Court into functions that the North Carolina Constitution delegates to the state executive branch of government.

## FOURTEENTH FURTHER DEFENSE

Plaintiffs' claims for permanent injunctive relief must fail, as Plaintiffs have not established 1) that Plaintiffs suffered irreparable injury; 2) that remedies at law are inadequate; 3) that the balance of hardships weighs in Plaintiffs' favor; and 4) that a permanent injunction would not disserve the public interest.

## FIFTEENTH FURTHER DEFENSE

Plaintiffs cannot sustain a class or subclass under Rule 23 of the Federal Rules of Civil Procedure because, among other things, the evidence fails to support the requirements of numerosity, commonality, and typicality.

## SIXTEENTH FURTHER DEFENSE

To the extent that Plaintiffs are no longer in detention, they lack standing to seek the relief sought in this action.

## SEVENTEENTH FURTHER DEFENSE

Prior to and since the filing of this action, Defendants have been in the process of voluntarily working to enhance its policies and practices regarding the housing of juveniles within its facilities. Therefore, no attorneys' fees are appropriate in this case. If attorneys' fees were appropriate, they should be limited to an hourly rate that is 150 percent of the hourly rate established under 17 U.S.C. § 3006A for court appointed counsel.

## ADDITIONAL DEFENSES

Defendants reserve the right, as allowed by law or the Court, to amend their Answer to assert any additional affirmative or other defenses allowed by the Federal Rules of Civil Procedure that develop or arise as additional evidence is discovered during the course of this litigation.

WHEREFORE, having responded to the allegations of Plaintiffs' Complaint, and having asserted the above-noted defenses, Defendants herein pray the Court as follows:

1. That Plaintiffs' Complaint be dismissed with prejudice;

2. That Plaintiffs' have and recover nothing from them in this action;

3. That the costs of this action, including reasonable attorney's fees, be taxed to Plaintiffs;

4. For such other and further relief as the Court deems just and proper; and

5. For a trial by jury of all issues of fact herein.

Respectfully submitted this the 4th April, 2024.

**JOSHUA H. STEIN**
**ATTORNEY GENERAL**

/s/ Orlando L. Rodriguez
Orlando L. Rodriguez
Special Deputy Attorney General
State Bar No. 43167
orodriguez@ncdoj.gov

Matthew Tulchin
Special Deputy Attorney General
State Bar No. 43921
mtulchin@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, North Carolina 27602
Phone: 919-716-6900
Fax: 919-716-6763
*Counsel for Defendants*