# EXHIBIT C



October 15, 2024

# Monitoring Debrief Memo
## Cabarrus JDC

<u>Facility Name:</u> Cabarrus Youth Development Center (YDC) – Juvenile Detention Center (JDC) Units

<u>Monitoring Visit Date:</u> September 12, 2024

<u>Visit Details:</u> Five individuals from DRNC monitored on September 12, 2024, hosted by YDC/JDC Facility Director Peter Brown and staff. Western Regional Manager Joseph Payne was also present during our monitoring visit. We conducted 40 youth interviews in the JDC during our monitoring visit. We conducted an exit meeting virtually on September 19, 2024. DRNC had previously conducted an abbreviated monitoring visit at Cabarrus JDC on February 12, 2024. This monitoring debrief memo concerns our September 12, 2024 visit.

The Cabarrus YDC/JDC facility contains both YDC and JDC units. DRNC also monitored in the YDC units on September 12, 2024. However, this monitoring debrief memo concerns only our monitoring in the JDC units on that date.

<u>Overall Impressions:</u> Because this was our first full monitoring visit of the Cabarrus JDC units, trends in conditions at the facility are difficult to identify. Our monitoring team did note some improvements from our abbreviated February 2024 visit concerning time out of room for students, though this was inconsistent. During our September 2024 visit, we identified several significant concerns, including but not limited to the facility's use of Temporary Confinement and the facility's practice of shackling students by the ankles when implementing "shackle plans," also called "safety plans."

<u>Physical Condition of the Facility:</u> We toured housing units, the grounds, and classrooms. Physical conditions were basic. We heard student reports of, and observed, pest issues in the facility. Pests included cockroaches and other insects, and at least one student reported concerns regarding mice. There was at least one report of mold in the facility, including in a bathroom. A young person reported that the bathrooms needed inspection. No other immediate safety concerns regarding the physical condition of the facility were noted. Of note, prior to our visit, there had been a weather-related electrical issue which had impacted the facility's operations in previous days.

<u>Concerns Regarding Time Out of Rooms:</u> In our interviews, there was significant variation in reported time out of rooms. Positively, some students in the housing units "down the hill" (Kirk

801 CORPORATE CENTER DRIVE | SUITE 118 | RALEIGH, NC 27607
919-856-2195 • 877-235-4210 • 919-856-2244 FAX • TTY USERS, DIAL 711

General Confidential Information    Case 1:24-cv-00017-CCE-JLW    Document 47-3    Filed 12/09/24    Page 2 of 5    DPS-015116

and McWhorter) reported significant time out of their rooms daily; some students reported being out of their rooms all day, particularly recently. At least one student noted that students in a down-the-hill unit were out far more often than in prior months, when students were noted to have been in their rooms for nearly 24 hours a day except for showers. On the other hand, we also heard from youth in units down the hill that they were in their rooms for 22-23 hours a day. Students in JDC units "up the hill" also reported varied time out of rooms, with some reporting three hours, some most of the day, and at least one report of a unit that was on "lockdown" for several weeks during which students did not come out on the pod and had largely been confined to their rooms.

Multiple students reported that the amount of time in their rooms was worsening their mental health.

As a behavioral consequence, students could be assigned Temporary Confinement (TC). TC could be imposed as a consequence for behaviors such as having contraband, kicking a door, or using profane language. When a student was on TC, they were reported to be confined to their rooms with the room window to the pod covered with a black opaque flap. TC was reported to last 1-3 days. While on TC, students did not attend school and only were allowed to leave their rooms for showers and possibly phone calls. Several young people reported that students on TC did not get phone calls. During TC, young people saw no one except the people who brought meals. At least one young person reported that students' water in their rooms was cut off while on TC. Students on TC were not permitted to go to school. We also heard report of "23-1" status used for multiple weeks as a disciplinary measure for a student.

<u>Educational Concerns:</u> Students in the JDC units reported having 1-2 hours daily of class, in addition to some students accessing other work on tablets. Some students reported that instruction was minimal and mainly delivered via packets. One DRNC staff member observed an in-person class that seemed engaging. In the facility, there did not appear to be a clear plan for fully implementing the Occupational Course of Study, and for implementing it in the least restrictive educational environment. At least one student mentioned not receiving their Section 504 plan accommodations.

<u>Other Access Concerns (to recreation, medical/mental health care, food, family contact):</u> Of significant concern on this visit was the facility's use of "shackle plans." We heard significantly more reports about "shackle plan" on this visit than previously. Numerous students reported that, when students get in a fight, they are placed on "shackle plans" for approximately 3 weeks, though the end date is typically murky. While on "shackle plans," young people were placed in ankle shackles while in the facility and outside of their rooms. DRNC monitors interviewed at least three students who were shackled during the interviews. While on "shackle plan," students did not have access to phone calls or recreation, but did attend school. Students reported that individuals on "shackle plans" were even shackled when showering. DRNC strongly requests that the facility ceases use of "shackle plans" - also called "safety plans" by staff. We do not

believe this to be a trauma-informed intervention, and we have concerns for the students' safety should an emergency situation occur while they are shackled.

Students reported that there was a positive behavior support level system in place in the JDC, though the highest level seemed difficult to reach. We heard at least one report that restraints happened with some regularity "down the hill."

Students down the hill generally reported regular access to outdoor recreation. These students did not have access to the indoor gym facility up the hill. Students up the hill generally reported somewhat regular – not daily – access to recreation; these young people seemed to have irregular access to outdoor recreation.

Students reported approximately twice weekly allowed phone calls, with increased call privileges corresponding to behavioral levels.

Students consistently raised complaints about the quality of the food served.

Of other significant concern, multiple students reported that they were required to be strip-searched following in-person visits with their families. This traumatizing practice caused several students to forgo in-person contact with their families. Students reported that, if they refused strip searches after in-person visits, they were placed in Temporary Confinement until they consented to be strip-searched.

Grievance forms were reported to not always be provided to students.

A bilingual DRNC staff person interviewed students in Spanish, if desired by the student. In general, language access while in the facility was an area noted for improvement.

<u>Individual Student Concerns and Facility Response:</u> We shared individual student-level concerns in our virtual debrief meeting. They are listed on the attached document.

Of note, Western Regional Manager Mr. Payne indicated in the virtual debrief meeting that the facility would be making changes to its TC and "shackle plan" / "safety plan" policies and practices looking forward.

<u>DRNC's Systemic Follow Up Requests:</u> Having completed the September 2024 monitoring visit of Cabarrus JDC, DRNC specifically requests:

1) Consistency in ensuring young people throughout the JDC receive increased time out of rooms, including during staffing shortages.
2) Review and trauma-informed revision of the policy and practice of Temporary Confinement, in which young people may currently be confined to their rooms (with flaps over the windows) for more than 23 hours a day for multiple days.
3) Elimination of the practice of "shackle plans."

General Confidential Information    Case 1:24-cv-00017-CCE-JLW    Document 47-3    Filed 12/09/24    Page 4 of 5    DPS-015118

4) Review and trauma-informed revision of the policy and practice requiring strip searches after in-person visitation.
5) Addressing of pest and mold issues.
6) A clear policy for expedient request of student records from young people's base schools, particularly where the young person is likely to be in secure custody for an extended period. Students should be afforded the opportunity to attend educational instruction even while waiting for school records to be received.
7) Increased direct instruction for all students.
8) Implementation of students' IEPs and Section 504 plans.
9) Consistent access to outdoor recreation time for all students and, for students "up the hill," consistent access to indoor recreation time.
10) Addressing of food quality concerns.
11) Review of uses of restraint.
12) Ensuring the provision of grievance forms, and timely follow-up.
13) Attention paid to language access for students who do not speak English, both for accessing schoolwork and in day-to-day interactions in the facility.
14) Full follow-up of individual student concerns raised in the September 2024 exit meeting.

Sincerely,

Cari Carson, Esq., MSW
Supervising Attorney – Education Team
Disability Rights NC