# **EXHIBIT 6**



February 6, 2025

## Monitoring Debrief Memo
## New Hanover Regional JDC

<u>Facility Name:</u> New Hanover Regional Juvenile Detention Center

<u>Monitoring Visit Dates:</u> November 8, 2024

<u>Visit Details:</u> Five individuals from DRNC monitored on November 8, 2024, and were given a tour of the facility by Director Keonya Williams. Eastern Regional Manager Ms. Tangi Jordan was also present during our monitoring visit. On the day of our visit, the facility had a census of 21 (including 1 arriving young person), and a capacity of 18. Director Williams reported 30 staff positions with 3-4 vacancies; gaps were filled by security guards. We spoke with 14 young people during our visit. We conducted a virtual exit meeting on November 14, 2024.

<u>Overall Impressions:</u> Youth reported significant variability in time out of room at the facility. Youth consistently reported that they got out of their rooms more on the second staff shift than the first staff shift. Educational access was an area of concern.

<u>Physical Condition of the Facility:</u> The condition of the physical facility was basic. The day room was generally bright, with natural light. In general, flaps were not covering youths' windows to the day room. The day room included a large selection of books. The facility had recently gotten new mattresses. The outdoor recreation area was large, with grassy areas, a basketball court, and a bench. At least two bathrooms had missing floor tiles and appeared in need of cleaning. One youth noted that a shower drain needed repair. We noted no other serious concerns related to maintenance or cleanliness of the physical facility.

<u>Concerns Regarding Time Out of Rooms:</u> Youth reported a wide variation in time out of room, though consistently noted that the second shift staff were more likely to get them out of their rooms than the first shift staff. Youth reported between 1.5 and 6 hours out of their rooms on weekdays. Youth reported between 2 hours out of their rooms and being out of their rooms all day on weekends.

Multiple youth reported that the facility had been on "lockdown" in the days prior to our visit, resulting in significant amounts of time confined to their rooms; this "lockdown" was due to behavior concerns. "Lockdowns" in general seemed to occur with some regularity. At least one youth also reported that they were confined to their room upon arrival to the facility for approximately 23.5 hours in a day due to COVID protocols.

**801 CORPORATE CENTER DRIVE | SUITE 118 | RALEIGH, NC 27607**
**919-856-2195 • 877-235-4210 • 919-856-2244 FAX • TTY USERS, DIAL 711**

DRNC_065

Case 1:24-cv-00017-CCE-JLW    Document 88-6    Filed 10/13/25    Page 2 of 5

Whereas first shift was noted to be more likely to put youth on "lockdown," the second shift staff were noted to care for the young people and to get youth out of their rooms more, including allowing youth on gold level to stay out of their rooms until 10:30 PM. Youth reported sometimes eating in their rooms and sometimes eating in the dayroom.

Of note, the facility's orientation schedule shows that young people are supposed to get several hours out of their rooms, in school and in programming, daily. It was clear that this schedule was not consistently followed. A handwritten schedule in the facility showed that youth only came out in groups, which could result in youth coming out for only roughly one hour on the first shift.

Young people could generally articulate the facility's positive behavior level system and ability to purchase items from the canteen based on behavioral points. It was also noted that it was easier to decrease in levels than to increase in levels.

Numerous youth reported on the facility's disciplinary system. The main disciplinary consequences included: decrease in level, "mod" or modified, and "temp." Students on "mod" could be confined to their rooms for 23-23.5 hours a day, coming out only for showers, brief phone calls, and – sometimes – groups or school. When youth on "mod" were out for 30-60 minutes, they were not allowed to be with their regular groups. "Mod" was reported to last for 4-5 days, though there was at least one report that "mod" could last several weeks or longer.

Students on "temp" were confined to their room for 24 hours, with unclear opportunity for a brief shower. Students on "temp" did not have access to phone calls. One day of "temp" followed by 1-2 days of "mod" was shared as a sample consequence for fighting. One youth reported that Temporary Room Confinement could last two days. At least one youth reported having had to stay in their room all day due to using profanity.

Not all youth interviewed had personally experienced disciplinary room confinement.

<u>Educational Concerns:</u> Youth expressed significant concerns about their educational access. Young people only participated in school for 30 minutes to 2 hours a day, depending on how many groups the youth were split into. While the educational window was from 9-2:30, a young person would only spend a small fraction of that time actually in school. Youth noted that the already-slim amount of time in school could be further diminished by school cancellations due to behavior issues. It was unclear to DRNC's monitors why youth were split into very small groups for school, resulting in little educational time, while youth appeared to have recreational time or free time in larger groups on second shift and during the weekends.

The educational programming appeared to be entirely virtual, using the Edgenuity platform, though the facility had a full-time teacher. Some youth reported only taking one class, whereas others reported taking all four core subjects on Edgenuity. Several youth reported having IEPs; multiple youth reported that their IEPs were not being implemented in the facility. There did not appear to be a clear protocol for letting youth know how many credits they had earned, or about the possibility of credit recovery. There did not appear to be community college course offerings

for youth who had already graduated from high school. One young person shared that there was no access to school lessons on the tablets provided to youth.

It was reported that educational staff at the facility did not have access to PowerSchool but that some staff at DJJ JDCs do have access to ECATS.

Other Access Concerns (to recreation, medical/mental health care, food, family contact): Youth reported regular but not daily access to outdoor recreation. (There was no indoor recreation space in the facility.) Generally, youth shared that they spent 30-60 minutes outdoors on an average of 2-3 days per week.

The facility had a color-coded paper system for indicating youths' mental health check status. Youth reported access to a therapist and human service coordinator, although the frequency of access to a therapist reported ranged from limited to every other day. The facility employed a contracted licensed mental health counselor. The therapist was reported to facilitate a group activity every Tuesday.

Some youth reported no concerns with medical care. Other youth reported concerns including delayed access to medications and medical attention. Female youth were reported to not always have timely access to the bathroom during their menstrual cycles.

Some youth reported getting enough to eat, whereas others reported not getting enough to eat. Food quality concerns included undercooked food (including undercooked meat) and expired/spoiled milk.

Youth had access to daily phone calls of variable length depending on their levels (3-15 minutes). Youth had access to both in-person and virtual visits.

While some youth in the facility reported feeling physically and mentally safe, others reported not feeling safe. There were some concerns about staff favoritism and staff aggression or stirring up of trouble. Director Williams was reported to be very fair. The grievance procedure was reported to not be effective. Youth reiterated that the first shift felt demoralizing, whereas the second shift felt more caring.

We also heard reports about a restraint that had occurred in the facility, in which the youth expressed difficulty breathing. DRNC monitors heard report that the restraint was a prone restraint. Director Williams relayed that the staff member in question had been let go. It did not appear that the regional manager had been notified of the incident prior to DRNC's monitoring visit.

Individual Student Concerns and Facility Response: DRNC staff verbally shared a list of individual student concerns to Ms. Williams and Ms. Jordan in the exit meeting.

DRNC's Systemic Follow Up Requests: Having completed the November 2024 monitoring visit of New Hanover JDC, DRNC specifically requests:

1) Repair and cleaning as needed in the facility's bathrooms.
2) Consistent, increased time out of room for all students, including on the first shift. Review and revision, as appropriate, of the facility's scheduling and grouping practices.
3) Review and trauma-informed revision of the facility's policies and practices surrounding "lockdown," "mod," "temp," and COVID quarantine, to minimize use of room confinement.
4) Consistent, significantly increased access to educational instruction for all students in all core subjects. Increased direct instruction for all students.
5) A review of which students have IEPs and 504 plans, full implementation of those plans, and procedures for Child Find identification of those students not yet identified who may need IEPs.
6) A clear policy for expedient request of student records from young people's base schools, particularly where the young person is likely to be in secure custody for an extended period. Students should be afforded the opportunity to attend educational instruction even while waiting for school records to be received.
7) Access to PowerSchool and ECATS for DJJ facility educators.
8) Access to educational instruction for youth on any form of room confinement.
9) Access to credit recovery and community college course offerings, as appropriate.
10) Review of student transcripts to assess number of credits earned for each young person in high school and sharing of that information with each student.
11) Daily access to outdoor recreation/large muscle movement opportunities.
12) Timely access to medical and mental healthcare.
13) Addressing of food quality and quantity concerns.
14) Creation and implementation of an effective grievance procedure.
15) Creation and implementation of an effective procedure to report on serious occurrences, such as restraints.
16) Banning of prone restraints in DJJ facilities.
17) Full follow-up of individual student concerns raised in the November 2024 exit meeting.

Sincerely,

Cari Carson, Esq., MSW
Supervising Attorney – Education Team
Disability Rights NC

DRNC_068

Case 1:24-cv-00017-CCE-JLW    Document 88-6    Filed 10/13/25    Page 5 of 5