# **EXHIBIT 7**



February 6, 2025

# Monitoring Debrief Memo
# Perquimans JDC

<u>Facility Name:</u> Perquimans Juvenile Detention Center

<u>Monitoring Visit Dates:</u> November 12, 2024

<u>Visit Details:</u> Four individuals from DRNC monitored on November 12, 2024, and were given a tour of the facility by Director Jeremy Pearsall. Eastern Regional Manager Ms. Tangi Jordan and DJJ Director of Accountability for Juvenile Education Services Mr. James Futrell were also present during our monitoring visit. Perquimans JDC reopened in July 2024. On the day of our visit, the facility had a census of 23 and a capacity of 24. Director Pearsall reported 25 staff positions with 8 vacancies; gaps were filled by support staff and security guards. We spoke with 9 young people during our visit. We conducted an exit meeting on-site at the conclusion of our monitoring visit.

<u>Overall Impressions:</u> Significant variation in time out of room was reported. Youth were generally positive about access to family contact and mental health supports, spoke positively about the positive behavior incentive level system, and spoke positively about Director Pearsall. Multiple youth expressed concerns about educational access.

<u>Physical Condition of the Facility:</u> The facility has two wings. In general, the facility appeared clean and well-kept. Flaps typically covered room windows to the pod, though youth could ask for them to be removed. University pennants decorated some walls. Two outdoor recreation areas each had grassy areas and a basketball court. We noted no serious concerns related to maintenance or cleanliness of the physical facility.

<u>Concerns Regarding Time Out of Rooms:</u> DRNC monitors were provided with the facility's daily schedule, which did not appear to be fully followed. Youth generally reported 2 to 6 hours out of their rooms on weekdays, and 5-6 hours or more out of their rooms on weekends. At least one youth reported sometimes being out almost all day on weekends. Youth usually ate meals in their rooms but sometimes ate meals on the pod. When on the pod, youth reported engaging in activities such as playing Uno or watching TV.

Almost all youth were familiar with and could articulate the positive behavior incentive level system. The privileges/incentives youth could earn appeared fairly robust. One youth expressed a desire for a canteen incentive system.

**801 CORPORATE CENTER DRIVE | SUITE 118 | RALEIGH, NC 27607**
**919-856-2195 • 877-235-4210 • 919-856-2244 FAX • TTY USERS, DIAL 711**

DRNC_069

Case 1:24-cv-00017-CCE-JLW    Document 88-7    Filed 10/13/25    Page 2 of 4

Disciplinary measures in the facility included decreasing in levels, and various names for room confinement – alternately called "mod," "temp," "room confinement," and "lockdown." Youth noted that room confinement could last for fifteen minutes to eight days, with room confinement more than 24 hours needing approval from administrators in Raleigh. Youth reported that young people on room confinement still got phone calls and showers but did not attend school. Of note, several of the young people who reported about room confinement policies and practices had not personally experienced room confinement.

Educational Concerns: Several youth reported concerns about educational access. Youth shared that they typically attend class for 45 minutes to one hour daily and that class was sometimes canceled. Some youth reported 2 hours daily in class. The work appeared to be mainly paperwork; youth reported the work was not challenging, and youth were unsure if they were obtaining credit for the work. Youth pursuing a GED/HiSET credential reported largely self-studying on tablets. There did not appear to be a way to make formal academic progress for youth who already had a high school diploma. At least one youth was unclear if their IEP was being followed.

The facility had one teacher on staff; that teacher reported being certified in Exceptional Children's services. Multiple youth spoke positively of the teacher, Dr. Allen. Dr. Allen reported having access to ECATS and the ability to pull in from PowerSchool. Several youth wanted to know how many credits they had. One youth shared that their previous school records still had not arrived at the facility even after several weeks. DRNC monitors were told that DJJ contracts with outside providers to perform needed special education evaluations.

Other Access Concerns (to recreation, medical/mental health care, food, family contact): Youth reported going outside daily, or at minimum 3 times per week, for 30 minutes to an hour.

The facility had a nurse on-site, and no delays were noted regarding medical care. A mental health provider was available 24/7 for emergencies and was otherwise accessible to youth once or twice a week.

Youth reported a range of experiences regarding the facility's food, ranging from not enough to nasty to good.

Young people at the facility got daily phone calls of up to 15 minutes, depending on their level. Weekly visits were also available. While some youth reported that only in-person visits were available, DRNC monitors also heard that virtual visits were available. DRNC monitors heard that youth were strip-searched after in-person visits.

Most, but not all, youth reported feeling safe in the facility. Youth shared that staff were encouraging, that staff responded to requests for assistance, and that Director Pearsall was helpful.

Individual Student Concerns and Facility Response: DRNC staff verbally shared a list of individual student concerns to Mr. Pearsall, Ms. Jordan, and Mr. Futrell in the exit meeting.

DRNC's Systemic Follow Up Requests: Having completed the November 2024 monitoring visit of Perquimans JDC, DRNC specifically requests:

1) Consistent, increased time out of room for all students.
2) Review and trauma-informed revision of the facility's policies and practices surrounding "lockdown," "mod," "temp," and "room confinement," to minimize use of room confinement.
3) Consistent, significantly increased access to educational instruction for all students in all core subjects. Increased direct instruction for all students.
4) A clear review of which students have IEPs and 504 plans, full implementation of those plans, and procedures for Child Find identification of those students not yet identified who may need IEPs.
5) A clear policy for expedient request of student records from young people's base schools, particularly where the young person is likely to be in secure custody for an extended period. Students should be afforded the opportunity to attend educational instruction even while waiting for school records to be received.
6) Access to educational instruction for youth on any form of room confinement.
7) Access to credit recovery and community college course offerings, as appropriate.
8) Review of student transcripts to assess number of credits earned for each young person in high school and communicating with each student regarding their credits.
9) Addressing of food quality and quantity concerns.
10) Clarification for youth of the availability of virtual visits.
11) Review and trauma-informed revision of the policy and practice requiring strip searches after in-person visits.
12) Full follow-up of individual student concerns raised in the November 2024 exit meeting.

Sincerely,

Cari Carson, Esq., MSW
Supervising Attorney – Education Team
Disability Rights NC