# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOHN DOE 1, a minor, by and through his parent and natural guardian JANE DOE 1; JOHN DOE 2, a minor, by and through his parent and natural guardian JANE DOE 2; on behalf of themselves and all others similarly situated, | No. 1:24-CV-00017-CCE-JGM |
| Plaintiffs, | |
| v. | |
| NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; JEFFREY SMYTHE, Secretary of the North Carolina Department of Public Safety, in his official capacity; WILLIAM L. LASSITER, Deputy Secretary of the Division of Juvenile Justice and Delinquency Prevention, in his official capacity; TIEA DANIELS, Facility Director of the Cabarrus Regional Juvenile Detention Center, in her official capacity, | **SETTLEMENT AGREEMENT** |
| Defendants. | |

This Settlement Agreement ("Agreement") is made and entered into by and between Plaintiffs and class representatives John Doe 1 and John Doe 2, on behalf of a class of pre-adjudication juveniles who are currently, or in the future will be, detained at the Cabarrus Juvenile Detention Center ("Cabarrus JDC"), on the one hand, and the North Carolina Department of Public Safety (the "Department"), Jeffrey Smythe, in his official capacity, William L. Lassiter, in his official capacity, and Tiea Daniels, in her official capacity, on the other hand.

1

## STIPULATION AND ORDER FOR A FINAL SETTLEMENT AGREEMENT

**WHEREAS**, Plaintiffs filed a class action Complaint on or about January 8, 2024 (the "Complaint"), initiating the above-captioned action under 42 U.S.C. § 1983 seeking to represent a class of juveniles who now are or in the future may be detained in Juvenile Detention Centers operated by the Department;

**WHEREAS**, Plaintiffs allege in the Complaint that Defendants violated Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution by routinely locking Plaintiffs and other juveniles alone in their cells for more than 23 hours a day without justification and routinely locking Plaintiffs and other juveniles alone in their cells for more than 23 hours a day due to purported violations of Juvenile Detention Center rules. Plaintiffs allege that Defendants' use of extensive confinement has irreparably harmed their mental health, denied them access to educational services, and denied them access to mental health services;

**WHEREAS**, Defendants filed their Answer to the Complaint on April 4, 2024, and have denied and continue to deny that they committed, or threatened, or attempted to commit any wrongful action or violation of the law in connection with the subject matter of this Action;

**WHEREAS**, Plaintiffs filed a Motion for Class Certification (the "Cert. Motion") on September 26, 2024, Defendants filed a Response to Plaintiffs' Motion for Class Certification on November 18, 2024, and Plaintiffs filed a Reply in Further Support of Motion for Class Certification on December 9, 2024;

**WHEREAS**, the Court held a hearing on the Cert. Motion on October 1, 2025, and on October 22, 2025, the Court issued an order in which it granted in part and denied in part Plaintiffs' Cert. Motion and certified a class of pre-adjudication juveniles who are currently, or in the future will be, detained at the Cabarrus JDC;

**WHEREAS**, since the initiation of this Action, Defendants have provided Plaintiffs with extensive documents concerning the room confinement and education policies and practices for juveniles at its Juvenile Detention Centers;

**WHEREAS**, the Parties have engaged in extensive settlement negotiations and have voluntarily agreed to enter into this Agreement to resolve this Action;

**WHEREAS**, the Parties represent and agree that this Agreement is fair, reasonable, and adequate to protect the interest of all Parties and the class;

**WHEREAS**, the Parties have negotiated in good faith and have agreed to settle this Action on the terms and conditions set forth herein;

2

Case 1:24-cv-00017-CCE-JGM    Document 104-1    Filed 04/15/26    Page 2 of 29

**NOW, THEREFORE,** in consideration of the mutual obligations, promises and commitments set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties hereto, intending to be legally bound, agree, in full and final settlement of any claims, actual or potential, relating to the Complaint, as follows:

## DEFINITIONS

As used in this Agreement:

**Action** means *John Doe 1, et al. v. North Carolina Department of Public Safety, et al.,* Case No. 1:24-cv-17-CCE-JGM (M.D.N.C.), filed January 8, 2024.

**Administrative Room Confinement** means the involuntary restriction of a juvenile alone in a cell, room, or other area, during Waking Hours, for any reason other than an imminent threat to the safety and security of other juveniles and/or staff members by the juvenile. For the purposes of this Agreement, Administrative Room Confinement shall have this definition irrespective of any other definition or meaning the Department shall ascribe to Administrative Room Confinement, whether in its policy manuals or otherwise.

**Defendants** means the North Carolina Department of Public Safety, Jeffrey Smythe, in his official capacity, William Lassiter, in his official capacity, Tiea Daniels, in her official capacity, and any of their employees, agents, independent contractors, representatives, or counsel.

**Juvenile Detention Center** means any facility or portion of a facility operated by the Department at which any juveniles are detained prior to the adjudication of their cases, while waiting to go to court, or until a placement can be arranged. For the purposes of the scope of this Agreement, Juvenile Detention Center is limited to the Cabarrus JDC and any portion of the Cabarrus Youth Development Center that is at the time being used to house pre-adjudication juveniles.

**Party or Parties** mean Plaintiffs and Defendants in this Action.

**Plaintiff or Plaintiffs** mean the named Plaintiffs and pre-adjudication juvenile detainees who are currently, or in the future will be, detained at the Cabarrus JDC.

**Plaintiffs' Counsel** means the attorneys representing Plaintiffs in the Action, including the law firm of Nelson Mullins Riley & Scarborough LLP, the Law Office of Michelle Duprey, PLLC, and any successor firms or organizations.

**Programming** includes education, mental health counseling, substance misuse treatment, recreation, and staff counseling.

3

**Room Confinement.** Room confinement shall be defined as the involuntary restriction of a juvenile alone in a cell, room, or other area, during Waking Hours. Room Confinement includes, but is not limited to, Temporary Room Confinement and Administrative Room Confinement.

**Temporary Room Confinement.** Temporary Room Confinement shall be defined as the involuntary restriction of a juvenile alone in a cell, room, or other area, during Waking Hours, when the juvenile poses an imminent threat to the safety and security of other juveniles and/or staff members and all less restrictive measures will not adequately address the threat. For the purposes of this Agreement, Temporary Room Confinement shall have this definition irrespective of any other definition or meaning the Department shall ascribe to Temporary Room Confinement, whether in its policy manuals or otherwise.

**Waking Hours.** Waking Hours shall be defined as the fourteen (14) hours from 7 a.m. until 9 p.m.

## SUBSTANTIVE RELIEF

**I. Restrictions on the Use of Room Confinement**

**A. In General**

1. Room Confinement may only be used in the Cabarrus JDC in the following circumstances:

   a. <u>Temporary Room Confinement.</u> When the juvenile poses an imminent threat to the physical safety of other juveniles and/or staff members and all less restrictive measures will not adequately address the threat.

      i. Temporary Room Confinement shall be for the minimum period of time necessary to resolve the threat. Under no circumstances shall facility staff place a juvenile in Temporary Room Confinement for a pre-determined period of time.

      ii. Facility staff shall perform safety checks on the juvenile every 15 minutes throughout the duration of the Temporary Room Confinement. Such safety checks must involve visual contact. The purpose of the safety checks is to help the youth de-escalate and leave Temporary Room Confinement. Staff members will attempt de-escalation prior to the professional visit by a mental health professional.

4

iii. A supervisor, the Facility Director, or the Facility Director's designee, shall reassess the juvenile's readiness to safely return to the general population at least every (1) hour and shall release the juvenile from Temporary Room Confinement when the juvenile no longer poses an imminent threat to the physical safety of other juveniles or staff members. The supervisor, the Facility Director, or the Facility Director's designee must reauthorize Temporary Room Confinement after a juvenile has been in Temporary Room Confinement for two hours and every two hours thereafter during Waking Hours.

iv. In order to reauthorize Temporary Room Confinement, a supervisor, the Facility Director, or the Facility Director's designee must meet with the juvenile, conduct a review of all relevant documentation including the incident report, and determine that continued Temporary Room Confinement is necessary pursuant to Paragraph I.A.1.a of this Agreement. A supervisor, the Facility Director, or the Facility Director's designee shall document his/her conclusions, including the specific facts upon which the supervisor, Facility Director, or the Facility Director's designee concludes that the juvenile continues to pose an imminent threat to the physical safety of other juveniles or staff members, and if the imminent risk to another's physical safety has not abated, notify the Facility Director if the Facility Director is not the person conducting the review at the earliest possible time after the decision is made by the designee. If for any reason the Facility Director cannot be notified within two hours, the Regional Manager should be notified.

v. No juvenile shall be subject to Temporary Room Confinement beyond 14 Waking Hours (i.e., no more than 24 total hours) unless the Facility Director, or his designee in the event he/she is unavailable, meets with the juvenile, conducts a review of all relevant documentation including the incident report, and determines that continued Temporary Room Confinement is necessary pursuant to Paragraph I.A.1.a of this Agreement. The Facility Director or his designee shall document his/her conclusions, including the specific facts upon which the Facility Director concludes that the juvenile poses an imminent threat to the physical safety of other juveniles and/or staff members. In the event continued confinement is necessary, the Facility Director, or his designee, will review the juvenile's

5

confinement every 24 hours in accordance with this paragraph until it is determined continued confinement is no longer necessary pursuant to the standard in this paragraph.

vi. At regular intervals throughout the juvenile's time in Temporary Room Confinement, a staff member must engage the juvenile in a structured conversation regarding de-escalation, with the goal of developing a plan for the juvenile to exit Temporary Room Confinement.

b. <u>Administrative Room Confinement (Medical).</u> When a medical professional determines that confinement is necessary to protect the health and medical safety of the juvenile and/or the facility and that no less restrictive measures will adequately protect the medical safety of other juveniles and staff. Medical Administrative Room Confinement shall only be used for the minimum period of time necessary to protect the health and medical safety of the juveniles and facility.

c. <u>Administrative Room Confinement (Weather).</u> When a severe weather event (such as a tornado warning or loss of power) has occurred and the Facility Director or his designee determines that such event would pose an imminent threat to the physical safety of juveniles or staff members if the juveniles were not administratively confined to their cells and all less restrictive measures will not adequately address the threat.

d. <u>Administrative Room Confinement (Security).</u> When safety concerns affecting more than one juvenile, such as a disturbance or investigation, require temporary restriction of movement. These events must be clearly documented and justified as necessary to preserve safety. A juvenile will not be placed in Administrative Room Confinement (Security) in response to that juvenile's violation of a facility rule. Administrative Room Confinement (Security) shall not be used longer than is necessary to directly address the safety concern giving rise to the initial use of Administrative Room Confinement (Security).

e. <u>Administrative Room Confinement (Staffing).</u> In the event where staffing at a facility is critically low and does not meet a 1:8 ratio of certified staff to juveniles during Waking Hours and the facility has exhausted all reasonable means of achieving the 1:8 ratio.

6

i. Within three (3) months of the Effective Date of this Agreement, Defendants shall, in collaboration with the Monitor, develop a "Modified Programming Schedule" to be used during critical staffing shortages to mitigate the impact of such staffing shortages on juveniles at the Cabarrus JDC. The Modified Programming Schedule shall include, but not be limited to, rotating groups of juveniles out of their cells so that the critical staffing shortage does not disproportionately impact one group of juveniles.

ii. In the event of a critical staffing shortage, the Facility Director or designee will notify the Regional Manager and the Monitor and implement the Modified Programming Schedule.

iii. If the Administrative Room Confinement (Staffing) persists for longer than 4 hours, staff shall contact the Director of Facility Operations or his designee who will take reasonable steps to resolve the critical staffing shortage.

iv. The Defendants shall take reasonable steps to not use Administrative Room Confinement (Staffing) at the Cabarrus JDC. Within six (6) months of the Effective Date of this Agreement, the Monitor shall, to the extent feasible, determine the maximum frequency of Administrative Room Confinement (Staffing) that would permit a finding of Substantial Compliance with this Agreement and shall notify Defendants and Plaintiffs' Counsel of her determination. The Monitor may for good cause change such maximum level. In the event the Monitor determines that it is not feasible to establish a single maximum frequency, the Monitor shall instead identify appropriate benchmarks, ranges, or qualitative criteria sufficient to guide a determination of Substantial Compliance.

2. Room Confinement shall never be used as a punishment for violating a policy or rule. For the avoidance of doubt, this means, among other things, that the sole justification for Room Confinement shall never be that a juvenile has violated a policy or rule. Rule violations are handled through the facility behavioral motivation system, which shall not include Room Confinement in the array of consequences or sanctions. Room Confinement with a pre-determined duration is presumptively punitive.

3. All juveniles shall be given an opportunity to eat at least two meals outside of their rooms unless the juvenile has been placed in Room Confinement.

7

a. The parties acknowledge that on occasion court appearances, Programming, educational services, medical appointments, or new admissions may overlap with a juvenile's opportunity to eat meals outside of the room. If this occurs, Cabarrus JDC may prioritize such activities over meals outside the rooms where necessary.

b. In the event the Modified Programming Schedule is implemented, Cabarrus JDC will follow the Modified Programming Schedule with respect to meals.

**B.      Documentation of Room Confinement**

1. Whenever a juvenile has been placed in Temporary Room Confinement, facility staff shall, prior to end of their shift, create a written report documenting at minimum:

   a. A detailed description of the behavior that presented an imminent threat to another person's physical safety;

   b. The less restrictive measures, if practicable, attempted before placement in Temporary Room Confinement;

   c. The beginning and ending date and time of Temporary Room Confinement;

   d. The name of the staff member(s) placing the juvenile in Temporary Room Confinement and, if applicable, reauthorizing placement in Temporary Room Confinement. All staff members authorizing or reauthorizing Temporary Room Confinement shall print their names legibly and shall sign such documentation; and

   e. The name of any mental health or other professional (such as a nurse or chaplain) who visits the juvenile in Temporary Room Confinement and the date and time of such visit.

2. Whenever a juvenile has been placed in Administrative Room Confinement for medical reasons, facility staff shall create a written report documenting at minimum:

   a. The medical condition necessitating Administrative Room Confinement;

8

b. Why Administrative Room Confinement is the least restrictive means possible of addressing the medical condition;

c. The beginning and ending date and time of the Administrative Room Confinement;

d. The date and time of any evaluations by medical professional(s) during the Administrative Room Confinement; and

e. The name of the medical professional(s) authorizing that the juvenile be placed in Administrative Room Confinement. All medical professional(s) authorizing that the juvenile be placed in Administrative Room Confinement shall print their names legibly and shall sign such documentation.

3. Whenever a juvenile has been placed in Administrative Room Confinement for any reason other than Medical, facility staff shall create a written report documenting at minimum:

a. The nature of the weather, security, or staffing related event;

b. The beginning and ending date and time of the Administrative Room Confinement;

c. The name of the Facility Director placing the juvenile in Administrative Room Confinement and the name of any supervisor(s) authorizing placement in Administrative Room Confinement. The Facility Director authorizing Administrative Room Confinement shall print their name legibly and shall sign such documentation; and

d. Facility staff may create a single written report regarding weather-related Administrative Room Confinement for a facility, as long as the report lists the names of all juveniles currently impacted by the Administrative Room Confinement.

4. Staff must conduct visual safety checks of juveniles who are in both Temporary Room Confinement and Administrative Room Confinement every 15 minutes and must contemporaneously record the actual time of such checks.

5. Facility staff must promptly (but no later than the end of the shift) document all assessments of a juvenile's readiness to safely return from Temporary

9

Room Confinement to general population, including but not limited to assessment made pursuant to Paragraph I.A.1.a.iii.

6. Defendants shall not destroy any documentation related to instances of Room Confinement, including any records created in accordance with this Subparagraph, during the term of this Agreement.

## II. Conditions of Room Confinement

### A. Permitted Restrictions

1. Specific items of property may be restricted as needed for safety of the juvenile and staff on a case-by-case basis and must be authorized by a supervisor when imposed.

   a. These restrictions shall be temporary in nature until these items can be safely returned to the juvenile. Staff shall document any such restrictions. Any property restricted from the juvenile shall be returned to the juvenile as soon as the risk of harm to the juvenile or staff ends and at the latest when Room Confinement ends.

2. Juveniles in Room Confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their cells or rooms or upon request to a staff member.

   a. Facility staff may turn off the supply of water to any room or cell while a juvenile is confined in that room or cell only when necessary to prevent damage to the room or cell or other areas of the facility.

   b. The length of time the supply of water to any room or cell is turned off shall be the minimum period of time necessary to resolve the imminent physical harm to the juvenile or damage to the room or cell or facility.

   c. Facility staff shall reassess the juvenile's readiness to have the supply of water turned back on every hour during their checks on the juvenile.

   d. Defendants shall document any instance in which facility staff turn off the supply of water to a room or cell while a juvenile is confined in that room or cell, including, but not limited to: (1) the reason the supply of water was turned off to the room or cell; (2) the name of the staff member who turned off the supply of water to the room or cell; and (3) the length of time the supply of water was turned off to the

10

room or cell, including the date and time the supply of water was turned off and the date and time the supply of water was turned back on.

3. The ability of a juvenile in Room Confinement to see outside of the cell or room shall not be restricted except as otherwise required by law. Flaps shall not be placed over the window of the cell or room by Facility staff while a juvenile is in Room Confinement except as otherwise required by law or specifically requested by the juvenile.

4. Defendants shall afford juveniles in Room Confinement for more than eight (8) Waking Hours at least one hour of recreation per day, one shower per day, and legal and non-legal visits, in accordance with standard policies in effect at the time of Room Confinement, provided that the juvenile will engage in these activities alone and that any such visits will be no contact visits.

5. Defendants shall ensure that all juveniles in Room Confinement are afforded the opportunity for the provision of educational instruction.

**B.      Access to Qualified Mental Health Professional**

1. A mental health professional shall visit, either in person or virtually, with any juvenile who has been placed in Temporary Room Confinement for a period lasting longer than eight (8) continuous hours (during Waking Hours). If a mental health professional is already on-site, the mental health professional will visit the juvenile in Temporary Room Confinement, attempt de-escalation, and make recommendations to the Department regarding alternative placement options if necessary. If a mental health professional is not available on-site, the juvenile shall receive a consultation with a mental health professional within 24 hours of the beginning of the Temporary Room Confinement. The mental health professional visit shall determine whether a mental health condition is impacting the juvenile's ability to exit Temporary Room Confinement and, if so, create a plan for treating such mental health condition. To the extent the juvenile requires additional mental health treatment, such treatment shall not be denied because of the juvenile being in Temporary Room Confinement.

2. If a juvenile is in Administrative Room Confinement for a period lasting longer than eight (8) continuous hours (during Waking Hours), a mental health professional shall visit with the juvenile. For the avoidance of doubt, the eight (8) continuous hours may occur on adjacent days. If a mental health professional is already on-site, the mental health professional will visit the

juvenile in Administrative Room Confinement. If a mental health professional is not available on-site, the juvenile shall receive a consultation with a mental health professional within 24 hours of the beginning of the Administrative Room Confinement.

**C.      Access to Services.**  Juveniles in Administrative Room Confinement shall receive all regularly scheduled, mental health services, medical services, and educational services to which they are entitled to under the law. These services will be provided outside of their cells to the extent reasonably feasible.

**D.      Individual Behavior Management Plans.**  If a juvenile is placed in Temporary Room Confinement for more than twenty-four (24) cumulative Waking Hours in a seven (7) day period, a licensed medical/mental health professional in conjunction with a Facility supervisor shall develop and implement an individual behavior management plan for such juvenile to address the underlying causes and focus on helping the juvenile develop the skills the juvenile needs to avoid future placement in Temporary Room Confinement.

## III.      Educational Services

### A.      Requirements

1. Defendants shall comply with the requirements of the Department's Educational Programming Policy.

2. Defendants will continue to adopt and follow a school calendar that ensures that each juvenile at the Cabarrus JDC has access to a minimum of 185 days of educational instruction or a minimum of 1,025 hours of educational instruction covering at least nine calendar months. These requirements are prorated by the portion of the school year that the juvenile is at the detention center. Such educational instruction shall comply with the requirements of N.C.G.S. Chapter 115C, Article 8. To accommodate different ages and grade levels on a given unit, instruction through electronic educational tablets or worksheets may be offered in addition to direct instruction. If such instruction is offered, a qualified instructor (i.e., certified teacher, educational development aide, or school administrator) will be available, either in-person or remotely, to answer questions from the juvenile during the same class period or school day.

3. Defendants will take reasonable measures to maintain sufficient education staff at the Cabarrus JDC to provide educational services to all juveniles, including those in Room Confinement.

12

4. For juveniles remaining in Room Confinement for more than two hours during the school day, staff must bring class/homework assignments, assigned by the teacher whose class the juvenile otherwise would attend, to the juvenile so that the juvenile may complete such assignments. All classwork/homework completed while a juvenile is in Room Confinement must be collected, delivered to the relevant teacher, and graded.

## IV.  Staffing

A.  The Monitor shall evaluate the Cabarrus JDC's staffing levels and shall provide Defendants with recommendations regarding any issues the Monitor identifies as impacting staffing levels at the Cabarrus JDC.  Defendants shall consider all such recommendations in good faith.

## V.  Monitor

### A.  Retention of Monitor

1. Defendants shall retain and fund a Monitor to monitor their compliance with this Agreement and to provide Defendants advice and expertise regarding the implementation of the requirements of this Agreement. The Monitor shall not assess compliance with issues not related to the requirements of this Agreement.

2. Defendants' contract with the Monitor shall provide the Monitor with complete access to staff, juveniles, juvenile records at Cabarrus JDC, and reasonable access to the Cabarrus JDC facility for purposes of monitoring compliance with this Agreement.

3. The Parties agree that Teresa Abreu shall be appointed Monitor. Neither Party, nor any employee or agent of either Party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations.

4. The Monitor may only be removed for good cause. Such removal may only be by Court order.  Should the Parties agree the Monitor is not fulfilling her duties in accordance with this Agreement, the Parties may jointly petition the Court for the Monitor's immediate removal and replacement.  Any Party may unilaterally petition the Court for the Monitor's removal for good cause, and the other Parties will have the opportunity to respond to the petition. Good cause means the occurrence of one or more of the following circumstances:

13

a. Material Breach of Duties. A material failure by the Monitor to perform the duties, responsibilities, or obligations set forth in this Agreement, including repeated failures to meet deadlines or provide required reports.

b. Misconduct or Lack of Integrity. Fraud, gross negligence, willful misconduct, dishonesty, or conduct that materially undermines the Monitor's independence, credibility, or fitness to serve.

c. Conflict of Interest. The existence or discovery of an actual or potential conflict of interest that was not disclosed prior to this Agreement or that materially impairs the Monitor's independence or objectivity. The Parties are currently not aware of any such conflicts of interest.

d. Incapacity or Unavailability. Physical or mental incapacity, illness, death, resignation, or other inability to perform the Monitor's duties in a timely and effective manner.

e. Violation of Law or Court Order. A violation of applicable law, ethical rules, or any order of the Court relating to the Monitor's appointment or conduct.

f. Other Comparable Circumstances. Any other circumstance of similar gravity that materially frustrates the purposes of the monitorship or the Monitor's ability to carry out the Monitor's duties in an impartial and effective manner.

5. In the event the Monitor resigns or is removed by the Court pursuant to Paragraph V.A.4., the Parties shall work together in good faith to select a new Monitor. If the Parties cannot agree on a new Monitor, Plaintiffs shall propose two (2) potential Monitors and Defendants shall propose two (2) potential Monitors; each Party can then strike one potential Monitor; and the Court shall appoint a new Monitor from the remaining potential Monitors.

6. The Monitor shall be required to maintain the confidentiality of records as required by the Family Education Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the protective order in this case, and any other relevant law.

7. In fulfilling her responsibilities, the Monitor may hire staff and consultants as necessary within the budget set forth below. The staff or consultants shall

14

not duplicate the work or assistance provided by other consultants retained pursuant to this Agreement.

8. The intention of the Parties is that Defendants will develop the capability to comply with the substantive provisions of the Agreement beyond the term of this Agreement without an outside monitor. During the term of the Agreement, the Monitor will assist Defendants in developing this capability.

### B. Monitor Compensation

1. The cost of the Monitor, including the cost of any staff or consultants, will be the responsibility of Defendants, but the Monitor and his or her staff or consultants are not agents of Defendants.

2. Annually, the Monitor will prepare and submit a detailed budget to Defendants. The Parties recognize that Defendants need to be able to anticipate the costs associated with the Monitor's services to the extent possible. Accordingly, the Monitor's fees and expenses, including any fees for staff or consultants hired pursuant to V.A.7, must be less than or equal to $200,000.00 in each year of monitoring, subject to subparagraph (3) immediately below.

3. The Monitor shall explain, in writing, the need for any increase to the budget during any given year. The Monitor may increase her fees in any given year, including any fees for staff or consultants hired pursuant to Paragraph V.A.7. Any such increase shall be reasonable and proportionate to the described need. In no case, however, should the increase exceed 15%. The baseline for each subsequent year after an increase shall remain $200,000.00.

### C. Monitor Visits to Cabarrus JDC

1. Within thirty (30) days of the entry by the Court of an order incorporating this Agreement, or as soon thereafter as practical, the Monitor shall conduct a baseline visit to the Cabarrus JDC.

   a. This baseline visit will include a preliminary evaluation of the ways in which existing policy and practices must be reconfigured to meet the requirements of this Agreement.

   b. As a result of the baseline site visit, the Monitor will develop a monitoring plan. The Monitor will issue a written report detailing his/her findings and monitoring plan within forty-five (45) days of the baseline visit.

2. The Monitor shall conduct at least two visits to the Cabarrus JDC each year during the term of the Agreement in addition to the baseline visit described in Paragraph V.C.1 if deemed necessary by the Monitor. The Monitor shall be allowed to visit the Cabarrus JDC at any time, including weekends, subject to reasonable restrictions due to security concerns. The Monitor shall provide the Cabarrus JDC with a minimum of one-hour advance notice of any visit to the Cabarrus JDC. The Cabarrus JDC will make reasonable efforts to ensure that the Monitor is granted access consistent with this Agreement. The Parties acknowledge that access will be facilitated by available Director or supervisory staff and may be subject to reasonable operational limitations, included reduced administrative staffing, limited availability of records customarily maintained by administrative personnel, and limited supervisory staff available to escort or assist the Monitor during such periods. Nothing in this provision is intended to impede or delay monitoring activities.

3. In addition to these visits, the Monitor shall be allowed additional access to the Cabarrus JDC as needed, subject to reasonable restrictions due to security concerns. The Monitor and any staff working at the Monitor's direction shall each be allowed to bring one electronic device into the Cabarrus JDC as long as the device is disclosed to the facility prior to entry. Defendants shall accommodate the Monitor's reasonable requests to bring additional electronic devices into the facility as needed that will be kept secure in the administrative offices of the facility. Only a single device will be permitted to be taken outside the administrative offices and further into the facility. However, the Monitor and any staff working at the Monitor's direction shall not take any recording or photographs of juveniles, employees, or other staff members.

**D.  Monitor's Access to Information**

1. Upon the Monitor's agreement to comply with the protective order entered in this case, the Monitor shall be given full and reasonable access throughout the term of the Agreement to any information, documents, or staff the Monitor deems necessary, unless state or federal law prevents disclosure of such information to the Monitor.

2. This includes, but is not limited to, the following:

    a. The Monitor shall have full access to the Cabarrus JDC, including but not limited to the ability to observe recreational time, down time, mealtime, activity time, classroom time, movement to and from

16

classes, and all other activities conducted by Department staff. Subject to any necessary safety and security conditions, and subject to state or federal law, the Monitor shall be able to observe and move about the Cabarrus JDC unaccompanied by Department staff or agents at the Monitor's discretion.

b.  The Monitor shall have the ability to talk with, consult with, and interview Defendants' staff and service providers at the Cabarrus JDC during their working hours, including, but not limited to education, medical, mental health, and line staff and supervisors. The Monitor shall have the ability to have such conversations with Department staff outside the presence of their supervisors, Department management, or Defendants' counsel. Defendants will make all reasonable efforts to provide the Monitor access to information from any independent contractor providers, if requested and as necessary to facilitate this provision, unless state or federal law prevents disclosure of that information to the Monitor, or the Defendants are otherwise unable to provide that information to the Monitor.

c.  The Monitor shall have the ability to observe juveniles in and across all settings, except during juveniles' individual therapy and medical visits.

d.  The Monitor shall have access to all relevant Cabarrus JDC records including, but not limited to, room check logs, room confinement sheets, intake packets, unit rules, programming daily schedules, ADA manuals, program rules, critical incidents tally sheets, live camera feeds and digital footage, case management systems, intake logs, disciplinary reports, creation and implementation of behavior management plans, educational records, and any grievances or other complaints received by Defendants regarding the subject matter of this Agreement, and any other records the Monitor deems necessary to measure progress and/or determine compliance with this Agreement.

e.  The Monitor shall have access to Cabarrus JDC staffing data and records.

f.  The Monitor shall be allowed to conduct written surveys of juveniles detained in Cabarrus JDC and to speak with juveniles in Cabarrus JDC. Juveniles shall be permitted to provide feedback and information to the Monitor and the Monitor shall not be precluded

17

from having informal conversations with juveniles during visits to the Cabarrus JDC which naturally arise as a result of incidental contact.

g.  The Monitor shall be entitled to speak with any juvenile at Cabarrus JDC outside the presence of Department staff, as long as the juvenile consents to speak with the Monitor. The Department shall facilitate private communication between the Monitor and juveniles at the Cabarrus JDC.

h.  The Monitor shall have authority to request and obtain from Defendants any of the information listed in this Paragraph V.D. to ascertain progress toward and compliance with this Agreement. Except where not reasonably feasible for good cause shown, Defendants shall provide the requested information within fourteen (14) calendar days of the request.

i.  Nothing in this Agreement shall restrict the Monitor from communicating with counsel for the Parties or counsel from communicating with the Monitor. The Parties acknowledge that funds allocated to the Monitor's services are finite and should not be exhausted unnecessarily. To the extent either Party or the Monitor believes communications under this Paragraph are being initiated too frequently or without sufficient good cause, the Parties will work with the Monitor to establish a regular call between the Monitor and all counsel to discuss issues at the Cabarrus JDC in lieu of direct communications.

j.  The Monitor shall be informed of when training will be conducted pursuant to the Agreement and may attend in her discretion.

**E.  Cooperation**

1.  Defendants may not block, obstruct, or discourage any juvenile or Cabarrus JDC staff member from speaking with the Monitor. Staff member efforts to resolve a juvenile's grievance shall not be construed to violate this provision.

2.  Cabarrus JDC staff members and juveniles have the right to keep the substance of their conversations with the Monitor private.

**F.  Semi-Annual Monitoring Reports**

1.  The Monitor shall prepare comprehensive reports on a semi-annual basis regarding the Cabarrus JDC ("Monitoring Reports") that will evaluate the

18

extent to which Defendants have successfully implemented this Agreement, any plans to effectuate its terms, and recommend specific actions the Monitor believes Defendants must make to achieve compliance.

2. The Monitoring Reports shall address at minimum:

   a. The Department's compliance with this Agreement at the Cabarrus JDC;

   b. The amount of time juveniles at the Cabarrus JDC spend outside of their cells during Waking Hours;

   c. Staffing levels at the Cabarrus JDC; and

   d. The Monitor's recommendations, if any, for the Cabarrus JDC, including but not limited to whether the Monitor has communicated such recommendations to Defendants and, if so, Defendants' response.

3. The Monitoring Reports shall not assess compliance with issues outside the scope of this Agreement.

4. The Monitor will consult with the Parties, as necessary, in drafting the Monitoring Reports. The Monitor will provide a draft of each Monitoring Report, along with a listing of any and all materials relied upon by the Monitor in drafting such a report with any confidential information which would reveal the identity of a minor redacted, to the Parties for review.

5. The Parties will provide comments and/or objections, if any, to the Monitor regarding each Monitoring Report within two weeks of receiving the draft report. The Monitor will consider these comments and will issue the final version of the report within two weeks thereafter. The Monitor shall have total discretion as to what information to include in the Monitoring Reports and shall not be required to accept comments from the Parties.

6. All draft reports are confidential and may not be distributed outside the Parties to this Agreement and their counsel.

7. Final Monitoring Reports will be posted on the Department's website. Defendants will ensure that all personally identifiable information and any other confidential information is redacted.

## VI. Compliance and Training

### A. Compliance

1. The Monitor shall be responsible for determining whether the Cabarrus JDC is in Substantial Compliance with the terms of this Agreement.

2. The Cabarrus JDC is in Substantial Compliance with a provision of this Agreement if any violations of the provision are minor or occasional and are neither systemic nor serious. However, if a serious violation of a provision occurs, the Cabarrus JDC is in Substantial Compliance if the Cabarrus JDC promptly identifies the violation, notifies the Monitor, and develops and implements a timely and appropriate remedy that results in Substantial Compliance. If a serious violation of a provision occurs and the Cabarrus JDC does not promptly identify the violation, notify the Monitor, and develop and implement a timely and appropriate remedy that results in Substantial Compliance, the Monitor shall notify counsel for the Parties. Within six (6) months of the Effective Date of this Agreement, the Monitor shall determine what constitutes a serious violation under this provision and shall notify Defendants and Plaintiffs' Counsel of her determination. The Monitor may for good cause change this determination.

3. Consistent with Section I above, in evaluating the reasonableness of the use of Room Confinement at Cabarrus JDC, criteria considered by the Monitor may include:

   a. The security needs unique to a detention setting, including the occasional need to use Room Confinement;

   b. The frequency of, reasons for, and Programming provided during Room Confinement at the Cabarrus JDC;

   c. The well-being of juveniles at the Cabarrus JDC;

   d. The ability to provide normal Programming to juveniles at the Cabarrus JDC; and

   e. Efforts taken by the Cabarrus JDC and the Department to mitigate staffing challenges to limit the use of Administrative Room Confinement.

20

**B.  Development of Quality Assurance System**

1. Within twelve months of the Effective Date, Defendants shall develop a quality assurance system that develops and implements internal processes for monitoring compliance with the terms of this Agreement and identifies trends and corrects deficiencies with regard to the use of Room Confinement, the behavior management program and juveniles' access to education at the Cabarrus JDC. Defendants shall consider the Monitor's recommendations regarding the development and/or implementation of the quality assurance system in good faith.

**C.  Designation of Compliance Coordinator**

1. Within 30 days of the entry by the Court of an order incorporating this Agreement, Defendants will designate a Compliance Coordinator.

2. This person will have the requisite skills, knowledge, abilities, and time to perform the job functions that are substantially related to coordinating the successful implementation of this Agreement. The Compliance Coordinator will serve as a primary point of contact for the Monitor.

3. The Compliance Coordinator will:

   a. Coordinate compliance and implementation activities;

   b. Coordinate and facilitate the Monitor's tours and site visits;

   c. Report to the Monitor significant events impacting the Department's efforts to comply with the Agreement;

   d. Facilitate the production of data, documents, materials, and access to Cabarrus JDC personnel for the Monitor, as needed;

   e. Ensure that each facility maintains all documents and records as required by this Agreement;

   f. Assist in assigning compliance tasks to Cabarrus JDC personnel; and

   g. Take primary responsibility for collecting information the Monitor requires to carry out his or her duties.

**D. Behavior Management Program**

1. Within 90 days of the effective date of this Agreement Defendants will work in good faith with the Monitor to make any recommended revisions to the positive behavior management program used at the Cabarrus JDC, should the Monitor determine any revisions are required.

2. Defendants will provide training regarding the positive behavior management program to staff members at the Cabarrus JDC. Prior to the training, Defendants shall provide the Monitor the curriculum to be used in the training, the name of and access to the trainer, and the trainer's qualifications. The Monitor may make recommendations to the Defendants regarding the curriculum, identity, and qualifications of the trainer, which the Defendants shall consider in good faith.

**E. Policy Revisions**

1. Within thirty (30) days of the Effective date, the Department will inform all employees and contractors who work in or have responsibility for the Cabarrus JDC of the substance of this Agreement.

2. Within 120 days of the Effective Date, Defendants shall revise policies and procedures utilized at the Cabarrus JDC addressing Room Confinement and behavior management to incorporate the conditions of this Agreement to the extent existing policies and procedures are inconsistent with this Agreement.

3. The Monitor shall review any proposed revisions to the policies and procedures utilized at the Cabarrus JDC as a result of this Agreement. Defendants will consider and incorporate any reasonable suggestions from the Monitor that are consistent with this Agreement.

4. Within sixty (60) days of the adoption of the new policies and procedures described in Paragraph VI.E.2., all employees at the Cabarrus JDC who have responsibilities for implementing Room Confinement shall receive training on the new policies and procedures. The Department shall provide the Monitor with the training materials used to train the employees pursuant to this paragraph. The Monitor shall review and provide suggestions to Defendants regarding the training and training materials and the Defendants shall consider all suggestions in good faith. The Department's training curriculum must include information on the potential for adverse outcomes associated with prolonged isolation and provide detailed instruction on all policy requirements, including instruction on the documentation requirements specified herein and in the new policies and procedures. Prior

22

to the training, Defendants shall provide the Monitor the curriculum to be used in the training, the name of and access to the trainer, and the trainer's qualifications. The Monitor may make recommendations to the Defendants regarding the curriculum, identity, and qualifications of the trainer, which the Defendants shall consider in good faith. All employees shall receive refresher training on the new policies and procedures annually.

5. Juveniles should be informed about the substance of the new policy and how to report concerns about the use of Room Confinement or the Behavior Management system (typically via the grievance process).

**F.      De-Escalation Training**

1. Within six (6) months of the Effective Date, all employees at the Cabarrus JDC who have responsibilities for implementing Room Confinement and behavioral management policies shall receive skills-based conflict de-escalation training. Prior to the training, Defendants shall provide the Monitor the curriculum to be used in the training, the name of and access to the trainer, and the trainer's qualifications. The Monitor may make recommendations to the Defendants regarding the curriculum, identity, and qualifications of the trainer, which the Defendants shall consider in good faith.

2. De-escalation training shall be provided to all staff at the Cabarrus JDC annually thereafter. Prior to the training, Defendants shall provide the Monitor the curriculum to be used in the training, the name of and access to the trainer, and the trainer's qualifications. The Monitor may make recommendations to the Defendants regarding the curriculum, identity, and qualifications of the trainer, which the Defendants shall consider in good faith.

**VII.   Training on Staff Retention.** Within six (6) months following the Effective Date, all Cabarrus JDC supervisors and the facility director shall receive training on strategies for retaining staff and for mitigating the impact of staff shortages on juvenile's out-of-room time. Prior to the training, Defendants shall provide the Monitor the curriculum to be used in the training, the name of and access to the trainer, and the trainer's qualifications. The Monitor may make recommendations to the Defendants regarding the curriculum, identity, and qualifications of the trainer, which the Defendants shall consider in good faith.

**VIII.  Court Approval**

A.      This Agreement shall be subject to District Court approval.

1. Within ten (10) days of the date that this Agreement is filed in the District Court for Preliminary Approval, Plaintiffs' counsel will provide the Notice of this Settlement Agreement as required by the CAFA (28 U.S.C. § 1715(b)) to the U.S. Attorney General, the North Carolina Attorney General's Office, and/or any other necessary parties.

2. The Parties shall jointly request that the District Court schedule and conduct a Fairness Hearing to address the fairness of this Agreement settling Plaintiffs' and Plaintiff class claims against Defendants and to decide whether there shall be Final Approval of the settlement embodied in this Agreement.

   a. At the Fairness Hearing, the Parties shall jointly move for and recommend Final Approval of this Agreement.

   b. The Fairness Hearing shall take place at a date allowing for such period of Notice to the Class as the District Court may direct, and in accordance with 28 U.S.C. § 1715.

3. For the purposes of identifying and providing notice to the Class, the Department shall provide or cause the preparation and provision of information sufficient for the distribution of notices no later than thirty (30) days after the preliminary approval date.

4. The terms of this Agreement will be incorporated into an order to be entered by the Court.

**B.  Term and Termination**

1. The Parties agree to terminate this Agreement once Defendants have demonstrated Substantial Compliance with all its terms for a period of eighteen (18) consecutive months, as determined by the Monitor. Plaintiffs will not oppose a motion to terminate under this provision, provided the condition in the preceding sentence is met.

2. Defendants shall not move to terminate this Agreement for any reason, including under 18 U.S.C. § 3626(b), for a period of two (2) years after the Effective Date. After a two-year period from the Effective Date, Defendants may move the Court to terminate this Agreement pursuant to and governed by 18 U.S.C. § 3626(b).

3. The Parties anticipate that Defendants will have substantially complied with all provisions of this Agreement within five (5) years of the Effective Date of this Agreement (the "Anticipated Substantial Compliance Deadline").

24

This Agreement will terminate automatically on the Anticipated Substantial Compliance Deadline, unless the Agreement is otherwise terminated, cancelled, extended, or subject to a pending motion to extend it before that date. Any motion to extend must be filed no later than six months before the Anticipated Substantial Compliance Deadline and any motion to extend can seek no more than a single year extension of the Anticipated Substantial Compliance Deadline. The Anticipated Substantial Compliance Deadline may be extended by (i) mutual agreement of both Parties; (ii) in the event that Defendants have not achieved Substantial Compliance with the Agreement on or before the Anticipated Substantial Compliance Deadline, by motion made pursuant to 18 U.S.C. § 3626(b); or (iii) if moving to extend under 18 U.S.C. § 3626(b) is unavailable, by motion under any other applicable statute or rule.

4. The Monitor's reports shall serve as the principal source of information regarding compliance with this Agreement. In the event a Party moves for relief and challenges conclusions contained in the Monitor's reports, the opposing Party may request narrowly tailored discovery to test the specific factual assertions that challenge the Monitor's conclusions regarding Substantial Compliance. Any discovery under this provision shall remain subject to the Court's supervision and authority to modify, limit, or supplement such discovery upon request of any Party or on the Court's own motion.

5. The Court shall retain jurisdiction of this action for the purposes specified in Section VIII of this Agreement until the Agreement is terminated.

## C. Dismissal

1. Within thirty (30) days of the termination of this Agreement, Plaintiffs agree to dismiss this Action with prejudice.

2. All parties agree to bear their own attorneys' fees except as otherwise specified herein.

3. Within sixty (60) days of the Effective Date, Defendants shall reimburse $100,000.00 of Plaintiffs' costs incurred in the prosecution of this Action through the Effective Date.

## D. Release

1. Upon dismissal in Paragraph VIII.C, Plaintiffs release, acquit, and discharge Jeffrey Smythe, William L. Lassiter, and Tiea Daniels, or their successors, in

their individual and official capacities, as well as the Department and all current and former officers, agents and employees of the above named entities (in both their official and individual capacities), and all successors of the above named entities from any and all claims, actions, causes of action, demands, rights, damages, and all liabilities of any kind or nature whatsoever at law, in equity, or otherwise, which the Plaintiffs or any agent, heir, representative, or successor-in-interest thereof, ever had, may have ever had, or now has against the Released Parties related to, arising from, or in any way connected to Defendants' use of Room Confinement, including and without limitation, the claims asserted in the above-captioned action, or which could have been asserted therein, including and not limited to federal constitutional violations.

2. This waiver shall not apply to any claims related to enforcement or compliance with this Agreement.

## E.    Dispute Resolution

1. The Parties commit to work in good faith to avoid enforcement actions.

2. If Plaintiffs believe that Defendants are not in compliance with a provision of this Agreement, and want to bring it to Defendants' attention in order to trigger these dispute resolution provisions, Plaintiffs shall give notice to all Parties in writing, which notice shall state the alleged non-compliance.

3. Upon receipt of such notice by Defendants, the Parties will promptly engage in good-faith negotiations concerning the alleged non-compliance and appropriate measures to cure such non-compliance.

4. If the Parties have not reached an agreement on the existence of the alleged non-compliance and curative measures within thirty (30) days after receipt of such notice of non-compliance, Plaintiffs may seek all appropriate judicial relief with respect to such non-compliance.

5. Notwithstanding the dispute resolution procedures set forth above, Plaintiffs may seek expedited judicial relief against the Defendants in the event of a violation of this Agreement threatening to cause immediate and irreparable harm to Plaintiffs, the class, or any portion of the class.

6. If Plaintiffs prevail in seeking relief from the Court for Defendants' non-compliance with the terms of this Agreement, Defendants shall pay Plaintiffs' reasonable attorneys' fees and costs associated with any action under this Section.

**F.     Non-Waiver.**  The failure by any Party to enforce any provision of this Agreement with respect to any deadline or other provision herein shall not be construed as a waiver of their right to enforce deadlines or provisions of this Agreement.

**IX.     Compliance with 18 U.S.C. § 3626(a).**  The Parties agree and jointly request that the Court find that this Agreement satisfies the requirements of 18 U.S.C. § 3626(a).  All the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation of a federal right for purposes of 18 U.S.C. § 3626.

**X.     Notice.**  Notices and other written communications pursuant to this Agreement shall be in writing.  Notices shall be addressed to the attorneys of the respective Parties specified in the signature pages of this Agreement.  In the event that any substitution is to be made in counsel to receive communications under this Agreement, all counsel shall be informed, and the name and contact information for substitute counsel shall be provided.

**XI.     Survival.**  All obligations of the Parties pursuant to this Agreement, as well as all representations and warranties contained herein, shall survive the execution and delivery of this Agreement.

**XII.  Counterparts.**  This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the full efficacy of a signed original.  Photocopies and PDFs of such signed counterparts may be used in lieu of the originals for any purpose.  The terms and conditions of this Agreement, and the commitments and obligations of the Parties, shall inure to the benefit of, and be binding upon, the successors and assigns of each Party.

**XIII.  Authorization.**  The undersigned representative of each Party to this Agreement certifies that each is authorized to enter into the terms and conditions of this Agreement and to execute and bind legally such party to this Agreement.

**XIV.  Modification.**  This Agreement may not be modified without the written consent of the Parties and the approval of the Court.

**XV.   Severability.**  If any of the provisions of the Agreement are determined to be invalid or unenforceable, that provision so determined shall be severable from the other provisions of the Agreement, and the Agreement shall be construed and enforced as if such invalid or unenforceable provision had not been included herein.

**XVI.  Entire Agreement.**  This Agreement contains all the terms and conditions agreed upon by the Parties with regard to the final settlement contemplated herein, and, following

the Court's final approval, supersedes all prior agreements, representations, statements, negotiations, and undertakings (whether oral or written) with regard to the settlement of this Action.

**XVII. Construction.** Should any of the provisions or terms of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing this Agreement shall not apply a presumption that such provision(s) or term(s) shall be more strictly construed against one Party by reason of the rule of construction that a document is to be construed more strictly against the party who prepared it, it being agreed that all Parties and their respective counsel have participated in the preparation and review of this Agreement. Further, the Parties specifically acknowledge and agree that each has retained separate, independent counsel to represent them.

*[SIGNATURE PAGE FOLLOWS]*

This the 15th day of April 2026

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

Robert L. Lindholm
(N.C. Bar No. 52800)
301 South College Street
23rd Floor
Charlotte, NC 28202
(704) 417-3000
robert.lindholm@nelsonmullins.com

Soren K. Young*
Donna O. Tillis*
Yasmeen Ebbini*
Axton Crolley*
1320 Main Street, 17th Floor
Columbia, SC 29201
(803) 799-2000
soren.young@nelsonmullins.com
donna.tillis@nelsonmullins.com
yasmeen.ebbini@nelsonmullins.com
axton.crolley@nelsonmullins.com

Matthew G. Lindenbaum*
One Financial Center, Suite 3500
Boston, MA 02111
(617) 217-4700
matthew.lindenbaum@nelsonmullins.com

**Law Office of Michelle Duprey, PLLC**

Michelle Duprey (N.C. Bar No. 53205)*
720 E. 4th Street, Suite 300
Charlotte, NC 28202
(336) 685-1647
michelledupreylaw@icloud.com

*Special Appearance Pursuant to Local Civil Rule 83.1(d)*

**NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY**

Jeffrey Smythe, Secretary
512 North Salisbury Street
Raleigh, NC 27604

**JEFF JACKSON**
**ATTORNEY GENERAL**

/s/ Elizabeth C. O'Brien
Elizabeth C. O'Brien
Special Deputy Attorney General
eobrien@ncdoj.gov
Terence P. Steed
tsteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, North Carolina 27602
Phone: 919-716-0091
Fax: 919-716-6763
*Attorneys for Defendants*

29