**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JOHN DOE 1, a minor, by and through his parent and natural guarding JANE DOE 1; JOHN DOE 2, a minor, by and through his parent and natural guardian JANE DOE 2; on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; JEFFREY SMYTHE, Secretary of the North Carolina Department of Public Safety, in his official capacity; WILLIAM L. LASSITER, Deputy Secretary of the Division of Juvenile Justice and Delinquency Prevention, in his official capacity; TIEA DANIELS, Facility Director of the Cabarrus Regional Juvenile Detention Center, in her official capacity,<br><br>      Defendants. | No. 1:24-CV-00017-CCE-JGM<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR FINAL SETTLEMENT APPROVAL** |

Plaintiffs John Doe 1 and John Doe 2, on behalf of themselves and of a class of pre-adjudication juveniles detained at the Cabarrus Regional Juvenile Detention Center (the "Cabarrus JDC"), submit this memorandum of law in support of the Parties' Joint Motion for Final Settlement Approval (the "Motion") (ECF No. 110).

More than two years ago, Plaintiffs brought this lawsuit to address the use of solitary confinement in juvenile detention centers operated by the North Carolina Department of Public Safety ("NCDPS"). This Court certified a class of all pre-adjudication juveniles who are now or will be detained at the Cabarrus JDC, a facility located just north of Charlotte, North Carolina. As representatives of that class, Plaintiffs negotiated a resolution of this lawsuit that Plaintiffs believe will address the constitutional violations that led them to file suit. The proposed settlement agreement (the "Proposed Settlement Agreement") will heavily restrict NCDPS's ability to confine juveniles to their cells for lengthy periods of time and will install an independent monitor to evaluate Defendants' compliance with the settlement. The Parties ask the Court to issue an order granting final approval of the Proposed Settlement Agreement.

In evaluating Proposed Settlement Agreement for final approval, courts in the Fourth Circuit consider whether the agreement is fair, adequate, and reasonable. The Proposed Settlement Agreement in this case meets all three requirements.

The Proposed Settlement Agreement is fair. It is the product of more than a year of negotiations, which have involved two in-person mediations (one lasting more than twelve hours), a remote mediation, and countless calls between counsel for the Parties. In these negotiations, Plaintiffs have had the benefit of hundreds of thousands of documents produced by the Defendants and seven depositions of key employees, giving Plaintiffs adequate information to reach a reasonable assessment of their likelihood of success at

2

trial. The settlement negotiations have been hard fought. Counsel have exchanged numerous drafts and have, at one time or another, edited nearly every paragraph in the 28-page settlement agreement. The Parties have also vigorously litigated the case in general. The Parties have brought multiple disputes to the Court, including a discovery dispute resolved via a contested hearing one week before the Parties reached a settlement. The Court should have no doubt that the settlement agreement represents the Parties' arms-length negotiation of contested issues, in which Plaintiffs' counsel have vigorously advanced the interests of the class.

The Proposed Settlement Agreement is adequate. Plaintiffs have received sufficient discovery to understand the strengths of their case and the potential challenges associated with trial. Plaintiffs continue to believe that they will prevail if this case goes to trial. Plaintiffs are, however, cognizant of the challenges associated with proving their case given that the key witnesses to Defendants' constitutional violations come from a transient population of juveniles, many of whom are impacted by mental health conditions. Moreover, Plaintiffs believe that a negotiated settlement—rather than a judgment imposed after trial—is the best way to effectuate lasting structural change to the policies and practices at the Cabarrus JDC.

The Proposed Settlement Agreement is reasonable. Its terms largely mirror the relief Plaintiffs requested in their Complaint, and any compromise represents counsel's reasoned balancing of the potential relief the Court might grant after trial against the risk of securing less relief—or none at all—after trial.

3

At the Court's direction, Defendants notified class members of the Proposed Settlement Agreement by posting a notice in all housing units at the Cabarrus JDC where class members are housed. The proposed notice provided an overview of the key terms of the settlement agreement and apprised the class members of how to review the entire Proposed Settlement Agreement and how to bring any objections to the settlement to the Court's attention. The notice process complied with the Fourth Circuit's requirements.

The Proposed Settlement Agreement is the culmination of more than a year of negotiation and, in the parties' view, represents a nuanced approach to resolving highly complex issues. The parties ask that the Court issue an order granting final approval to the Proposed Settlement Agreement so that the juveniles housed at the Cabarrus JDC may begin to benefit from its terms.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

**I.     Litigation History.**

At the time they filed this lawsuit in January 2024, Plaintiffs were children detained at the Cabarrus JDC, a facility operated by NCDPS just north of Charlotte, North Carolina. (ECF No. 1 ¶¶ 20–21.) Plaintiffs had not been adjudicated delinquent (the equivalent in the juvenile justice system to being found guilty as an adult). (*Id.* ¶¶ 161, 176.) Rather, Plaintiffs were held prior to the adjudication of their cases and were, therefore, the juvenile equivalent of pre-trial detainees. (*Id.*)

Plaintiffs challenged the conditions of their confinement at the Cabarrus JDC and alleged that similar conditions occurred in other juvenile detention centers operated by

4

NCDPS across the state of North Carolina. (ECF No. 1 ¶¶ 54–90.) Specifically, Plaintiffs alleged that NCDPS routinely kept them and other pre-adjudication juveniles in solitary confinement, locking them in single-occupancy cells for more than 23 hours a day for weeks at a time as a punishment for disciplinary incidents and as a response to inadequate staffing. (*Id.*) According to Plaintiffs, solitary confinement harmed their mental health and violated the Eighth and Fourteenth Amendments to the United States Constitution. (*Id.* ¶¶ 161–191, 208–228.)

On October 22, 2025, the Court certified a class consisting of "[a]ll pre-adjudication juveniles who are currently, or in the future will be, detained in the Cabarrus Juvenile Detention Center." (ECF No. 90.)

The parties have conducted extensive discovery. Plaintiffs have served 108 requests for production, 29 interrogatories, and 23 requests for admission. (Lindholm Decl. ¶ 3.) In response, Defendants have produced hundreds of thousands of pages of documents, including internal emails from dozens of custodians and log files showing instances of confinement at the Cabarrus JDC. (*Id.*) Plaintiffs have inspected three juvenile detention centers, including the Cabarrus JDC. (*Id.* ¶ 4.) Plaintiffs have taken seven depositions, including a corporate representative deposition of NCDPS and depositions of key leaders within NCDPS and at the Cabarrus JDC. (*Id.* ¶ 5.) Defendants, in turn, have deposed both class representatives. (*Id.* ¶ 6.) Both sides have designated expert witnesses and have served expert reports. (*Id.* ¶ 7.) Plaintiffs sought discovery from third party Disability Rights North Carolina ("DRNC"), an organization that monitors the conditions at North

Carolina juvenile detention centers, resulting in motion practice and a hearing in the Eastern District of North Carolina when DRNC resisted the subpoena. *See Doe v. Disability Rts. N. Carolina*, No. 5:25-MC-4-RJ, 2025 WL 1171582, at *1 (E.D.N.C. Apr. 22, 2025) (compelling document production); Lindholm Decl. ¶ 9. The only discovery outstanding when the parties reported settlement—11 days before discovery was set to close—was depositions of both sides' expert witnesses and depositions of two NCDPS fact witnesses, pursuant to the Court's February 20, 2026 Text Order. (*Id.* ¶ 8.)

The parties have vigorously litigated this case. Defendants opposed Plaintiffs' motion to certify a class. (ECF No. 45.) The parties have exchanged countless letters regarding discovery disputes. (Lindholm Decl. ¶ 11.) Three of these disputes resulted in contested hearings. (*Id.* ¶ 11.) For example, Plaintiffs moved the Court to allow them to interview juveniles during their inspection of the Cabarrus JDC, which Defendants opposed. (ECF Nos. 35, 36.) Plaintiffs sought Court intervention regarding Defendant's failure to timely complete discovery. (ECF No. 58.) Most recently, Plaintiffs moved the Court to allow additional depositions of two fact witnesses. (ECF No. 100.)

The Parties notified the Court of settlement on February 26, 2026. (ECF No. 102.) At this point, few deadlines remain. Notice came less than two weeks before the close of all discovery on March 9, 2026. (ECF No. 94.) If the Court does not approve the Proposed Settlement Agreement, the parties anticipate filing motions for summary judgment and motions in limine, including *Daubert* motions, before this case is set for trial in October 2026. (ECF No. 95.)

## II. Settlement Negotiations.

The Parties negotiated a settlement agreement (the "Proposed Settlement Agreement") over the course of fourteen months. The Parties first discussed settlement during an in-person mediated settlement conference on December 4, 2024 with mediator Frank Laney, previously the Circuit Mediator for the Fourth Circuit Court of Appeals for twenty-five years. (Lindholm Decl. ¶ 12.) Although the Parties did not reach settlement then, the Parties continued to discuss potential settlement, both directly and through Mr. Laney. (*Id.* ¶ 13.) The Parties and Mr. Laney reconvened for a second, remote mediation on March 12, 2025. (*Id.* ¶ 14.) Throughout the remainder of the year, counsel for both Parties negotiated the terms of the Proposed Settlement Agreement directly via email and conference calls, exchanging numerous drafts. (*Id.* ¶ 15.) Plaintiffs' counsel believed then, as now, that a negotiated settlement was the most effective means of securing certain and lasting relief for the class. (*Id.* ¶ 16.) The Parties therefore asked the Court three times to extend case deadlines so that the Parties could focus on settlement. (*Id.* ¶ 17; ECF Nos. 71, 72, 73.)

On January 6, 2026, the Parties held their third mediated settlement conference with Mr. Laney in Raleigh. (Lindholm Decl. ¶ 18.) The in-person mediation lasted more than twelve hours and brought the Parties close to settlement. (*Id.*) After the mediation, the Parties continued to exchange drafts of the settlement agreement and to negotiate via numerous conference calls between counsel. (*Id.* ¶ 19.) On February 26, 2026, the Parties reached a settlement in principle and notified the Court. (*Id.* ¶ 20; ECF No. 102.)

### III. Overview of Settlement Terms.

The Proposed Settlement Agreement primarily addresses NCDPS's use of room confinement at the Cabarrus JDC, the overall conditions of confinement at the Cabarrus JDC, and systems for ensuring compliance with the terms of the agreement. (Lindholm Decl. ¶ 21.) The Proposed Settlement Agreement spans 28 single-spaced pages and contains seventeen sections. (*See* D.E. 104-1) Under the Proposed Settlement Agreement, NCDPS may only use room confinement in limited circumstances.

#### A. Use of Room Confinement.

The most significant provisions of the Proposed Settlement Agreement restrict NCDPS's use of "room confinement," defined as "the involuntary restriction of a juvenile alone in a cell, room, or other area, during Waking Hours" (i.e., from 7 am until 9 pm). In keeping with NCDPS's internal nomenclature, the Proposed Settlement Agreement separates room confinement into two categories: Temporary Room Confinement ("TRC") and Administrative Room Confinement ("ARC"). (Lindholm Decl. ¶ 22.) These designations differ in name only: the end result is the same; under either designation, a juvenile is locked in his cell alone. (*Id.*)

#### 1. Temporary Room Confinement.

Under the Proposed Settlement Agreement, NCDPS may use room confinement "[w]hen a juvenile poses an imminent threat to the physical safety of other juveniles and/or staff members and all less restrictive measures will not adequately address the threat." (D.E. 104-1, ¶ IA.1.) This represents a significant departure from NCDPS's current policy

regarding what it terms "Temporary Room Confinement," which allows NCDPS to place juveniles in room confinement "to protect the juvenile from himself; to protect others from the juvenile; to protect state or personal property from destruction by the juvenile; or to protect the security and/or orderly management of the detention center." (Lindholm Decl. ¶ 23.)

The Proposed Settlement Agreement also provides that "Temporary Room Confinement shall be for the minimum period of time necessary to resolve the threat" leading to room confinement. (D.E. 104-1, ¶ I.A.1.a.i.) This provision is designed to end NCDPS's practice—if not official policy—of imposing extended Temporary Room Confinement even when juveniles no longer present (or never presented) a threat to others. (Lindholm Decl. ¶ 25.)

The Proposed Settlement Agreement prevents NCDPS from using room confinement for punitive purposes. Plaintiffs allege—and believe that discovery has demonstrated—that NCDPS staff members routinely impose room confinement for set periods of time in response to relatively minor rule infractions, such as juveniles trading snacks or talking back to staff members. (Lindholm Decl. ¶ 26.) To address these issues, the Proposed Settlement Agreement provides that "Room Confinement shall never be used as a punishment for violating a policy or rule." (D.E. 104-1, ¶ I.A.2.) This means that NCDPS may not use room confinement "for a pre-determined period of time," (*id.* ¶ I.A.1.a.i.), and that "the sole justification for Room Confinement shall never be that a juvenile has violated a policy or rule," (*id.* ¶ I.A.2.).

If a juvenile is repeatedly placed in room confinement due to that juvenile's risk to other juveniles and staff members, NCDPS must "develop and implement an individual behavior management plan for such juvenile to address the underlying causes and focus on helping the juvenile develop the skills the juvenile needs to avoid future placement in Temporary Room Confinement." (D.E. 104-1, ¶ II.D.)

### 2. Administrative Room Confinement (Medical, Weather, and Security).

The Proposed Settlement Agreement maintains NCDPS's ability to use room confinement when necessary "to protect the health and medical safety of the juvenile and/or facility," (D.E. 104-1, ¶ I.A.1.b.), to protect juveniles from harm during a "severe weather event," (*id.* ¶ I.A.1.c.), and "[w]hen safety concerns affecting more than one juvenile, such as a disturbance or investigation, require temporary restriction of movement," (*id.* ¶ I.A.1.d.). In their Complaint, Plaintiffs did not challenge NCDPS's use of these specific justifications for room confinement. (Lindholm Decl. ¶ 27.) Plaintiffs have also not seen discovery materials suggesting that NCDPS's use of these three forms of Administrative Room Confinement violates the U.S. Constitution. (*Id.*) Accordingly, Plaintiffs do not believe that leaving the policies concerning such forms of Administrative Room Confinement intact impacts the benefits of the Proposed Settlement Agreement. (*Id.*)

### 3. Administrative Room Confinement (Staffing).

The Proposed Settlement Agreement addresses NCDPS's overuse of room confinement to address staffing shortages. Based on their own experiences, discovery conducted in this matter, and Defendants' representations, Plaintiffs believe that

chronically low staffing is one of the root causes of NCDPS's use of solitary confinement in the Cabarrus JDC. (Lindholm Decl. ¶ 28.) Defendants have represented that the Prison Rape Elimination Act ("PREA") requires them to confine juveniles to their cells to maintain a ratio of one certified staff member to eight juveniles during waking hours and have routinely used Administrative Room Confinement (Staffing) for that purpose. (*Id.* ¶ 29.)

Staffing is a nuanced issue that requires a nuanced solution. No settlement agreement—in fact, no court order—can create willing workers where there are none. The Proposed Settlement Agreement therefore aims to help the Cabarrus JDC solve its staffing shortage and mitigate the impact on class members if the Cabarrus JDC drops below the 1:8 PREA ratio. (*Id.* ¶ 30.) Under the Proposed Settlement Agreement, NCDPS may only use room confinement due to "critically low" staffing when NCDPS "has exhausted all reasonable means of achieving the 1:8 ratio," a departure from NCDPS's current policy, which gives the Department discretion to use room confinement as a means of first resort. (D.E. 104-1, ¶ I.A.1.e.) When all reasonable alternatives fail, the Proposed Settlement Agreement requires NCDPS to develop a "'Modified Programming Schedule' to be used during critical staffing shortages," which shall include "rotating groups of juveniles out of their cells so that the critical staffing shortage does not disproportionately impact one group of juveniles." (*Id.* ¶ I.A.1.e.i.) Any time the Cabarrus JDC uses room confinement due to low staffing, facility leadership must immediately report the staffing shortage to NCDPS leadership and to the Monitor. (*Id.* ¶ I.A.1.ii.) If room confinement due to a staffing

11

shortage lasts more than four hours, the facility must report the situation to the Director of Facility Operations, a senior NCDPS official, and must also "take reasonable steps to resolve" any staffing shortage. (*Id.* ¶ I.A.1.e.ii.) NCDPS must also consider in good faith an independent monitor's recommendations regarding how to resolve any issues impacting staffing at the Cabarrus JDC. (*Id.* ¶ IV.A.)

**B.  Conditions of Confinement.**

The Proposed Settlement Agreement includes numerous provisions addressing the conditions of confinement at the Cabarrus JDC.

- Except while in room confinement, "[a]ll juveniles shall be given an opportunity to eat at least two meals outside of their rooms" (D.E. 104-1, ¶ I.A.3.);

- In the rare instances NCDPS places a juvenile in room confinement for more than eight continuous hours, NCDPS must arrange for a mental health professional to visit the juvenile to help lessen the impact of prolonged isolation on the juvenile (*id.* ¶ II.B.);

- Juveniles in room confinement must "receive all regularly scheduled, mental health services, medical services, and educational services to which they are entitled to under the law" (*id.* ¶ II.C.);

- To mitigate the impact of room confinement on educational development, "[f]or juveniles remaining in Room Confinement for more than two hours during the school day, staff must bring class/homework assignments, assigned by the

12

teacher whose class the juvenile otherwise would attend, to the juvenile so that the juvenile may complete such assignments" (*id.* ¶ III.A.4.); and

- NCDPS must also take "reasonable measures to maintain sufficient education staff at the Cabarrus JDC to provide educational services to all juveniles, including those in Room Confinement" (*id.* ¶ III.A.3.);

### C.      Monitoring.

The Proposed Settlement Agreement requires NCDPS to retain an independent Monitor.  The Monitor shall "monitor [Defendants'] compliance with this Agreement and to provide Defendants advice and expertise regarding the implementation of the requirements of this Agreement."   (D.E. 104-1, ¶ V.A.1.)   The Monitor shall have "complete access to staff, juveniles, juvenile records at Cabarrus JDC, and reasonable access to the Cabarrus JDC facility," (*id.* ¶ V.A.2.), and may observe the ordinary operation of the Cabarrus JDC outside the presence of Cabarrus JDC staff, (*id.* ¶ V.D.2.a.).  The Monitor "shall conduct at least two visits to the Cabarrus JDC each year during the term of the Agreement" and may visit more frequently if she chooses.  (*Id.* ¶ V.C.1.)  The Monitor may conduct these visits with only an hour's advance notice.  (*Id.* ¶ V.C.2.)

The Monitor must prepare semi-annual reports evaluating "the extent to which Defendants have successfully implemented this Agreement, any plans to effectuate its terms, and recommend specific actions the Monitor believes Defendants must make to achieve compliance."   (D.E. 104-1, ¶ V.F.1.)  These monitoring reports, which will be available publicly on NCDPS's website, will form the basis of any determination that

13

Defendants are in substantial compliance with the terms of the Proposed Settlement Agreement.

The Parties have agreed that Teresa Abreu will serve as the Monitor. (D.E. 104-1, ¶ V.A.3.) Ms. Abreu is an attorney with significant experience serving as a monitor in other cases involving the juvenile justice system. (Lindholm Decl. ¶ 31.) The Parties' counsel have interviewed Ms. Abreu multiple times and believe she will adequately protect the interests of the class in overseeing the implementation of the Proposed Settlement Agreement. (*Id.* ¶ 32.)

### D.     Internal Compliance.

The ultimate goal of the Proposed Settlement Agreement is for NCDPS to put in place processes that prevent the recurrence of the issues giving rise to this litigation even when not under the watchful eye of the Monitor. The Proposed Settlement Agreement requires NCDPS to work with the Monitor to "develop a quality assurance system that develops and implements internal processes for monitoring compliance with the terms of this Agreement and identifies trends and corrects deficiencies with regard to the use of Room Confinement, the behavior management program and juveniles' access to education at the Cabarrus JDC." (D.E. 104-1, ¶ VI.B.) NCDPS has also committed to revising its policies and procedures relating to room confinement and to provide training to its staff regarding the revised policies, positive behavior management, de-escalation training, and staff retention. (*Id.* ¶¶ VI.D–F.)

14

### E.   Term and Termination.

The Proposed Settlement Agreement will terminate five years after its effective date unless one of the following events occurs:

- Defendants maintain substantial compliance with the terms of the Proposed Settlement Agreement, as determined by the Monitor, for eighteen consecutive months, at which point the agreement will terminate (D.E. 104-1, ¶ VIII.B.1.);

- The Court grants Defendants' motion to terminate the agreement under 18 U.S.C. § 3626(b), though Defendants agree not to move under this provision for two years after the effective date of the agreement (*id.* ¶ VIII.B.2.);

- The Parties agree to extend the agreement beyond its initial five-year term (*id.* ¶ VIII.B.3.); and

- Plaintiffs move to extend the term of the agreement, if Defendants have not achieved substantial compliance with the terms of the agreement (*Id.* ¶ VIII.B.3.).

## IV.   Notice

On May 26, 2026, the Court approved the Parties' proposed Notice to class members regarding the contents of the Proposed Settlement Agreement.  (ECF No. 108.)  NCDPS posted copies of the Notice "in prominent and visible locations accessible to all pre-adjudication juveniles housed at the Cabarrus Regional Juvenile Detention Center," which "will remain posted through the Fairness Hearing."  (ECF No. 109 ¶ 3.)  NCDPS also delivered a copy of the Notice "to each pre-adjudication juvenile housed at the Cabarrus

Regional Juvenile Detention Center" and posted a copy of the Notice "on the North Carolina Department of Public Safety's public website." (*Id.* ¶¶ 4–5.) Finally, copies of the Proposed Settlement Agreement "are available for review by juveniles" at the Cabarrus JDC. (*Id.* ¶ 7.) Plaintiffs are not aware of any class members who have objected to the Proposed Settlement Agreement. (Lindholm Decl. ¶ 39.)

## LEGAL STANDARD

Under Rule 23(e), "a class action shall not be dismissed without the approval of the court." Fed. R. Civ. P. 23(a). "The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991). The Court may only approve a class settlement "on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).[1]

## ARGUMENT

**I. The Court should approve the Proposed Settlement Agreement under Rule 23(e).**

**A. The Proposed Settlement Agreement is fair.**

"In determining whether the settlement is fair, [the Fourth Circuit] has identified the following factors the district court may consider . . . : '(1) the posture of the case at the

---

[1] Although "Federal Rule of Civil Procedure 23(e)(2) has been amended and now sets forth factors for the district court to assess in evaluating fairness, reasonableness, and adequacy," the Fourth Circuit "continues to apply its own standards as they 'almost completely overlap with the new Rule 23(e)(2) factors,' rendering the analysis the same." *Herrera v. Charlotte Sch. of L., LLC*, 818 F. App'x 165, 176 (4th Cir. 2020) (*citing In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020) [hereinafter *In re Lumber Liquidators*]).

time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation.'" *Herrera,* 818 F. App'x at 176 (quoting *In re Lumber Liquidators*, 952 F.3d at 484). The Parties, represented by counsel with decades of experience, have reached the Proposed Settlement Agreement at the close of discovery, after more than a year of negotiations. All factors therefore support final approval of the Proposed Settlement Agreement.

### 1. The stage of the case.

Discovery has largely concluded; if not settled, the case will proceed to dispositive motions and trial this year. *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("The fact that all discovery has been completed and the cause is ready for trial is important, since it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case.")

### 2. The extent of discovery.

The Parties have conducted extensive discovery, allowing them to "'adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation.'" *Lewis v. Precision Concepts Grp. LLC*, No. 1:18CV64, 2021 WL 7185505, at *4 (M.D.N.C. Mar. 23, 2021) (quoting *West v. Cont'l Auto., Inc.*, No. 316CV00502FDWDSC, 2018 WL 1146642, at *4 (W.D.N.C. Feb. 5, 2018)). Plaintiffs have served more than one hundred document requests and twenty-nine interrogatories on Defendants. (Lindholm Decl. ¶ 3.) In response, Defendants have produced hundreds of

thousands of documents, consisting of internal emails and data regarding the Cabarrus JDC. (*Id.*) Plaintiffs' counsel and their experts have inspected multiple juvenile detention centers, and Plaintiffs' experts have interviewed multiple juveniles detained at the Cabarrus JDC. (*Id.* ¶ 4.) Both sides have submitted expert witness reports. (*Id.* 7.) The parties have collectively taken nine depositions. (*Id.* ¶¶ 5–6.) Plaintiffs have received discovery from a third party corroborating the allegations in their Complaint. (*Id.* ¶ 9.) The extent of discovery in this matter supports a finding that the Proposed Settlement Agreement is fair. *See Lewis*, 2021 WL 7185505, at *4 (settlement fair where "[t]he parties engaged in extensive written discovery [and] conducted nearly ten (10) depositions between the parties").

### 3. The circumstances regarding the negotiation of the settlement agreement.

The third factor is primarily concerned with confirming "the want of collusion in the settlement." *Olvera-Morales v. Int'l Labor Mgmt. Corp., Inc.*, No. 1:05CV559, 2008 WL 11490499, at *1 (M.D.N.C. Oct. 10, 2008) (citing *Flinn,* 528 F.2d at 1173). Collusion is generally only a concern where a settlement is reached "at a very early stage in the litigation and prior to any formal discovery." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159. In contrast, here, the Proposed Settlement Agreement comes at the close of discovery and is the product of more than a year of negotiations. *See Flinn*, 528 F.2d at 1174 (that settlement "followed protracted discussions" demonstrated fairness of settlement agreement); Lindholm Decl. ¶¶ 12–20. Settlement negotiations involved two in-person mediations with the former Circuit Mediator for the Fourth Circuit (one stretching more

18

than 12 hours), one remote mediation, and numerous settlement conferences between counsel for the Parties. *See Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400-BR, 2009 WL 2208131, at *24 (E.D.N.C. July 22, 2009) ("extended nature" of settlement negotiations, which lasted more than one year and included three mediations, "numerous conference calls and in-person sessions in various locations" demonstrated fairness of proposed settlement agreement); Lindholm Decl. ¶¶ 12–20. Moreover, "the attorneys for the respective Parties have vigorously advanced the interests of their respective clients" by briefing numerous contested motions regarding class certification and discovery. *West*, 2018 WL 1146642, at *5; Lindholm Decl. ¶ 11. The Parties have not colluded in preparing the settlement agreement.

### 4. The experience of counsel in the area of class action litigation.

Counsel for both sides have decades of experience, including significant experience with class action litigation. The Court has already found Plaintiffs' counsel sufficiently experienced to serve as class counsel. (ECF No. 90.) And as Defendants noted in the context of one discovery dispute, Plaintiffs' counsel have worked tirelessly to advance the class's interests. (ECF No. 60 (noting that Plaintiffs' counsel routinely work on "the eve of a holiday or late on a Friday").) Counsel would also submit that their competency to bring this case to a fair conclusion is shown through "the intricacies and comprehensiveness of the proposed settlement," a 28-page single-spaced document addressing in detail numerous aspects of the juvenile justice system. *Beaulieu*, 2009 WL 2208131, at *25.

\* \* \*

For these reasons, the Court should find that the Proposed Settlement is fair.

## B. The Proposed Settlement Agreement is adequate.

The Fourth Circuit has identified the following factors for "assessing a settlement's adequacy: "(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement." *McAdams v. Robinson*, 26 F.4th 149, 159 (4th Cir. 2022) (*quoting In re Lumber Liquidators*, 952 F.3d at 484).

### 1. The relative strength of the Plaintiffs' case on the merits.

The Proposed Settlement Agreement represents the Parties' reasoned balancing of the strength of Plaintiffs' case against the realities of proving constitutional violations in a highly-controlled prison environment. Plaintiffs believe they have a strong case. (Lindholm Decl. ¶ 33.) If this case goes to trial, Plaintiffs expect to elicit testimony proving that NCDPS kept Plaintiffs and other juveniles at the Cabarrus JDC in isolation for long periods of time and that such isolation harmed them, in violation of the Eighth and Fourteenth Amendments to the federal Constitution. (*Id.*)

### 2. Difficulties of proof.

Plaintiffs are, however, cognizant of the risk of trial. (*Id.* ¶ 34.) At trial, Plaintiffs would primarily have to prove their case through incarcerated juveniles, many of whom

20

are impacted by mental health conditions, and through adverse witnesses employed by Defendants. (*Id.*) The class is, by nature, transient, meaning that few witnesses would have knowledge of the conditions at the Cabarrus JDC over long periods of time. (*Id.* ¶ 35.) Moreover, all current detainees—the only witnesses to the current conditions at the Cabarrus JDC—are in Defendants' control, and Defendants have repeatedly resisted Plaintiffs' efforts to meet with such class members, which would materially impact Plaintiffs' ability to prepare for trial. (*Id.* ¶ 36.)

### 3. Anticipated duration and expense of trial.

Continuing to litigate this case would involve significant expense to both Parties. (*Id.* ¶ 37.) By settling, the Parties have avoided expert depositions, briefing dispositive motions, briefing *Daubert* motions, pre-trial motions practice, and a bench trial. (*Id.*) Due to the importance of the issues at stake in this litigation, both sides likely would have invested significant resources in vigorously litigating the remainder of this case. (*Id.*)

### 4. Solvency.

Because Plaintiffs do not seek monetary damages, the final factor—the solvency of the defendants—is irrelevant.

### 5. The degree of opposition to the settlement.

Plaintiffs are aware of no opposition to the Proposed Settlement Agreement. No class members have contacted class counsel objecting to the terms of the settlement. (Lindholm Decl. ¶ 39.) No absent class members have filed notices of objection to the Proposed Settlement Agreement.

21

\* \* \*

For these reasons, the Court should find that the Proposed Settlement Agreement is adequate.

## C.     The Proposed Settlement Agreement is reasonable.

The Fourth Circuit has "not enumerated factors for assessing a settlement's reasonableness." *In re: Lumber Liquidators*, 952 F.3d at 484. It has, however, "suggested that assessing whether a class settlement is 'reasonable' involves examining the amount of the settlement . . . [to] ensure[] that the amount on offer is commensurate with the scale of the litigation and the plaintiffs' chances of success at trial." *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 527 (4th Cir. 2022).

Although Plaintiffs did not seek—and the Proposed Settlement Agreement does not involve—monetary damages, the Proposed Settlement Agreement includes detailed injunctive relief that "mirrors significant portions of the relief which Plaintiff[s] affirmatively seek[] in [their] Complaint," namely, ending NCDPS's practice of solitary confinement. *Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 340 F.R.D. 242, 250 (D.S.C. 2021). There is no reason to believe that the class would receive meaningfully better relief after trial, and, as discussed above, the risks of trial render settlement a reasonable way to ensure that the class's constitutional rights are protected. (Lindholm Decl. ¶ 38.)

22

## II. Class members were adequately notified of the Proposed Settlement Agreement.

Before a class action may be settled, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The "notice need only 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *McAdams v. Robinson*, 26 F.4th 149, 158 (4th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005)). The notice must also "be 'reasonably calculated, under all the circumstances, to apprise [absent class members] of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* at 157–58 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

The Court previously approved a Notice that meets Rule 23(e)(1)'s requirements. (*See* ECF No. 104-2.) The Notice apprised the class of the key settlement terms, the manner that class members can review the entire proposed settlement, the date and location of the fairness hearing, and instructed class members on how they can be heard on the proposed settlement by writing to the Court. (*Id.*)

Defendant NCDPS has made the Notice and the Proposed Settlement Agreement available to members of the class. Pursuant to the Court's Order, NCDPS posted copies of the Notice "in prominent and visible locations accessible to all pre-adjudication juveniles housed at the Cabarrus Regional Juvenile Detention Center," which "will remain posted through the Fairness Hearing." (ECF No. 109 ¶ 3.) NCDPS also delivered a copy of the

23

Notice "to each pre-adjudication juvenile housed at the Cabarrus Regional Juvenile Detention Center" and posted a copy of the Notice "on the North Carolina Department of Public Safety's public website." (*Id.* ¶¶ 4–5.) Finally, copies of the Proposed Settlement Agreement "are available for review by juveniles" at the Cabarrus JDC. (*Id.* ¶ 7.)

The class members have had a reasonable opportunity to raise any objections to the terms of the Proposed Settlement Agreement. Defendants provided the Notice to class members on June 1, 2026, three months before the Fairness Hearing, which is currently set for September 3, 2026. (ECF No. 109.) Class members at the Cabarrus JD have "access to paper, envelopes, and stamps, which will allow the class members to mail any objections." (ECF No. 107.)

In similar cases involving prisoners and detainees, courts have held that providing notice by, among other things, posting notice in the detention facilities is sufficient, and that individual mailed notice to the entire class is not required. *See, e.g.*, *VanHorn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988) (flyers posted on the walls at correctional facility was sufficient notice); *Hall v. County of Fresno*, No. 1:11–cv–02047–LJO–BAM, 2015 WL 5916741, at *3, *8 (E.D. Cal. Oct. 7, 2015) (approving notice to prisoner class by posting notice in all housing units and hand delivering to prisoners in lockdown and restricted housing units).

All absent class members have had adequate notice of the terms of the Proposed Settlement Agreement and an opportunity to object.

24

## CONCLUSION

The Proposed Settlement Agreement—the product of more than a year of negotiations and more than two years of litigation—vindicates the constitutional rights of the entire class without exposing the class to the risks of trial.  The Court should approve the Proposed Settlement Agreement so that justice may be done.

*[SIGNATURE PAGE FOLLOWS]*

Dated this 6th day of August, 2026

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Robert L. Lindholm*
Robert L. Lindholm
(N.C. Bar No. 52800)
301 South College Street, 23rd Floor
Charlotte, NC 28202
(704) 417-3000
robert.lindholm@nelsonmullins.com

Soren K. Young*
Donna O. Tillis*
Yasmeen Ebbini*
Axton Crolley*
1320 Main Street, 17th Floor
Columbia, SC 29201
(803) 799-2000
soren.young@nelsonmullins.com
donna.tillis@nelsonmullins.com
yasmeen.ebbini@nelsonmullins.com
axton.crolley@nelsonmullins.com

Matthew G. Lindenbaum*
One Financial Center, Suite 3500
Boston, MA 02111
(617) 217-4700
matthew.lindenbaum@nelsonmullins.com

**Law Office of Michelle Duprey, PLLC**

Michelle Duprey (N.C. Bar No. 53205)*
720 E. 4th Street, Suite 300
Charlotte, NC 28202
(336) 685-1647
michelledupreylaw@icloud.com

*Special Appearance Pursuant to Local Civil Rule 83.1(d)*
*Attorneys for Plaintiffs*

26

## CERTIFICATE OF WORD COUNT

Undersigned hereby certifies that the foregoing brief does not exceed 6,250 words, including the body of the brief, headings, and footnotes, but excluding the caption, signature lines, certificate of service, this Certificate of Word Count, and/or any cover page or index.

Dated: August 6, 2026

*/s/ Robert L. Lindholm*
Robert L. Lindholm (N.C. Bar No. 52800)
Nelson Mullins Riley & Scarborough LLP
301 South College Street
23rd Floor
Charlotte, NC 28202
(704) 417-3000
robert.lindholm@nelsonmullins.com

27

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

Dated: August 6, 2026

*/s/ Robert L. Lindholm*
Robert L. Lindholm (N.C. Bar No. 52800)
Nelson Mullins Riley & Scarborough LLP
301 South College Street
23rd Floor
Charlotte, NC 28202
(704) 417-3000
robert.lindholm@nelsonmullins.com